# Exhibit B

Page 1

```
 1         UNITED STATES DISTRICT

 2     EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   NO. 02-2943

 5   ------------------------------------

 6   VANGUARD IDENTIFICATION SYSTEMS,

 7   INC.

 8   VS.

 9   RONNIE E. GOADE, SR., ET AL

10   ------------------------------------

11         Deposition of RONNIE GOADE

12   taken in accordance with the Notice

13   and the Federal Rules of Civil

14   Procedure at the offices of Edwards

15   & Angell, Three Stamford Plaza, 301

16   Tresser Boulevard, Stamford,

17   Connecticut, before Meghan M.

18   English, LSR, a Licensed Shorthand

19   Reporter and Notary Public, in and

20   for the State of Connecticut on

21   Wednesday, June 9, 2004, at 10:14

22   a.m.

23

24      MEGHAN M. ENGLISH, LSR NO. 211
```

Page 86

1  dispute over how much would come out
2  of your pocket in settlement of the
3  litigation versus the DocuSystems
4  pocket?
5  A. There is more of a dispute about
6  negotiations and other things.
7  Settlement was never a serious issue
8  for any of us.
9  Q. Did DocuSystems ever ask you when this
10  settlement proposal arose to pay 2.5
11  million?
12  A. When we received this letter, either I
13  had a conversation with this guy or
14  somebody else. He wasn't even a
15  decision maker on something like this.
16  He shouldn't have been in any
17  negotiation with Vanguard without my
18  approval. None of these things, so we
19  discounted this whole thing.
20  Q. Okay. Why should he have not been in
21  settlement discussions with Vanguard
22  without your approval?
23  A. That was part of our understanding.
24  Q. And that understanding arose out of

Page 87

1  the merger agreement?
2  A. I don't remember what agreement it
3  was, but we had first right of
4  refusal. We had -- I was to be kept
5  abreast of all negotiations,
6  everything with this, and none of
7  those things happened.
8       MR. PERLMAN: I am going to ask
9  the reporter to mark this as number
10  16.
11       (Exhibit Goade 16 was marked for
12  identification, described in index.)
13  BY MR. PERLMAN:
14  Q. Number 16 starting on the second page
15  is entitled subordination agreement?
16  A. Yes.
17  Q. If you turn -- the pages are numbered
18  at the bottom with a stamp DSI then
19  with the number.
20  A. Yes.
21  Q. If you turn to DSI 005531, that's your
22  signature, correct?
23  A. It is, yes.
24       (Exhibit Goade 17 was marked for

Page 88

1  identification, described in index.)
2  BY MR. PERLMAN:
3  Q. The last page of number 17 is entitled
4  Acknowledgement. That's your
5  signature, right?
6  A. It is, yes.
7  Q. Do you recall ever receiving this
8  document?
9  A. No.
10  Q. As I understand your testimony about
11  settling the patent litigation, you
12  always had the authority or right of
13  first refusal, as you said, of whether
14  or not to settle the case; is that
15  right?
16  A. That is correct.
17  Q. You're aware that in July of 2000
18  there was a stipulated judgment in
19  that patent litigation? Are you aware
20  of that?
21  A. Explain that.
22  Q. Well, okay. You're aware that there
23  is a judgment out there for $2 million
24  in the patent litigation, right?

Page 89

1  A. Yes.
2  Q. And did you have any involvement in
3  the -- in that judgment coming into
4  being?
5  A. No.
6  Q. Are you aware that DocuSystems
7  stipulated to the judgment?
8  A. After the fact.
9  Q. After the fact you became aware of it?
10  A. Yes.
11  Q. So they -- I guess you would say they
12  breached the agreement that you had,
13  your understanding of the agreement
14  that you had the right of first
15  refusal; is that right?
16  A. Well, I had the right of first
17  refusal, yes.
18  Q. Well, did you approve that stipulated
19  judgment?
20  A. No.
21  Q. And after it was entered did you --
22  were you upset about it?
23       MR. ZAKEN: At what point in
24  time?

