## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VANGUARD IDENTIFICATION SYSTEMS, INC.** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **02-2943** |
| | : | |
| **v.** | : | |
| | : | |
| **RONNIE E. GOADE, SR.,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

AND NOW, this _____ day of _____, 2004, upon consideration of Plaintiff's

Motion for Partial Summary Judgment, supporting memorandum, Defendants' Opposition

thereto, and the record as a whole, it is hereby **ORDERED** that Plaintiff's Motion is DENIED in

its entirety.

**BY THE COURT:**

_____
, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VANGUARD IDENTIFICATION SYSTEMS, INC., | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | NO. 02-2943 |
| | : | |
| v. | : | |
| | : | |
| RONNIE E. GOADE, SR., et al. | : | |
| | : | |
| Defendants. | : | SEPTEMBER 1, 2004 |
| | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants REG Oklahoma Acquisitions, LLC (individually, "REG"), Ronnie E. Goade,

Sr. (individually, "Goade"), The Ronnie E. Goade, Sr. Revocable Trust (individually, "Goade

Trust"), Renise Goade Lee, Ron E. Goade, Jr., Sean Goade, and Susan M. Goade (collectively,

"Defendants"), hereby submit this Memorandum of Law in Opposition to Vanguard

Identification Systems, Inc.'s ("Vanguard's") Motion for Partial Summary Judgment ("Motion").

In its Motion, Vanguard claims that it is entitled to summary judgment on the "successor

liability" count of its Amended Complaint. Vanguard's Motion should be denied. REG cannot

be deemed the "successor" to Stik/Strip Laminating Company, Inc. ("Stik/Strip") for liability

purposes, because REG was a good faith purchaser of Stik/Strip's assets in a sale conducted

pursuant to the Uniform Commercial Code.

Even if the U.C.C. does not automatically preclude REG from being deemed Stik/Strip's

"successor in interest," Vanguard's Motion should still be denied, because Vanguard has utterly

failed – and indeed has not even attempted – to demonstrate that REG is the legal successor to

Stik/Strip under the traditional exceptions to the general rule of non-successor liability. Instead, Vanguard bases its entire Motion on the "continuity of enterprise" theory – a successor liability standard that has absolutely no application in this case.

Lastly, even if the "continuity of enterprise" theory were the correct standard, Vanguard's Motion should still be denied. In analyzing Vanguard's Motion, the court must construe the facts of this case in a light most favorable to Defendants, the non-moving party. When the facts are construed in a light most favorable to Defendants, REG cannot be deemed Stik/Strip's successor in interest under the "continuity of enterprise" theory.

## II.    STATEMENT OF RELEVANT FACTS[1]

### A.    The 1998 Sale of Stik/Strip to DSI

In 1969, Ron E. Goade, Sr. ("Goade") founded Stik/Strip. See Deposition of R. Goade, taken 8/3/98, at 26-27 (Appendix, Exhibit 1).[2] In late 1997, Goade was approached by Tom Breen, then-president of a company called DocuSystems, Inc. ("DSI"), about the possibility of DSI purchasing Stik/Strip. See Deposition of R. Goade, taken 6/9/04, at 45-46 (Appendix, Exhibit 3) ("Goade '04 Tr."). DSI then began "courting" Stik/Strip to be purchased by DSI, by, *inter alia*, inviting Goade to visit DSI's plant in Nashville, Tennessee. See id. The acquisition of Stik/Strip by DSI was intended to help DSI to expand its horizons and build upon Stik/Strip's and Goade's reputations in the industry. See id.

The negotiations between the parties continued through the beginning of 1998, and on May 29, 1998, DSI, Stik/Strip, and Goade closed the deal by signing, *inter alia*, a Stock Purchase

---

[1] The factual background of this case is discussed at length in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, which is filed concurrently herewith. Defendants hereby incorporate by reference the entire "Facts" section of their Motion for Summary Judgment. Defendants set forth herein the facts which are directly relevant to Vanguard's Motion for Partial Summary Judgment.

[2] All exhibits referred to herein are attached to the "Appendix of Exhibits" filed in support of Defendants' Motion for Summary Judgment, which is filed concurrently herewith.

Agreement & Merger Agreement. See Stock Purchase & Merger Agreement, dated 5/29/04 ("Purchase Agreement") (Appendix, Exhibit 18). As a result of the sale, DSI's senior commercial lender, Heller Financial, Inc. ("Heller"), took a security interest in substantially all of Stik/Strip's assets. See Deposition of H. Wilder, dated 6/10/04, at 15-18 (Appendix, Exhibit 16) ("Wilder Tr.").[3]

Pursuant to the Purchase Agreement, DSI acquired all of Stik/Strip's stock from the Goade Trust. See Purchase Agreement, ¶¶ 1.1; 1.5. As a result of the May 29, 1998 closing ("1998 Closing"), Stik/Strip became a wholly-owned subsidiary of DSI, and acquired all of Stik/Strip's liabilities. Goade relinquished control over Stik/Strip to DSI. See Affidavit of Ronnie E. Goade, Sr., dated 8/31/04, ¶ 4 ("Goade Aff.") (Appendix, Exhibit 28). DSI also hired Goade as a full time employee. See Employment Agreement, dated 5/29/04 (Appendix, Exhibit 20). Goade was provided with a position on DSI's Board of Directors. See Goade Aff., ¶ 6.[4]

### B.    DSI Integrates Stik/Strip After the 1998 Closing, Fires Goade, And Removes Goade From DSI's Board of Directors

After the 1998 Closing, Stik/Strip ceased existing as an independent, stand-alone operation, and was functionally integrated into DSI's pre-existing operation. See Goade Aff., ¶ 6. Within only a few weeks of the 1998 Closing, DSI made a number of substantial changes to the business of Stik/Strip, in order to effect the integration of Stik/Strip. See id. Within a few weeks of the 1998 Closing, DSI had converted Stik/Strip from a stand-alone operation into a "finishing plant" for products manufactured at DSI's other manufacturing facilities in another state. See Goade Aff., ¶ 7.