Page 90

1    MR. PERLMAN: Immediately after
2  it was entered.
3    MR. ZAKEN: Object to the form.
4  I don't know if you have established
5  that he was aware of it immediately,
6  whatever that means, but answer the
7  question if you can.
8    THE WITNESS: No, I wasn't upset
9  about it.
10 BY MR. PERLMAN:
11 Q. Well, when did you become aware of it?
12 A. When they tried to sell me the assets
13   of the company, then I became aware of
14   it. "They" being Heller Financial.
15 Q. So would you have approved of it if
16   you had known about it in advance?
17 A. No. No.
18 Q. So why is it that you didn't care
19   about it when you found out about it
20   afterwards?
21 A. It's not that I didn't care. It's
22   just that the company was bankrupt.
23   They had taken this great company
24   that I had built for thirty years and

Page 91

1  all of this stuff was just part of the
2  mismanagement on their part. This was
3  just part of it. They owed me a lot
4  of money. They owed me a lot more
5  than money, that more than anything
6  coming off of this thing as far as I
7  was concerned.
8 Q. How did -- how did you -- I mean who
9   told you about the judgment? What was
10  the actual circumstance of you
11  learning about it?
12 A. When I was contacted by somebody -- I
13   don't remember who -- telling me that
14   they were in the tank. That was it.
15   And they said that there had been this
16   judgment by Vanguard, which I was
17   amazed to even hear about. I don't --
18   I mean it's like they didn't even show
19   up. It was just like they just walked
20   in, said we haven't got the money to
21   fight this and it was over. It wasn't
22   any big deal. I mean he was given
23   judgment to a company that was
24   bankrupt.

Page 92

1 Q. It wasn't that big a deal because the
2   company was bankrupt and couldn't pay
3   the judgment anyway?
4    MR. ZAKEN: Objection to the
5  form.
6    THE WITNESS: It was a huge deal
7  that the company was bankrupt. They
8  owed me a lot of money.
9  BY MR. PERLMAN:
10 Q. Well, I am not referring to the
11   bankruptcy, but the judgment wasn't a
12   big deal because the company was
13   bankrupt.
14    MR. ZAKEN: Is there a question?
15    MR. PERLMAN: Yes.
16    MR. ZAKEN: Could you read back
17  the question? I am sorry.
18    (Whereupon the last question was
19  read by the court reporter.)
20    MR. ZAKEN: I don't hear a
21  question.
22    MR. PERLMAN: Well, I was
23  referring to the prior question. I
24  will start over again.

Page 93

1  BY MR. PERLMAN:
2  Q. You said it wasn't any big deal, and I
3    am saying are you saying that the
4    judgment wasn't any big deal because
5    the company was bankrupt?
6     MR. ZAKEN: Objection to the
7   form. You said it wasn't a big deal.
8   I never heard Mr. Goade say that. I
9   object to the form.
10    MR. PERLMAN: I think he did say
11  that.
12  BY MR. PERLMAN:
13  Q. Can you answer the question, Mr.
14    Goade?
15  A. If I used that word, it was poor
16    judgment on my part. The situation
17    was, as I understand it, Vanguard
18    received a call saying that
19    DocuSystems was going bankrupt and
20    they had this date set and they
21    went -- Altheimer & Gray or somebody
22    showed up and they said, We don't have
23    the money to defend this. They hadn't
24    paid Dunlap & Codding or anybody and

24 (Pages 90 to 93)

CUNNINGHAM SERVICES, INC.
1-800-842-4486

Page 94

1  do what you want to and that was it.
2  So they had judgment against a company
3  that was for all intent purposes
4  bankrupt. So if I had sued them and
5  got $100 million judgment, it wouldn't
6  have been any big deal because they
7  didn't have any money. Does that
8  answer your question?
9  Q. Yes.
10     Were you concerned
11  about your having to indemnify
12  DocuSystems if the judgment was
13  entered?
14 A. No.
15 Q. No?
16 A. No.
17 Q. Were you concerned about buying the
18  assets of Stik/Strip and, you know,
19  running a business based on those
20  assets when the judgment was entered
21  against Stik/Strip?
22 A. I was buying the assets of the
23  company. I wasn't buying the
24  corporation.