---

[3] Hugh Wilder was the senior vice president and manager of Heller's "workout group," which, as is discussed below, became involved with Heller's loan to DSI not long after the 1998 Closing, when DSI began to experience financial difficulties. See Wilder Tr. at 9-10.

[4] Goade's position on DSI's board was a minority one, and did not give Goade the ability to control either DSI or Stik/Strip after the 1998 Closing. See Goade Aff., ¶ 5.

One of DSI's first major acts of integration was to dramatically decrease Stik/Strip's function as a card manufacturing plant. <u>See</u> Goade Aff., ¶ 8. While DSI continued to use Stik/Strip's Oklahoma facility for smaller card manufacturing jobs, all of the large jobs, and indeed a majority of the products turned out under the Stik/Strip name, were manufactured at DSI's Tennessee manufacturing facility. <u>See id.</u> At the Tennessee manufacturing plant, DSI used different equipment to manufacture Stik/Strip's products. <u>See</u> Goade Aff., ¶ 9. For example, the Tennessee manufacturing plant used "rotary press" machines to manufacture cards, which enabled DSI to mass-produce a high volume of cards in a short period of time. <u>See id.</u> Prior to the closing, Stik/Strip used much smaller machines, which produced fewer cards, but which allowed Stik/Strip to control the quality of its products. <u>See id.</u> With the switch, DSI sacrificed quality for quantity and speed. <u>See id.</u> Generally, the products produced under the Stik/Strip name out of DSI's Tennessee operation were of an inferior quality relative to the products that had been produced by Stik/Strip prior to the 1998 Closing in Stik/Strip's Oklahoma plant. <u>See id.</u>

In addition to switching the location of the facility at which the vast majority of Stik/Strip's products were manufactured, DSI fundamentally altered the nature of the products manufactured by DSI under the Stik/Strip name. <u>See id.</u> ¶ 10. Prior to the 1998 Closing, Stik/Strip's cards were manufactured at the Oklahoma facility using a material called "Teslin," which is considered a premium product in the card manufacturing business. <u>See id.</u> Almost immediately after the 1998 Closing, DSI stopped manufacturing Stik/Strip's cards with Teslin, and instead, began manufacturing cards under the Stik/Strip name, out of DSI's Tennessee facility using a product, called "T2." <u>See id.</u> DSI effected this change in an attempt to manufacture products in a more cost effective manner, because T2 costs less than Teslin, but T2

is an inferior product relative to Teslin. See id. As such, after the 1998 Closing, DSI sacrificed the quality of Stik/Strip's products in order to save money.

Only two weeks after the 1998 Closing, DSI terminated virtually all of Stik/Strip's quality control and customer service representatives, began to substitute inferior products for the products that Stik/Strip had sold when it was run by Goade, and substantially altered the way Stik/Strip was operated. See Goade '04 Tr. at 96. Throughout the period of time between the 1998 Closing and late 1999, Goade grew increasingly concerned that DSI's changes would eventually harm DSI and Stik/Strip. See id. at 97-100. Goade became less and less involved in the day-to-day operation of Stik/Strip. See Deposition of J. Beller, taken 7/28/04, at 24-24 (Appendix, Exhibit 17) ("Beller Tr.").

On October 22, 1999, the relationship between DSI and Goade reached a boiling point, and DSI terminated Goade. Four months later, in February 2000, DSI also removed Goade from his position on DSI's board of directors. See Goade '04 Tr. at 163-164 (indicating that Goade had not visited Stik/Strip's plant facility since his termination in October 1999); Petition in Goade v. DocuSystems, No. CJ-2000-3719-6 (filed 5/19/00) ("Goade Petition") (Appendix, Exhibit 29) (indicating that Goade was terminated by DSI on October 22, 1999, and that DSI removed Goade from his position on DSI's board of directors); Consent of Stockholder of DocuSystems Holdings Corporation, dated 2/14/00 (Corporate resolution of Code, Hennessy, the majority shareholder of DSI, removing Goade from DSI's board of directors). (Appendix, Exhibit 30).

### C.  DSI's Rapid Decline, and The Purchase by REG of the Assets of Stik/Strip In A Foreclosure Sale

Goade's concerns regarding the way DSI was conducting business proved to be valid. By late 1999, DSI was indeed suffering severe financial difficulties, and was in danger of filing for bankruptcy protection. See Wilder Tr. at 17-20; Deposition of J. Riddle, taken 6/21/04, at 7-10

(Appendix, Exhibit 31) ("Riddle Tr.") (indicating that within six months of the 1998 Closing, DSI's level of profitability had dropped below zero, DSI was losing money and was unable to service its financial obligations, and was in jeopardy of filing for bankruptcy).[5] By late 1999, DSI had defaulted on its obligations under its credit agreement with Heller, by failing to meet certain financial benchmarks required by the agreement. See Wilder Tr. at 11-12; 16-19.

Rather than foreclosing on its debt against DSI after DSI's default, Heller entered into a series of seven forbearance agreements with DSI, the first in December 1999, the last in May 2000. See id. at 21-27; Forbearance Agreement, dated 12/03/99 (Appendix, Exhibit 32); Forbearance Agreement, dated 12/30/00 (Appendix, Exhibit 33); Forbearance Agreement, dated 1/31/00 (Appendix, Exhibit 34); Forbearance Agreement. dated 1/31/00 (Appendix, Exhibit 35); Forbearance Agreement, dated 3/24/00 (Appendix, Exhibit 36); Forbearance Agreement Dated 4/14/00 (Appendix, Exhibit 37); Forbearance Agreement. dated 5/22/00 (Appendix, Exhibit 38). Heller used the Forbearance Agreements to restructure the terms of DSI's original credit agreement, in an attempt to turn DSI around from a financial perspective, or to at least minimize the financial hit Heller would suffer as a result of DSI's financial troubles. See Wilder Tr. at 16-19; 21-27. During the workout period, Heller continued to provide money to DSI in order to keep DSI in operation. See Wilder Tr. at 27-29.