Page 95

1  Q. So you're saying you weren't concerned
2   because you were buying the assets and
3   you weren't buying the corporation?
4  A. I was buying the assets to build a new
5   company. I wasn't buying the old
6   corporation who had the judgment
7   against them from Vanguard.
8  Q. So it was your understanding that you
9   would take the assets and build a new
10  company and be free of the judgment
11  because you weren't buying the
12  corporation against which the judgment
13  was entered; is that right?
14     MR. ZAKEN: Objection to form.
15     THE WITNESS: Be free? I don't
16  know what you mean. I mean the
17  judgment was there against Stik/Strip
18  which was wholly owned by DocuSystems
19  which was now bankrupt, so no, I
20  didn't have any reason to think that I
21  was -- that I was involved in any of
22  that, no.
23  BY MR. PERLMAN:
24 Q. Now when you were employed by

Page 96

1   DocuSystems after the 1998
2   transaction, things kind of went sour
3   between you and DocuSystems?
4  A. Yes.
5  Q. How did that happen?
6  A. A lot of reasons: Poor management,
7   putting product out on the street that
8   was faulty, inconsistencies in
9   accounting. A lot of things. They
10  were not keeping me abreast. I wasn't
11  allowed to do my job. A lot of
12  things.
13 Q. When did the falling out begin?
14 A. Two weeks after I sold the company.
15 Q. And what was the incident two weeks
16  afterwards that started things to go
17  sour?
18 A. They virtually fired all of the people
19  in quality control, all of the people
20  in customer service. They substituted
21  inferior products for products that
22  had been sold. They changed the whole
23  way that the company was being ran,
24  and I had a serious issue with that.

Page 97

1  Q. So two weeks into it they started
2   firing people?
3  A. That's right.
4  Q. And they changed the products. Did
5   that also occur like in two weeks or
6   was that -- did that occur within two
7   weeks or at a later point in time?
8  A. It was like days after the company was
9   sold.
10 Q. And do you know why they made those
11  changes, the personnel changes and the
12  product changes?
13    MR. ZAKEN: Object to the form.
14    THE WITNESS: To make more money.
15 BY MR. PERLMAN:
16 Q. They thought they were going to make
17  more money?
18 A. That's correct.
19 Q. And you had no idea that that was
20  their plan when you sold the company
21  in May of 1998?
22 A. Absolutely not.
23 Q. And why did that -- why did that
24  disturb you? Was it because it would

Page 182

1  ERRATA
2
3  PG/LN   NOW READS:    SHOULD READ:
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

Page 184

1      Witness my hand as Notary Public
2  the ___16th day of ___June_____,
3  2004.
4
5
6  _____
7  MEGHAN M. ENGLISH, LSR
8  Notary Public
9  LSR NO. 211
10 My Commission Expires October 31, 2007

Page 183

1           CERTIFICATE
2
3      I hereby certify that I am a
4  Notary Public, in and for the State of
5  Connecticut, duly commissioned and
6  qualified to administer oaths.
7
8      I further certify that the
9  deponent named in the foregoing deposition
10 was by me duly sworn, and thereupon
11 testified as appears in the foregoing
12 deposition; that said deposition was taken
13 by me stenographically in the presence of
14 counsel and reduced to typewriting under
15 my direction, and the foregoing is a true
16 and accurate transcript of the testimony.
17
18     I further certify that I am
19 neither of counsel nor attorney to either
20 of the parties to said suit, nor am I an
21 employee of either party to said suit, nor
22 of either counsel in said suit, nor am I
23 interested in the outcome of said cause.
24

CUNNINGHAM SERVICES, INC.
1-800-842-4486