Despite Heller's attempts to turn DSI around, DSI continued to bleed cash at an alarming rate during the period of time between December 1999 and May 2000. See id. at 46-47; Riddle Tr. at 13-14 (indicating that DSI "basically was melting down"). By May, 2000, Heller was unwilling to provide DSI with any additional capital, and it was clear that the turnaround effort was not working. See id. Thus, in June 2000, Heller made the decision to foreclose on DSI's assets. See

---

[5] John Riddle is a partner at Dresner Investments, the investment bank hired by DSI, at Heller's insistence, at the end of 1999 to assist with Heller's attempt to turn DSI's financial position around. See Riddle Tr. at 5-8; Wilder Tr. at 64-65.

Riddle Tr. at 8, 16-17. By that time, DSI's debt to Heller had ballooned to approximately $55 million. See Wilder Tr. at 83-84. At Heller's insistence, DSI's equity investor, Code Hennessey, directed Dresner to sell off all of DSI's remaining core operations, including Stik/Strip. See id. at 16-17; Deposition of J. Kacergis, taken 6/21/04, at 8-9 (Appendix, Exhibit 39) ("Kacergis Tr.").

By June 2000, DSI could barely make payroll, was on the verge of going out of business, and was weeks away from shutting its doors and terminating its employees. See id. at 50-51. Heller decided to sell the assets of Stik/Strip, as opposed to the selling the company as a going concern, due to time constraints: A straight sale of Stik/Strip would have required extensive due diligence by the purchaser, whereas an asset sale would allow Heller to sell Stik/Strip in a much more expedient manner. See id. at 47-49.

In late June of 2000, Heller directed Dresner to begin the process of selling the assets of Stik/Strip. See Kacergis Tr. at 12-13; Riddle Tr. at 16-17; Wilder Tr. at 50-52.[6] Dresner was specifically tasked with selling Stik/Strip's assets in a very short period of time. See Riddle Tr. at 12-13. Thus, Dresner had to find a buyer quickly. Dresner prepared an "Offering Memorandum," which it distributed to potential buyers of Stik/Strip. See Offering Memorandum, dated June 2000 (Appendix, Exhibit 41); Kacergis Tr. at 14, 26-27; Riddle Tr. at 21-22.

Dresner received a variety of bids for Stik/Strip, from a number of potential purchasers, including StoneHouse Marketing Services, Lucas Color Card, and Norwood/Plastag. See Kacergis Tr. at 15-19; Riddle Tr. at 27-33; StoneHouse Bid Proposal (Appendix, Exhibit 42); Lucas Color Card Bid Proposal (Appendix, Exhibit 43). Dresner evaluated these bid proposals and provided reports to Heller and DSI's Board of Directors. See Wilder Tr. at 50-51. None of these potential

---

[6] Dresner originally attempted to sell DSI and Stik/Strip as a single operation, but the bidders were interested in buying the assets of Stik/Strip as a stand-alone operation. See Riddle Tr. at 12-13; 23-24.

buyers were aggressive in pursuing a deal. See Riddle Tr. at 35-36. Norwood and StoneHouse eventually developed cold feet and backed away from the deal. See Riddle Tr. at 41, 43-44.

Lucas submitted an attractive $4.3 million offer for the purchase of Stik/Strip's assets. See Riddle Tr. at 42. Dresner worked extensively with Lucas, but simply ran out of time to close the transaction, because Lucas could not raise the capital needed to complete the transaction in the limited amount of time available. See Riddle Tr. at 42-43. The time pressure stemmed from the fact that as of mid-July, 2000, Heller would no longer continue to loan money to keep Stik/Strip operating. See Riddle Tr. at 35-37; Kacergis Tr. at 21. If Heller stopped funding Stik/Strip, Stik/Strip would have been forced to close its doors, and the company would "have been worth no more that the auction value of its equipment." See Riddle Tr. at 43.

Dresner also approached Goade as a potential bidder on the assets of Stik/Strip, due to the fact that Goade was the original owner of Stik/Strip. See Riddle Tr. at 33-35; Kacergis Tr. at 20, 29; Goade '04 Tr. at 123-124. Initially, Goade was not interested in making an offer due to the fact that Stik/Strip's reputation had deteriorated since the 1998 Closing, and the fact that the business was not performing well. See Riddle Tr. at 34-36; Goade '04 Tr. at 122-126; Kacergis Tr. at 29-30. However, when Dresner informed Goade that Heller intended to shut Stik/Strip down in mid-July, Goade decided to make an offer for Stik/Strip's assets, because he did not want to see the company shut down and the employees lose their jobs. See Goade '04 Tr. at 128-129; Riddle Tr. at 44-45; Kacergis Tr. at 20-21.

On July 13, 2000, only days before Stik/Strip's doors were set to close, Goade submitted a written offer to Dresner. See Riddle Tr. at 44-45; E-mail from R. Goade to J. Riddle, dated 7/13/00 (Appendix, Exhibit 44); Goade '04 Tr. at 129-130.[7] Goade offered $2 million in cash, and

---

[7] That same day (July 13, 2000), Dresner was instructed to open bidding up to "previously excluded parties," including Vanguard. See Memo to R. Kane from J. Kacergis, dated 7/13/00, and attachments (Appendix, Exhibit

- 8 -

"suggested he could close within a couple of days." See Riddle Tr. at 45. The fact that Goade's cash offer was not contingent on financing, and the fact that Goade was willing to close the deal quickly, with little to no "due diligence," made the offer attractive to Dresner and Heller. See Wilder Tr. at 52-59; Riddle Tr. at 47-49. With no other viable offer on the table, Dresner recommended to Code Hennessy and Heller that they approve the sale of Stik/Strip's assets to Goade. See Riddle Tr. at 47-48; Kacergis Tr. at 24-25. The sale could not go forward without Heller's assent. See Riddle Tr. at 47-48. Indeed, Heller had the ultimate authority as to whom the assets of Stik/Strip would be sold. See Wilder Tr. at 116. In the end, Heller approved the sale to Goade for the following reasons:

> [T]he bank group made the decision that Mr. Goade's offer provided an acceptable level of recovery with the higher certainty of closure. In other words, the additional dollar amounts that may have been on the table for the company, for SSI, at that time, in light of the contingencies or the requirements of that deal getting done, were viewed to be too risky in light of the continued operating losses that were being suffered at the business.

Wilder Tr. at 60-61.

On July 14, 2000, REG, through Goade, acquired substantially all of the assets of Stik/Strip in a foreclosure sale conducted pursuant to Article 9 of the U.C.C. ("2000 Sale"). See Foreclosure Agreement, dated 7/14/00 (Appendix, Exhibit 47) ("Foreclosure Agreement"). In addition, REG acquired two pieces of real property in Oklahoma, both of which were formerly owned by Stik/Strip. See id.

---

45); Riddle Tr. at 45-46. In response, Vanguard apparently submitted an offer for the assets of DSI, see Wilder Tr. at 122, although neither of the two Dresner employees who worked on the asset sale could recall receiving such a bid. See Kacergis Tr. at 26; Riddle Tr. at 46-47 ("If we had a legitimate offer from [Vanguard], they would have been at the table. . . . We [Dresner] are hired . . . to sell an operation . . . , our incentive is to sell it for the highest price. If we had an offer from a party, we would include them in the mix and assess that against the other bids that we had"). It is undisputed that neither Wilder (the Heller representative), nor the Dresner representatives assigned to the asset sale, could recall receiving a *__written__* bid from Vanguard. See Wilder Tr. at 122 (indicating that while he recalls Vanguard submitting a bid, he does not recall any written bid). Wilder opined that Vanguard's bid was never really seriously considered because it contained "a level of uncertainty for closure," and thus "the bank group decided that it was not willing to take the risk of an uncertain sale for whatever additional proceeds may have been available through a Vanguard bid." See id.

### D.    Goade Builds A New Company

Goade bought the assets of Stik/Strip in order to build a new company. See Goade '04 Tr. at 95. Goade did not, as Vanguard claims in its Motion, simply pick up where Stik/Strip had left off. Indeed, given the damage Stik/Strip's reputation had sustained in the industry since the 1998 Closing, Goade considered his purchase of the assets of Stik/Strip to be "like starting all over again." See id. at 123-26. Goade gave his new company the name "SSI Technologies" because he believed that people in the industry associated the initials "SSI" with Ron Goade. See Goade '04 Tr. at 170-171 ("[W]e tried to follow my experience, not the name SSI. . . . [C]ompletely changing things [would have caused] people [to] lose sight of the fact that [REG] was a Ron Goade company,"); Goade Aff., ¶ 14.[8] REG did not agree to assume Stik/Strip's liabilities when it purchased Stik/Strip's assets, and REG did not pay any vendors who were owed money by Stik/Strip. See Goade '04 Tr. at 177; Foreclosure Agreement (Appendix, Exhibit 47).

In order to build his new company, Goade first needed to take steps that would allow REG to begin manufacturing products out of the Oklahoma facilities he purchased in the 2000 Sale. See Goade Aff., ¶ 15. The building itself was in serious need of repair, a large percentage of the computers and software programs mysteriously disappeared after the 2000 Sale, and a large percentage of the equipment was in terrible condition. See id. REG spent millions of dollars to bring the building up to code and for new equipment that would produce a product comparable to its competitors' products. See id.

Further, under DSI, the majority of Stik/Strip's products were manufactured at DSI's Tennesee facilities. See Goade Aff., ¶ 8. Thus, Goade invested $1.3 million in REG in order to

---

[8] This is the same reason REG initially indicated on its website that SSI Technologies had been a "leader in the industry" for over thirty years.  See Goade '04 Tr. at 168-171.  The intent was not to imply that REG/SSI Technologies had actually been in business for years, but rather, that Goade had been a leader in the industry for over thirty years. See id.; Goade Aff., ¶ 14.  When Goade first became aware that REG's website insinuated that the new company had been in business for years, he immediately had it changed. See Goade '04 Tr. at 169-70.

allow the new company to begin manufacturing products. See Goade '04 Tr. at 145-146. REG

used the $1.3 million investment to replace outdated equipment REG had purchased in the 2000

Sale, and to begin a new method of manufacturing. See id. 145-153. Goade had developed a new

system for running plastic cards since he had been terminated by DSI, and he bought the new

equipment to facilitate this innovation. See id. at 148. Goade also had to buy new equipment,

including a magnetic stripping encoder, in order to allow his new company to commence

production. See id. at 157.

Thus, shortly after the 2000 Sale, REG began manufacturing products in a different

location, using a different method than had been used by Stik/Strip, and on different equipment

than had been used by Stik/Strip. See id.; Goade Aff., ¶ 11. In addition, REG began to

manufacture its products using Teslin. See Goade Aff., ¶ 11. Teslin is a premium product in the

card industry. DSI/Stik/Strip had used an inferior product "T2" to manufacture Stik/Strip's

products. See Goade Aff., ¶ 10.

Construed in a light most favorable to REG,[9] these facts do not establish that REG is the

same business as Stik/Strip, regardless of what successor liability standard is applied.

## II.    **ARGUMENT**

### A.    **Vanguard's Motion Should Be Denied Because REG Purchased The Assets of Stik/Strip In A Commercially Reasonable Foreclosure Sale Pursuant To The UCC And Thus Cannot Be Deemed To Be The Corporate Successor Of Stik/Strip For Liability Purposes**

It is undisputed that REG purchased the assets of Stik/Strip in a foreclosure sale

conducted pursuant to the UCC. See Foreclosure Agreement, Recital B (indicating that Heller

---

[9] In deciding Vanguard's Motion, the court must "draw all reasonable inferences in the light most favorable to" Defendants, the non-moving parties. See C.F. Foods, Inc. v. First Baptist Church, No. 01-2849, 2001 U.S. Dist. LEXIS 21057, at *6 (E.D. Pa. Dec. 20, 2001).

sold the assets of Stik/Strip to REG under the provisions of "the applicable Uniform Commercial

Code.") (Appendix, <u>Exhibit 47</u>).  Section 9-610 of the UCC Provides:

> § 9610. Disposition of collateral after default
>
> > (a) Disposition after default.--After default, a secured party may sell, lease, license or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.
> >
> > (b) Commercially reasonable disposition.--Every aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable.  If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels and at any time and place and on any terms.

13 Pa. Cons. Stat. Ann. § 9610; <u>accord</u> 12A Okla. Stat. § 1-9-610 (substantially the same); 810

Ill. Comp. Stat. 5/9-610 (substantially the same).[10]  A good-faith transferee who acquires the

assets of the selling company at a commercially reasonable foreclosure sale takes the assets free

of the bank's security interest, and free of "***any subordinate security interest or other***

***subordinate lien***."  13 Pa. Cons. Stat. Ann. § 9617 (emphasis added); <u>accord</u> 12A Okla. Stat. § 1-

9-617; 810 Ill. Comp. Stat. 5/9-617 (same).

The evidence in this case establishes that REG was a good-faith purchaser of the assets of

Stik/Strip in the 2000 foreclosure sale, and that the 2000 Sale was commercially reasonable.  <u>See</u>

---

[10] In its Motion, Vanguard incorrectly assumes, without any analysis, that Pennsylvania law applies to its successor liability claims. However, under Pennsylvania's choice of law rules, which must be applied by this court in this diversity action, either Illinois or Oklahoma law should apply to Vanguard's successor liability claims. <u>See</u> Southeastern Penn. Transp. Auth. v. International Eng'g, No. 91-7179, 92-2053, 1993 U.S. Dist. LEXIS 5698, at *3-4 (E.D. Pa. May 3, 1993) (in diversity, a federal court in Pennsylvania applies Pennsylvania's choice of law rules, which requires a determination as to whether the laws of the states at issue actually conflict, and if so, which state "has the most significant relationship to the events and parties and the greatest interest in the particular question at issue."). Here, the facts show that the 2000 Sale had no connection whatsoever to Pennsylvania. Indeed, the 2000 Sale of Stik/Strip's assets to REG closed in Illinois, and the Foreclosure Agreement pursuant to which REG acquired the assets of Stik/Strip contains an Illinois choice of law provision. <u>See</u> Foreclosure Agreement, § 20.4; Goade Aff., ¶ 16. Likewise, Oklahoma law could apply to Vanguard's successor liability claims, because Oklahoma was the situs of the assets which were sold to REG as a result of the 2000 Sale, and REG's principal place of business is in Oklahoma. <u>See</u> Goade Aff., ¶ 16. As is discussed, <u>infra</u>, note 12, Pennsylvania's law on successor liability conflicts with the laws of Oklahoma and Illinois in aspects that are material to Vanguard's claims in this litigation. Nonetheless, Defendants submit that Vanguard's Motion should be denied, regardless of whether Pennsylvania, Oklahoma or Illinois or law applies.

Kacergis Tr. at 15-19; Riddle Tr. at 27-33 (testifying that Dresner evaluated a number of different bids for the assets of Stik/Strip); Wilder Tr. at 64-65 (testifying that Heller accepted Goade's bid for the assets of Stik/Strip because it believed that it was in Heller's best interest to do so). As is discussed at length in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, there is no evidence in this case that the 2000 Sale was tainted in any way by a desire on behalf of any of the Defendants, or for that matter, DSI, Stik/Strip, Heller or Dresner, to structure the asset sale to preclude Vanguard from recovering on its Judgment. Heller chose to sell the assets of Stik/Strip in an asset sale (rather than an attempt to sell Stik/Strip as a going concern) because a straight sale of Stik/Strip would have required extensive due diligence by the purchaser, whereas an asset sale would allow Heller to sell Stik/Strip quickly. See Wilder Tr. at 47-49. Goade, Heller and Dresner have harmoniously testified that Goade submitted a bid for the assets of Stik/Strip because he did not want to see the company shut down, and because he did not want to see all of Stik/Strip's employees lose their jobs. See Goade '04 Tr. at 128-129 (indicating that Goade decided to bid on the assets of Stik/Strip because he did not want to see Stik/Strip close down, and because he wanted to save the jobs of Stik/Strip's employees); Riddle Tr. at 44-45 (same); Kacergis Tr. at 20-21 (same). Vanguard has presented no evidence to the contrary.

As a good faith transferee of the assets of Stik/Strip, REG took those assets free of the claims of Stik/Strip's unsecured creditors, such as Vanguard. Thus, Vanguard cannot now proceed against REG under a successor liability theory.[11] Therefore, Vanguard's Motion should be denied.

---

[11]The one lower Pennsylvania Superior Court decision cited by Vanguard is neither binding on this court, as it is not a decision of Pennsylvania's highest court, nor is it even applicable, as Pennsylvania law does not govern this Count. See Continental Ins. Co. v. Schneider, Inc., 810 A.2d 127, 129 (Pa. Super. Ct. 2002). In any event, the superior court's ruling in Continental Ins. Co. is currently on appeal to the Pennsylvania Supreme Court. See Continental Ins. Co. v. Schneider, No. 629 WAL 2002, 2003 Pa. LEXIS 965 (Pa. June 5, 2003). Defendants' research has yielded no comparable Illinois cases or Oklahoma cases. Thus, the Continental Insurance case creates a conflict between the laws of Pennsylvania on the one hand, and Illinois and Oklahoma on the other. As is discussed *supra*, note 11, the states with the most significant relationship to the issue of whether REG should legally be considered the "corporate successor" to Stik/Strip for liability purposes are Illinois and Oklahoma. As such, the Pennsylvania's "successor

**B.**    **Vanguard's Motion Should Be Denied Because Vanguard Has Utterly Failed
To Demonstrate That Any Of The Exceptions To The Rule of Non-Successor-
Liability Apply In This Case.**

Vanguard has utterly failed – and indeed has not even attempted – to demonstrate that

REG is the legal successor to Stik/Strip under the traditional exceptions to the general rule of

non-successor-liability.  It is axiomatic that when one company sells its assets, the purchaser of

those assets generally does not acquire the liabilities of the predecessor company.  See Husak v.

Berkel, Inc., 341 A.2d 174, 176 (Pa. Super. Ct. 1975); Pulis v. United States Electrical Tool Co.,

561 P.2d 68, 69 (Okla. 1977); Nguyen v. Johnson Machine & Press Corp., 433 N.E.2d 1104,

1106 (Ill. App. Ct. 1982).  There are five exceptions to this rule.  The first four exceptions are

where:

> (1) there is an express or implied agreement of assumption; (2) the transaction amounts to
> a consolidation or merger of the purchaser or seller corporation; (3) the purchaser is
> merely a continuation of the seller; or (4) the transaction is for the fraudulent purpose of
> escaping liability for the seller's obligations.

Davila v. Magna Holding Co., 97-C-1909, 2000 U.S. Dist. LEXIS 2684, at *20-21 (E.D. Ill. Feb.

28, 2000); accord Husak v. Berkel, Inc., 341 A.2d 174, 176 (Pa. Super. Ct. 1975); Pulis v. United

States Electrical Tool Co., 561 P.2d 68, 69 (Okla. 1977).  The fifth exception, called the "de

facto merger" exception, focuses on whether there is a continuity of the successor corporation as

evidenced by:

> (1) continuity of ownership/stockholders; (2) a cessation of ordinary business of the
> predecessor and its prompt dissolution; (3) assumption by the successor of the liabilities
> ordinarily necessary for daily operation of the business; and (4) continuity of
> management, personnel, physical locations, aspects and general business operation.

Ryan Beck & Co., Inc. v. Faust, No. 03-CV-636, 2003 U.S. Dist. LEXIS 15164, at *7 (W.D. Pa.

Aug. 6, 2003); accord Pulis, 561 P.2d at 71; Nguyen, 433 N.E.2d at 1143.

---

liability" case law is not applicable in this case, and the Pennsylvania court's holding in Continental Insurance is not
binding on this court.  In any event, the facts construed in a light most favorable to Defendants preclude the entry of
summary judgment in favor of Vanguard even if Continental Insurance were applicable here.

In its Motion, Vanguard does not even attempt to apply **any** of these exceptions to the facts of this case. The reason for this is that Vanguard's Motion is based entirely on only three facts: (1) REG purchased substantially all of the assets of Stik/Strip; (2) REG continued to employ all of Stik/Strip's employees except one, and (3) REG manufactured cards out of the two facilities REG purchased from Stik/Strip after the 2000 foreclosure sale. These facts, even if true, do not establish that REG is the successor in interest to Stik/Strip under any of the above-mentioned standards.

To the contrary, for the reasons stated in Defendants' Motion for Summary Judgment filed concurrently herewith, Defendants are entitled to summary judgment that REG is not the successor to Stik/Strip as a matter of law under any of these aforementioned exceptions.

Due to its inability to establish that REG is the successor in interest to Stik/Strip under any of the applicable successor liability standards, Vanguard relies in its Motion on a "relaxed" successor liability standard that is only applicable in cases involving federal statutory rights and public policy issues, none of which are at issue here. Vanguard's entire Motion is grounded in the so-called "substantial continuity" or "continuity of enterprise" theory. See Vanguard's Mem. of Law in Supp. of Mot. for Partial Sum. Judgment ("Vanguard's Brief"), at 9-12.

The cases cited in Vanguard's Brief make clear, however, that the "substantial continuity" or "continuity of enterprise" doctrine evolved in cases involving federal statutory rights and public policies, such as CERCLA cases. In those limited cases, the courts have "**lessened the stringent burden** of establishing successor liability under the common law standard by expanding the scope of the 'mere continuation' exception." Andritz Sprout-Bauer, Inc. v. Beazer East, Inc., 12 F. Supp. 2d 391, 404-05 (M.D. Pa. 1998) (emphasis added) (cited on page 9 of Vanguard's Brief).

In CERCLA cases, courts apply these less rigorous successor liability principles due to the "remedial purpose of CERCLA, i.e., to place the burdens of cleaning up hazardous substances on those who caused the problem due to the irresponsible handling of such materials." Id. at 405. The less rigorous "substantial continuity" is not applicable in this case, which is neither a CERCLA case nor a products liability case, nor does it implicate any federal statutory rights. See, e.g., Central Nat'l Gottesman v. Pemcor, Inc., No. 03-3203, 2001 U.S. Dist. LEXIS 16388, at *3 (E.D. Pa. Oct. 10, 2001) (refusing to apply doctrine of "continuity of enterprise" in an action involving a contract dispute, which did not involve "issues of grave public concern," or federal statutory rights).

Indeed, each and every one of the cases cited in Vanguard's Brief in which a court considered the "substantial continuity" exception is either a CERCLA case or a products liability case. See United States v. Keystone Sanitation Co., No. 1:CV-93-1482, 1996 U.S. Dist. LEXIS 13651, at *14-15 (M.D. Pa. Aug. 22, 1996) (CERCLA case, noting that "[n]umerous courts have recognized the applicability of the substantial continuity theory **in the CERCLA context**.") (emphasis added) (cited on pages 9-10 of Vanguard's Brief); Andritz Sprout-Bauer, Inc., 12 F. Supp. 2d at 404-05 (CERCLA case, noting that "**[u]nder CERCLA**, standards for successor liability **less rigorous** than the traditional common law standard have evolved.") (emphasis added) (cited on page 9 of Vanguard's Brief); United States v. Mexico Feed & Seed Co. Inc., 980 F.2d 478 (8th Cir. 1992) (CERCLA case) (cited on page 9 of Vanguard's Brief); United States v. Atlas Minerals & Chemicals, Inc., 824 F. Supp. 46, 50 (E.D. Pa. 1993) (holding that "continuity of enterprise" theory is inapplicable even in some CERCLA cases, noting that "**it was never intended that this new approach would replace the traditional test**. Instead, the 'continuity of enterprise' theory should be applied **only when the application of traditional corporate law**

**principles would frustrate the remedial goals of CERCLA**.") (emphasis added) (cited on page

9 of Vanguard's Brief); Conway v. White Trucks, 692 F. Supp. 442 (M.D. Pa. 1988) (product

liability case) (cited on page 9 of Vanguard's Brief); Dawejko v. Jorgensen Steel Co., 290 Pa.

Super. 15 (1981) (products liability case) (cited on page 9 of Vanguard's Brief).

 The law in Illinois and Oklahoma is not any different. There, the courts apply the

"substantial continuity" doctrine only when application of the relaxed standard is necessary "**in**

**order to protect federal rights or effectuate federal policies**." See Chicago Truck Drivers, et

al. v. Tasemkin, 59 F.3d 48, 49 (7th Cir. 1995) (ERISA case, applying Illinois law) (emphasis

added); Norfolk Southern Ry. v. Gee Co., No. 98-C-1619, 2001 U.S. Dist. LEXIS 10784, at \*81

(N.D. Ill. June 26, 2001) (noting that "[t]he Seventh Circuit has not yet recognized the

"substantial continuity" exception in the CERCLA context," but that it has "employed the

concept **in the context of other federal statutes**.") (emphasis added); Horsehead Indus. v. St.

Joe Minerals Corp., No. 94-C-98-B, 1996 U.S. Dist. LEXIS 22493, at \*53 (N.D. Okla. Apr. 3,

1996) ("The broad remedial purpose of CERCLA requires application of the more flexible

continuity of enterprise theory of successor liability to prevent responsible parties from evading

CERCLA liability through strategic behavior or transactional technicalities").[12]

 Therefore, the proper "successor liability" analysis in this case should focus on the five

traditional exceptions to the general rule of non-successor-liability, and this court should

disregard Vanguard's misleading attempt to divert the court's attention to the inapplicable

"continuity of enterprise" exception. Since Vanguard has not even attempted to demonstrate that

any of the traditional exceptions to the general rule of non-successor-liability are applicable in

this case, its Motion should be denied.

---

[12] It should be noted that the Horsehead Industries case is the **only** Oklahoma case, state or federal, Defendants
could locate in which a court, applying Oklahoma law, even mentions the "substantial continuation" theory.

**C.**    **Even If The Continuity of Enterprise Standard Is Applicable, Vanguard's Motion Should Be Denied When The Facts Are Viewed In A Light Most Favorable To Defendants.**

Even if the "continuity of enterprise" standard is applicable in this case, Vanguard's Motion should be denied.  When the facts of this case are viewed in a light most favorable to Defendants, as they must be, REG is not the legal "successor in interest" to Stik/Strip.[13]  Under the "more expansive theory, christened the 'continuing enterprise' theory, liability attaches . . . to a purported purchaser which continues to operate **the same business enterprise**, essentially without interruption."  Andritz Sprout-Bauer, Inc. v. Beazer East, Inc., 12 F. Supp. 2d 391, 405 (M.D. Pa. 1998) (emphasis added) (cited on page 9 of Vanguard's Brief).  Viewed in a light most favorable to Defendants, the facts demonstrate that REG cannot be considered the "same business enterprise" as Stik/Strip.

As is stated above, Vanguard's Motion dwells on three facts:  (1) REG purchased substantially all of the assets of Stik/Strip; (2) REG continued to employ all of Stik/Strip's employees except one, and (3) REG manufactured cards out of the two facilities REG purchased from Stik/Strip after the 2000 foreclosure sale.  According to the case law cited in Vanguard's own Brief, these "facts," even if undisputed, do not, as a matter of law, render REG the successor in interest to Stik/Strip for liability purposes.  This is true even under the relaxed "continuity of enterprise" doctrine.

In the Andritz case, for example, which Vanguard cites on page 9 of its Brief, the court declined to find successor liability under the "continuity of enterprise" doctrine.  The plaintiff in Andritz had pointed to the fact that the defendant had "hired [the predecessor's] factory workers," "continued to use the same production facilities at the same site as" the predecessor in order to

---

[13] In their Motion for Summary Judgment, Defendants demonstrate that even if the facts of this case are viewed in a light most favorable to Vanguard, Defendants are entitled to summary judgment on Vanguard's successor liability claims under the traditional successor liability standard.

manufacture "the same product" as had been produced by the predecessor. See Andritz, 12 F.

Supp. 2d at 406. The court ruled:

> [W]e do not find these factors, by themselves, to be highly significant and certainly not outcome determinative. **Almost any time one manufacturing concern sells production assets to another corporation, these factors will be present. The purpose of purchasing production facilities, obviously, is to use them to produce a product**. The product will almost always be the same, in a generic sense, i.e., if the prior manufacturer used the machinery and equipment to make automobile seats, the buyer will, almost certainly use them for the same purpose – the purpose for which the machinery is designed. In the same way, if the purchaser is acquiring an entire plant, of course, manufacturing will continue at the same location. In such cases the purchaser will, in many instances, assume the obligations of the seller under applicable union contracts, and hire the laborers used by the former owner.
>
> Were we to find that these factors alone support a finding of successor liability under the enterprise theory, **no sale of a plant or operating facility would ever be exempt from its application. Every buyer of a plant would be subject to liability . . . . Virtually the only sales which would be exempt from the attachment of such liability would be the sale of one or several pieces of equipment transported to a different location by the buyer for use by different workers.**

Id. (denying plaintiff's summary judgment motion on issue of successor liability).

    In its Motion, Vanguard relies on the very same factors deemed by the Andritz court to be

neither "highly significant" nor "outcome determinative." See id. Specifically, as did the plaintiff

in Andritz, Vanguard relies on the fact that REG continued to employee substantially all of

Stik/Strip's employees,[14] acquired substantially all of Stik/Strip's assets, and manufactured cards

out of the facilities REG purchased from Stik/Strip. As the court's ruling in Andritz dictates, these

factors are present in most asset purchase sales, and do not, as a matter of law, entitle Vanguard to

summary judgment.

---

[14] The Andritz court specifically noted that "[h]iring the workers of the seller is not, in any event, a practice public policy would discourage. Obviously, the practice promotes economic stability in addition to eliminating undue upheaval in the lives of hourly-wage workers who have no say in the sale or acquisition of the plant which employs them." Id. at 406 n.8; compare with Goade '04 Tr. at 28-29 (indicating that Goade decided to buy the assets of Stik/Strip in the foreclosure sale because, inter alia, he did not want to see Stik/Strip's workers lose their jobs).

Moreover, Vanguard's claim that REG and Stik/Strip manufactured the "same product" at "the same location, using the same facilities" is not supported by the facts. While it was a wholly owned subsidiary of DSI, Stik/Strip was relegated to a finishing plant for products manufactured by DSI at DSI's Tennessee manufacturing facilities. See Goade Aff., ¶ 7. Indeed, Stik/Strip was not a standalone card manufacturer while it was under DSI's control, but rather, it was a single piece of DSI's multi-state card manufacturing process. At the Tennessee manufacturing plant – which was not purchased by REG in the foreclosure sale – DSI used "rotary press" machines to manufacture cards, which enabled DSI to mass produce a high volume of cards in a short period of time. See Goade Aff., ¶ 9. Those cards were then transported to Stik/Strip's Oklahoma facilities for finishing. See id.

Conversely, after the 2000 foreclosure sale, Goade had to "start all over again," and he intended to use the assets of Stik/Strip in order to build a new company. See id. at 123-26; Goade Aff., ¶ 15. Goade first needed to take steps that would allow REG to begin manufacturing products out of the Oklahoma facilities REG had purchased in the foreclosure sale. See Goade Aff., ¶ 15. Thus, Goade invested $1.3 million in REG in order to allow the new company to begin manufacturing products. See Goade '04 Tr. at 145-146; Goade Aff., ¶15. REG used the $1.3 million investment to replace outdated equipment REG had purchased in the 2000 Sale, and to begin a new method of manufacturing. See Goade '04 Tr. at 145-153.

REG also fundamentally altered the nature of the products turned out by the Oklahoma facilities. DSI manufactured cards at its Tennessee facilities using an inferior substrate called "T2." See Goade Aff., ¶ 10. After REG acquired Stik/Strip's assets, it began producing cards at the Oklahoma facility, using a substrate called Teslin. See Goade Aff., ¶ 11. Teslin is a

premium product in the industry, whereas T2 is an inferior product relative to Teslin. See id., ¶ 10.

Thus, when the facts of this case are viewed in a light most favorable to Defendants, after the 2000 foreclosure sale, REG began manufacturing products in a different location, using a different method than had been used by Stik/Strip, on different equipment than had been used by Stik/Strip. See id.; Goade Aff., ¶ 11. These facts do not make Defendants a successor under any theory, and preclude summary judgment in Vanguard's favor. See, e.g., Andritz, 12 F. Supp. 2d at 407 (denying summary judgment on successor liability issue where, *inter alia*, "production techniques and practices were modified to bring them into line with [the successor company's] practices").

Moreover, contrary to Vanguard's bold and factually unsupported statement, there is no evidence in this case of a "manifest intent" by REG to "establish continuity with Stik/Strip by using the 'SSI' name." See Vanguard Brief at 7. To the contrary, after REG acquired the assets of Stik/Strip, Goade gave the new company the name "SSI Technologies" because he believed that people in the industry associated the initials "SSI" with Ron Goade. See Goade '04 Tr. at 170-171 ("[W]e tried to follow my experience, not the name SSI. . . . [C]ompletely changing things [would have caused] people [to] lose sight of the fact that [REG] was a Ron Goade company,"); Goade Aff., ¶ 14.[15]

As the above demonstrates, even under the inapplicable, relaxed "continuity of enterprise" doctrine, Vanguard's Motion must be denied. Under the correct, traditional standard, as

---

[15] This is the same reason REG initially indicated on its website that SSI Technologies had been a "leader in the industry" for over thirty years. See Goade '04 Tr. at 168-171. The intent was not to imply that REG/SSI Technologies had actually been in business for years, but rather, that Goade had been a leader in the industry for over thirty years. See id.; Goade Aff., 14. When Goade first became aware that REG's website insinuated that the new company had been in business for years, he immediately had it changed. See Goade '04 Tr. at 169-70.

Defendants establish in their Motion for Summary Judgment, the facts indisputably demonstrate that REG is not the successor in interest to Stik/Strip as a matter of law.

## CONCLUSION

For all the foregoing reasons, Defendants submit that Plaintiff's Motion for Partial Summary Judgment should be denied.

THE DEFENDANTS
BY ITS ATTORNEYS

Marc L. Zaken (CT 03110)
mzaken@edwardsangell.com
EDWARDS & ANGELL, LLP
Three Stamford Plaza
301 Tresser Boulevard
Stamford, CT 06901
Tel: (203) 353-6819
Fax: (888) 325-1667

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Memorandum of Law in Opposition to

Plaintiff's Motion for Partial Summary Judgment was sent mailed first class mail, postage

prepaid to counsel for Plaintiff, addressed as follows:

George Bochetto, Esquire
David J. Perlman, Esquire
1524 Locust Street
Philadelphia, PA 19102

A. Richard Feldman, Esquire
Bazelon, Less & Feldman, P.C.
1515 Market Street, Suite 700
Philadelphia, PA 19102

this 1st day of September, 2004.

Marc L. Zakoff

- 23 -