**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VANGUARD IDENTIFICATION SYSTEMS, INC.,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | **NO. 02-2943** |
| | : | |
| **v.** | : | |
| | : | |
| **RONNIE E. GOADE, SR., et al.** | : | |
| | : | |
| **Defendants.** | : | **SEPTEMBER 1, 2004** |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT WITH RESPECT TO ALL COUNTS OF
PLAINTIFF'S FIRST AMENDED COMPLAINT**

### I. PRELIMINARY STATEMENT

Defendants REG Oklahoma Acquisitions, LLC (individually, "REG"), Ronnie E. Goade, Sr. (individually, "Goade"), The Ronnie E. Goade, Sr. Revocable Trust (individually, "Goade Trust"), Renise Goade Lee, Ron E. Goade, Jr., Sean Goade, and Susan M. Goade (collectively, "Defendants"), hereby submit this Memorandum of Law in Support of their Motion for Summary Judgment ("Motion") with respect to Counts One through Eight of plaintiff Vanguard Identification Systems, Inc.'s ("Vanguard's") First Amended Complaint ("Complaint").

Vanguard commenced this action in an attempt to collect on a judgment entered in a patent-infringement action to which none of the Defendants are parties. Vanguard claims that the Defendants in this action are liable for the judgment under a variety of different theories. The evidence in this case shows, however, that Vanguard's claims are unsupported by facts, and indeed, that Defendants are entitled to summary judgment on each of Vanguard's claims.

Count I of the Complaint, which charges Goade, the Goade Trust and REG with fraud, and Count VI, which charges Goade and the Goade Trust with breach of fiduciary duty, are barred by Pennsylvania's two-year statute of limitations for such claims. The statements and conduct which form the basis for these two claims were allegedly made by Goade, through his attorney, in 1998, **four years** before Vanguard commenced this action on or about May 26, 2002. The claims in the Complaint that are derived entirely from Vanguard's fraud claim (conspiracy to defraud (Count II), promissory estoppel (Count III) and Vanguard's request for an accounting (Count VII)) are likewise barred by the two-year statute of limitations, as they are based on the same conduct that underlies Vanguard's fraud and breach of fiduciary duty claims.

Further, Defendants are entitled to summary judgment on Vanguard's fraud-based claims (Counts I-III and VII) *regardless* of whether they are barred by Pennsylvania's two-year statute of limitations. The evidence in this case indisputably demonstrates that none of the Defendants in this action committed a fraud upon Vanguard. Likewise, Vanguard's fiduciary duty claim (Count VI) must be dismissed because Defendants did not owe any fiduciary duty to Vanguard, and did not breach any such duty even if one existed.

REG is also entitled to summary judgment on Vanguard's "successor liability" claim (Count IV), because the evidence indisputably shows that REG is not, as a matter of law, the successor in interest to any of the parties against whom the judgment in the patent-infringement action was entered.

Vanguard's Uniform Fraudulent Transfer Act ("UFTA") claim (Count V) fails because none of the Defendants in this action qualify as "debtors" under the UFTA. Vanguard's UFTA claim fails even if the Defendants in this action do qualify as "debtors" under the UFTA, because

there is no evidence in this case of an intent on the part of any of the Defendants to defraud Vanguard.

Finally, Vanguard's application for the equitable relief of a constructive trust, in Count VIII, must be dismissed as all of the underlying causes of action in the Complaint fail for the reasons set forth herein.

## II. **FACTUAL BACKGROUND**

### A.    **The Patent Action**

In 1969, Ron E. Goade, Sr. ("Goade") founded a company called Stik/Strip Laminating Co., Inc. ("Stik/Strip"). See Deposition of R. Goade, taken 8/3/98, at 26-27 (Appendix, Exhibit 1) ("Goade '98 Tr."). Stik/Strip was engaged in the business of developing, producing, and selling "custom data cards," for example, library cards and photo-identification cards. See id. at 8, 23-24. Plaintiff Vanguard is and was at all times relevant engaged in a similar business.

On or about November 4, 1997, Vanguard sued Stik/Strip in the Federal District Court for the Eastern District of Pennsylvania, in a case captioned Vanguard v. Stik/Strip Laminating Co., Inc., No. 97-6790 (U.S.D.C., E.D. Pa.) (hereinafter "Patent Action."). In the Patent Action, Vanguard claimed that Stik/Strip had been, and continued to, infringe on certain patents held by Vanguard. See Patent Action Complaint (Appendix, Exhibit 2).

### B.    **The Sale of Stik/Strip To DocuSystems, Inc. During the Pendency of the Patent Action**

In late 1997, while the Patent Action was pending, Goade was approached by Tom Breen, then-president of a company called DocuSystems, Inc. ("DSI"), about the possibility of DSI purchasing Stik/Strip. See Deposition of R. Goade, taken 6/9/04, at 45-46 (Appendix, Exhibit 3) ("Goade '04 Tr."). DSI then began "courting" Stik/Strip to be purchased by DSI, by, *inter alia*, inviting Goade to visit DSI's plant in Nashville, Tennessee. See id. The acquisition of Stik/Strip

by DSI was intended to help DSI to expand its horizons and build upon Stik/Strip's and Goade's

reputations in the industry. See id.[1]

By February 1999, DSI and Stik/Strip, through Goade, had reached an agreement with

respect to the basic terms of DSI's purchase of Stik/Strip, and signed a letter of intent summarizing

the terms of the purchase. See Letter from Thomas J. Formolo (Vice President of DSI) to R.

Goade, dated 2/10/98 (Appendix, Exhibit 5) (hereinafter, "Letter of Intent"). Negotiations over the

specific terms of the transaction continued through March, April and May 1998. See, e.g., Letter

from Altheimer & Gray (DSI's attorneys) to C. Coleman (Stik/Strip's attorney) dated 4/1/98

(Appendix, Exhibit 6); Letter from C. Coleman to Altheimer & Gray, dated 4/10/98 (Appendix,

Exhibit 7); Letter from C. Coleman to Altheimer & Gray, dated 4/15/98 (Appendix, Exhibit 8);

Letter from C. Coleman to Altheimer & Gray, dated 5/11/98 (Appendix, Exhibit 9); Letter from C.

Coleman to Altheimer & Gray, dated 5/22/98 (Appendix, Exhibit 10). The parties scheduled the

closing of the DSI/Stik/Strip transaction to take place on May 29, 1998 (hereinafter "1998

Closing"). See Goade '04 Tr. at 48-49.

## C.    May 1998 Correspondence between Vanguard and Stik/Strip Regarding the 1998 Closing

On May 19, 1998, ten days before the 1998 Closing, Stik/Strip's attorney in the Patent

Action, Joseph Titterington, Esq., voluntarily informed Vanguard's attorney in the Patent Action,

Gary Rosen, Esq. ("Attorney Rosen"), that the sale of Stik/Strip was pending. See Deposition of J.

Titterington, taken 3/3/04, at 12, 38-39 (Appendix, Exhibit 11) ("Titterington Tr."); Letter from G.

Rosen to J. Titterington, dated 5/20/98 (Appendix, Exhibit 12); Letter from J. Titterington to G.

Rosen, dated 5/22/98 (Appendix, Exhibit 13). Purportedly concerned that the sale of Stik/Strip

---

[1] According to Richard O. Warther, Vanguard's CEO, Vanguard was aware that Goade was amenable to selling Stik
Strip even prior to the commencement of the Patent Action, and had even discussed with Goade, in the mid 1990s,
the possibility of Vanguard purchasing Stik/Strip. See Deposition of R.O. Warther, taken 6/15/04, at 6; 52-54
(Appendix, Exhibit 4) ("Warther Tr.").

would adversely affect Stik/Strip's ability to satisfy any judgment eventually obtained by

Stik/Strip in the Patent Action,[2] Attorney Rosen sent a letter to Stik/Strip's attorney stating:

> I have been instructed to begin preparing papers seeking a preliminary injunction against
> further patent infringement and to join Ron Goade, Sr., personally as a co-infringer, as
> well as a temporary restraining order and injunction against any disposition of sale
> proceeds pending final judgment in this action. You could obviate the need for us to take
> this action at this time by providing in writing . . . confirmation that SSI's assets will not
> be encumbered or depleted by this transaction . . . .

See Letter from Attorney Rosen to J. Titterington, dated 5/26/98 (Appendix, Exhibit 14)

(emphasis added); see also Warther Tr. at 59-60. In response to Attorney Rosen's inquiry,

Stik/Strip's attorney represented as follows:

> The transaction involves a sale of stock and as far as is known to Ron Goade, Sr., there is
> nothing in the transactional documents which leads him to believe that SSI's assets will
> be encumbered or depleted by the sales transaction or that the sale will have a material
> adverse impact on SSI's balance sheet.

See Letter from J. Titterington to Attorney Rosen, dated 5/26/98 (Appendix, Exhibit 15)

(hereinafter, "May 1998 Letter").

At the time Titterington wrote the May 1998 Letter, Goade had no knowledge that, in

fact, DSI planned to borrow money from Heller Financial, Inc. ("Heller"), a commercial lending

institution, in order to finance the purchase of Stik/Strip. See Goade '04 Tr. at 25-29; 50-52;

Deposition of H. Wilder, dated 6/10/04, at 15-16 (Appendix, Exhibit 16) ("Wilder Tr.").[3]

Likewise, Goade had no knowledge that Heller would indeed take a security interest in all of the

assets of Stik/Strip as a result of the 1998 Closing. See Goade '04 Tr. at 50-52; Wilder Tr. at 15-

18. Further, Goade, did not discuss with DSI exactly where DSI planned to obtain the capital to

---

[2] The Patent Action **had not** gone to judgment by May 1998, nor had there been – nor has there ever been – any
dispositive ruling in Vanguard's favor on the merits of its claims in the Patent Action.

[3] Hugh Wilder was the senior vice president and manager of Heller's "workout group," which, as is discussed below,
became involved with Heller's loan to DSI not long after the 1998 Closing, when DSI began to experience financial
difficulties. See Wilder Tr. at 9-10.

finance its the purchase of Stik/Strip, and in fact believed that DSI simply had the cash available. See Goade '04 Tr. at 26-28; accord Letter of Intent, at 2 (indicating that DSI's purchase of Stik/Strip was "not contingent upon financing").

Goade was not the only Stik/Strip employee to review the financial documents exchanged between DSI and Stik/Strip prior to the 1998 Closing. Stik/Strip's Controller, Jay Beller, the senior-most financial employee at Stik/Strip at the time, reviewed copies of the financial documents exchanged between Stik/Strip and DSI. See Deposition of J. Beller, taken 7/28/04, at 7-10, 13-14 (Appendix, Exhibit 17) ("Beller Tr."). These documents included drafts of the Letter of Intent and the proposed Stock Purchase Agreement. See id. at 15-17. Mr. Beller also had numerous conversations with DSI's employees regarding the 1998 Closing prior to the closing. See id. at 11-12. Mr. Beller confirmed that as of the date of the 1998 Closing, as far as he knew, there was "nothing in the transactional documents which [led him] to believe that Stik/Strip's assets [would] be encumbered or depleted" by the sale of Stik/Strip to DSI. See id. at 22.

In fact, there was nothing in the transactional documents that Goade reviewed that indicated that Stik/Strip's assets would be encumbered or depleted by the sales transaction or that the sale would have a material adverse impact on Stik/Strip's balance sheet. See Stock Purchase & Merger Agreement, dated 5/29/04 ("Purchase Agreement") (containing the terms of the agreement between DSI and Goade (among others) regarding the purchase of Stik/Strip) (Appendix, Exhibit 18); Letter of Intent. At most, the documents indicate that Goade was to be given a "Junior Subordinated Promissory Note" and that Heller financial was to be DSI's senior lender.[4] See Purchase Agreement, ¶¶ 1.2; Junior Subordinated Promissory Note of DSI, dated May 29, 1998 (indicating that the promissory note is "subordinated to the 'senior obligations' . . .

---

[4] Goade did not know why the $1.326 million Promissory Note was called a "Junior Subordinated" note. See Goade '04 Tr. at 33-34.

among Heller Financial, Inc. . . . and certain other parties . . . .") (Appendix, Exhibit 19). None

of these documents expressly indicate, or reasonably imply, that Heller intended to take a

security interest in all of Stik/Strip's assets at the 1998 Closing.

### D.    The 1998 Closing

On May 29, 1998, DSI, Stik/Strip, and Goade (in his individual capacity and as Trustee of

the Goade Trust), signed, *inter alia*, the Purchase Agreement, which memorialized the agreement

between the parties with respect to DSI's purchase of Stik/Strip. See Purchase Agreement.

Pursuant to the Purchase Agreement, DSI acquired the stock of Stik/Strip from the Goade Trust.

See id. ¶¶ 1.1; 1.5. DSI then transferred the stock to a newly created subsidiary of DSI, in

exchange for which DSI received 100% of the newly-created subsidiary's stock. See id. ¶ 1.5. DSI

then merged the newly created subsidiary into Stik/Strip, with Stik/Strip continuing as the

surviving corporation. See id. ¶ 1.2.

In exchange for the purchase of Stik/Strip's stock, DSI paid the Goade Trust $8 million in

cash. See Purchase Agreement, ¶¶ 1.2; 1.3; 2.5; Goade '04 Tr. at 24-25; 55-57. DSI also provided

the Goade Trust with a Junior Subordinated Promissory Note in the amount of $1.326 million, in

addition to 500 shares of Class A Common Stock in DocuSystems Holding Corporation. See id. ¶

1.3; Junior Subordinated Promissory Note (Appendix, Exhibit 19). As a result of the 1998

Closing, Stik/Strip became a wholly-owned subsidiary of DSI, and acquired all of Stik/Strip's

liabilities.

In the Purchase Agreement, DSI specifically represented to Goade and the Goade Trust that

after the 1998 Closing, Stik/Strip (defined in the Purchase agreement as "Surviving Corporation"):

> will not (i) be insolvent (either because its financial condition is such that the sum of its
> debts is greater than the fair value of its assets as a going concern or because the present
> fair salable value of its assets as a going concern will be less than the amount required to
> pay its liabilities on its debts as they mature), (ii) have unreasonably small capital with

which to engage in its business, or (iii) have incurred or plan to incur indebtedness beyond its ability to pay as it matures.

Purchase Agreement, ¶ 4.1(i).

After the closing, Goade relinquished control over Stik/Strip. See Goade Aff., ¶ 4. However, DSI hired Goade as a full time employee. See Employment Agreement, dated 5/29/04 (Appendix, Exhibit 20). Goade was also provided with a position on DSI's Board of Directors. See Affidavit of Ronnie E. Goade, Sr., dated 8/31/04, ¶ 6 ("Goade Aff.") (Appendix, Exhibit 28).[5] The Purchase Agreement also required DSI to obtain prior approval from Goade before settling the Patent Action. See Purchase Agreement, ¶ Article VIII, § 8.10.

### E.   Heller Notifies the General Public, Including Vanguard, Of Its Security Interest in Stik/Strip's Assets

On June 1, 1998 and June 2, 1998, only a week after the May 1998 Letter, days after the 1998 Closing, and almost four years before Vanguard commenced the instant action, Heller filed with the Illinois and Oklahoma Secretaries of State, respectively, UCC forms which clearly and unambiguously indicated that it had taken a security interest in substantially all of Stik/Strip's assets. See UCC-1 Filing, dated 6/1/98; UCC-1 Filing, dated 6/2/98 (Appendix, Exhibits 21 and 22, respectively). These UCC forms were filed with the Illinois and Oklahoma Secretaries of State specifically to put the general public – including Vanguard – on notice that the assets of Stik/Strip had been encumbered as a result of the 1998 Closing. Nonetheless, it is undisputed that Vanguard failed to conduct UCC searches in order to determine whether, in fact, the assets of Stik/Strip had been encumbered as a result of the 1998 Closing. See Deposition of G. Rosen (Vanguard's attorney), dated 7/26/04, at 37-39 (Appendix, Exhibit 51) ("Rosen Tr."); Warther Tr. at 164-166 (indicating that Warther, Vanguard's CEO, was familiar with UCC statements and their purposes,

---

[5] Goade's position on DSI's board was a minority one, and did not give Goade the ability to control either DSI or Stik/Strip after the 1998 Closing. See Goade Aff., ¶ 5.

but that he did not bother to check whether the assets of Stik/Strip had been encumbered); Deposition of Robert W. Kane, taken on June 15, 2004, at 159-164 (Appendix, Exhibit 23) (indicating that Kane, Vanguard's CFO, was familiar with UCC statements and their purposes, but that he did not bother to run a UCC search).

The UCC filings gave Vanguard constructive notice of Heller's security interest in Stik/Strip's assets as of June 1998. In addition, Vanguard has produced documents in this action that demonstrate that Vanguard had actual notice of Heller's security interest in Stik/Strip's assets as early as October 1999, three years prior to commencing this suit. During discovery, Vanguard produced copies in its possession of Dun & Bradstreet reports for Stik/Strip, dated October 29, 1999, and DSI, dated October 12, 1999, both of which clearly report that Heller had taken a security interest in both Stik/Strip's and DSI's assets. See Dun & Bradstreet Report, dated 10/29/1999 (Appendix, Exhibit 24); Dun & Bradstreet Report, dated 10/12/1999 (Appendix, Exhibit 25).

Vanguard's CFO, Robert Kane, specifically requested that Vanguard's counsel obtain the Dun & Bradstreet report regarding DSI. See Kane Tr. at 59-61. Kane was intimately involved in Vanguard's prosecution of the Patent Action, and had requested that his attorneys obtain the DSI Dun & Bradstreet report in connection with settlement negotiations between Vanguard and DSI regarding the Patent Action. See id. at 70-73; 75-78.

The Dun & Bradstreet reports and UCC statements filed by Heller demonstrate that as early as June 1998, but by no means later than October 1999, Vanguard knew, or should have known, that the assets of Stik/Strip had been encumbered by Heller as a result of the 1998 Closing.[6]

---

[6] Vanguard has also produced copies of "InfoAccess" company profiles of DSI, both of which bear the date October 7, 1999, and both of which clearly indicate that Heller had taken a security interest in DSI's accounts receivable, equipment, furniture, fixtures, inventory, and "undefined" assets, in June 1998, only five days after the 1998 Closing. See InfoAccess Profiles, dated 10/7/99 (attached hereto, respectively, as Exhibit 26 and Exhibit 27).

**F.    DSI Integrates Stik/Strip into the Operations of DSI After the 1998 Closing**

After the 1998 Closing, Stik/Strip ceased existing as an independent, stand-alone operation, and was functionally integrated into DSI's pre-existing operation. See Goade Aff., ¶ 6. Within only a few weeks of the 1998 Closing, DSI made a number of substantial changes to the business of Stik/Strip, in order to effect the integration of Stik/Strip. See Goade Aff., ¶ 6. Within a few days of the 1998 Closing, DSI had converted Stik/Strip from a stand-alone operation into a "finishing plant" for products manufactured at DSI's other manufacturing facilities in another state. See Goade Aff., ¶ 7.

One of DSI's first major acts of integration was to dramatically decrease Stik/Strip's function as a card manufacturing plant. See Goade Aff., ¶ 8. While DSI continued to use Stik/Strip's Oklahoma facility for smaller card manufacturing jobs, all of the large jobs, and indeed a majority of the products turned out under the Stik/Strip name, were manufactured at DSI's Tennessee manufacturing facility. See id. At the Tennessee manufacturing plant, DSI used different equipment to manufacture Stik/Strip's products. See Goade Aff., ¶ 9. For example, the Tennessee manufacturing plant used "rotary press" machines to manufacture cards, which enabled DSI to mass-produce a high volume of cards in a short period of time. See id. Prior to the closing, Stik/Strip used much smaller machines, which produced fewer cards, but which allowed Stik/Strip to control the quality of its products. See id. With the switch, DSI sacrificed quality for quantity and speed. See id. Generally, the products produced under the Stik/Strip name out of DSI's Tennessee operation were of an inferior quality relative to the products that had been produced by Stik/Strip prior to the 1998 Closing. See id.

In addition to switching the location of the facility at which the vast majority of Stik/Strip's products were manufactured, DSI fundamentally altered the nature of the products

manufactured by DSI under the Stik/Strip name. See id. ¶ 10. Prior to the 1998 Closing,

Stik/Strip's cards were manufactured at the Oklahoma facility using a material called "Teslin,"

which is considered a premium product in the card manufacturing business. See id. Almost

immediately after the 1998 Closing, DSI stopped manufacturing Stik/Strip's cards with Teslin,

and instead, began manufacturing cards under the Stik/Strip name, out of DSI's Tennessee

facility using a product, called "T2." See id. DSI effected this change in an attempt to

manufacture products in a more cost effective manner, because T2 costs less than Teslin, but T2

is an inferior product relative to Teslin. See id. As such, after the 1998 Closing, DSI sacrificed

the quality of Stik/Strip's products in order to save money.

### G.    DSI's Termination of Goade and The Rapid Decline of DSI throughout 1999

Not long after the 1998 Closing, DSI took over control of Stik/Strip's defense in the Patent

Action, and hired the defense law firm Altheimer & Gray. See Goade '04 Tr. at 63-66; Titterington

Tr. at 45-47. Goade's role in the Patent Action defense diminished from that point on, and DSI

began to make decisions in the Patent Action without seeking Goade's prior authorization. See

Goade '04 Tr. at 68-70; Titterington Tr. at 56-59 (indicating, *inter alia*, that after the 1998 Closing,

Titterington no longer dealt with Goade regarding the Patent Action, but instead dealt with Jeff

Bainter, another Stik/Strip employee).

At the same time, Goade's relationship with DSI began to turn sour. See Goade '04 Tr. at

95-96. Only two weeks after the 1998 Closing, DSI terminated virtually all of Stik/Strip's quality

control and customer service representatives, began to substitute inferior products for the products

that Stik/Strip had sold when it was run by Goade, and substantially altered the way Stik/Strip was

operated. See id. at 96. Throughout the period of time between the 1998 Closing and late 1999,

Goade grew increasingly concerned that DSI's changes would eventually harm DSI. See id. at 97-

100.  Goade became less and less involved in the day-to-day operation of Stik/Strip. See Beller Tr.

at 24-25.  On October 22, 1999, the relationship between DSI and Goade reached a boiling point,

and DSI terminated Goade.  Four months later, in February 2000, DSI also removed Goade from

his position on DSI's board of directors. See Goade '04 Tr. at 163-164 (indicating that Goade had

not visited Stik/Strip's plant facility since his termination in October 1999); Petition in Goade v.

DocuSystems, No. CJ-2000-3719-6 (filed 5/19/00) ("Goade Petition") (Appendix, Exhibit 29)

(indicating that Goade was terminated by DSI on October 22, 1999, and that DSI removed Goade

from his position on DSI's board of directors); Consent of Stockholder of DocuSystems Holdings

Corporation, dated 2/14/00 (Corporate resolution of Code, Hennessy, the majority shareholder of

DSI, removing Goade from DSI's board of directors). (Appendix, Exhibit 30).[7]

Goade's concerns regarding the way DSI was conducting business proved to be valid.  By

late 1999, DSI was indeed suffering severe financial difficulties, and was in danger of filing for

bankruptcy protection. See Wilder Tr. at 17-20; Deposition of J. Riddle, taken 6/21/04, at 7-10

(Appendix, Exhibit 31) ("Riddle Tr.") (indicating that within six months of the 1998 Closing, DSI's

level of profitablility had dropped below zero, DSI was losing money and was unable to service its

financial obligations, and was in jeopardy of filing for bankruptcy).[8]  By late 1999, DSI had

defaulted on its obligations under its credit agreement with Heller, by failing to meet certain

financial benchmarks required by the agreement. See Wilder Tr. at 11-12; 16-19.

Rather than foreclosing on its debt against DSI after DSI's default, Heller entered into a

series of seven forbearance agreements with DSI, the first in December 1999, the last in May

---

[7] On May 19, 2000, Goade sued DSI in Oklahoma state court over his termination. See Goade Petition.  In his
Petition, Goade claimed that DSI had breached its employment contract with him, had improperly removed Goade
from DSI's board of directors, and had refused to provide Goade with financial and other information relating to
DSI, which information Goade was entitled to receive as a substantial shareholder in DSI. See id. ¶¶ 9-12.

[8] John Riddle is a partner at Dresner Investments, the investment bank hired by DSI, at Heller's insistence, at the end
of 1999 to assist with Heller's attempt to turn DSI's financial position around. See Riddle Tr. at 5-8; Wilder Tr. at
64-65.

2000. See id. at 21-27; Forbearance Agreement, dated 12/03/99 (Appendix, Exhibit 32);

Forbearance Agreement, dated 12/30/00 (Appendix, Exhibit 33); Forbearance Agreement, dated

1/31/00 (Appendix, Exhibit 34); Forbearance Agreement, dated 1/31/00 (Appendix, Exhibit 35);

Forbearance Agreement, dated 3/24/00 (Appendix, Exhibit 36); Forbearance Agreement, dated

4/14/00 (Appendix, Exhibit 37); Forbearance Agreement, dated 5/22/00 (Appendix, Exhibit 38).

With the forbearance agreements, Heller commenced a "workout" period, in which it

agreed to hold off on exercising the remedies available to it under its credit agreement with DSI

due to DSI's default. See Wilder Tr. at 22-23. Instead of foreclosing on DSI's assets, Heller

restructured the terms of DSI's original credit agreement, in order to turn DSI around from a

financial perspective, or to at least minimize the financial hit Heller would suffer as a result of

DSI's financial troubles. See Wilder Tr. at 16-19; 21-27. During the workout period, Heller

continued to provide money to DSI in order to keep DSI in operation. See Wilder Tr. at 27-29. As

consideration for Heller's decision to enter into the forbearance agreements, Heller required DSI to

engage in additional financial reporting, to hire a turnaround consultant, and to retain an

investment bank, Dresner Investments ("Dresner") to sell off DSI's non-core assets. See id. at 40-

44.[9]

Despite Heller's attempts to turn DSI around, DSI continued to bleed cash at an alarming

rate during the period of time between December 1999 and May 2000. See id. at 46-47; Riddle Tr.

at 13-14 (indicating that DSI "basically was melting down"). By May 2000, Heller was unwilling

to provide DSI with any additional capital, and it was clear that the turnaround effort was not

---

[9] The non-core assets sold by Dresner in the end of 1999 included DSI's ticket manufacturing operation in the United
Kingdom, a carbon ticket manufacturing plant in Tennessee, as well as a small label operation in Ohio. See Riddle
Tr. at 10-11; 15-16. Stik/Strip, along with DSI's other card making operation in Tennessee, were considered to be
DSI's primary operations, and were to be retained while Heller attempted to turn DSI's financial condition around.
See id.

working. See id. Thus, in June 2000, Heller made the decision to foreclose on DSI's assets. See Riddle Tr. at 8, 16-17. By that time, DSI's debt to Heller had ballooned to approximately $55 million. See Wilder Tr. at 83-84. At Heller's insistence, DSI's equity investor, Code Hennessey, directed Dresner to sell off all of DSI's remaining core operations, including Stik/Strip. See id. at 16-17; Deposition of J. Kacergis, taken 6/21/04, at 8-9 (Appendix, Exhibit 39) ("Kacergis Tr.").[10]

## H.   DSI Agrees to a Consent Judgment In the Patent Action Without Goade's Approval.

In the midst of its financial meltdown, DSI, on behalf of itself[11] and Stik/Strip, agreed to the entry of a $2 million consent judgment ("Judgment") in the Patent Action in July 2000. See Judgment, filed 7/10/00 (Appendix, Exhibit 40). The Patent Action was scheduled for trial on July 10, 2000, and DSI agreed to the entry of the Judgment on the eve of trial due to its inability to fund its defense. See Goade '04 Tr. at 93-94; Titterington Tr. at 47-48 (indicating that Dunlap & Codding, the firm originally retained by Goade/Stik/Strip to represent Stik/Strip in the Patent Action, withdrew as Stik/Strip's counsel prior to trial due to DSI's inability to pay for the cost of defense); Wilder Tr. at 66-69 (indicating that Heller refused to provide DSI with money to continue to fund its defense in the Patent Action); Rosen Tr. at 39 (indicating that in the summer of 2000, DSI was in such financial distress that Vanguard had been advised to cease prosecuting the Patent Action).[12]

Around the time the Judgment entered, DSI's assets had been, or were in the process of being, sold off by Dresner in foreclosure for about $18 million, which was insufficient to pay off

---

[10] Joseph Kacergis is a Vice president at Dresner, and was intimately involved in the sale of DSI's core and non-core assets during the December 1999 through June 2000 time frame. See Riddle Tr. at 5-9.

[11] Vanguard had added DSI as a defendant in the Patent Action in February 2000. See Complaint ¶ 39.

[12] In fact, Joseph Titterington, Stik/Strip's attorney in the Patent Action, testified at his deposition that Stik/Strip had a number of strong defenses to Vanguard's claims in the Patent Action, and he believed that Stik/Strip had a good chance of succeeding on those defenses. See Titterington Tr. at 50-56.

DSI's outstanding loan obligations in excess of $50 million. See Wilder Tr. at 83-85; see also *infra*, discussion concerning the foreclosure sale of DSI's assets. The Judgment against DSI and Stik/Strip, which now forms the basis for all of Vanguard's claims in this action, was, according to Vanguard's own counsel, worthless. See Rosen Tr. at 82.

Despite the fact that the Purchase Agreement between Goade and DSI required DSI to obtain prior approval from Goade before settling the Patent Action, DSI failed to do so. See Purchase Agreement, ¶ Article VIII, § 8.10, Goade '04 Tr. at 88-94. Indeed, the only evidence presented in discovery in this case undisputedly demonstrates that DSI did not obtain approval from Goade and the Goade Trust before agreeing to the terms of the Judgment. See Goade '04 Tr. at 88-94. Vanguard's Chief Financial Officer testified in his deposition that he has no knowledge that Goade approved the entry of the consent judgment or was involved in the settlement discussions that led to it. See Kane Tr. at 122-125 (indicating that Robert W. Kane, Vanguard's Chief Financial Officer, has no knowledge as to whether Goade was involved in the settlement discussions which led to the entry of the consent judgment, and that Kane is not aware of any settlement discussions in which Goade participated). Likewise, Vanguard's CEO testified that Goade did not participate in settlement discussions. See Warther Tr. at 38-39. Indeed, Goade was not involved in any of the discussions that led to the entry of the Judgment. See Goade '04 Tr. at 88-90.

## I.    REG Purchases The Assets of Stik/Strip From DSI In Foreclosure Sale

Due to DSI's rapidly deteriorating financial situation, Heller made the decision in June 2000 to sell the assets of DSI – including the assets of Stik/Strip – in a foreclosure sale. See Wilder Tr. at 47-49. By that time, DSI could barely make payroll, was on the verge of going out of business, and was weeks away from shutting its doors and terminating its employees. See id. at

50-51. Heller decided to sell the assets of Stik/Strip, as opposed to selling the company as a going concern, due to time constraints:  A straight sale of Stik/Strip would have required extensive due diligence by the prospective purchaser, whereas an asset sale would allow Heller to sell Stik/Strip in a much more expedient manner.  See id. at 47-49.

In late June of 2000, Heller directed Dresner to begin the process of selling the assets of Stik/Strip.  See Kacergis Tr. at 12-13; Riddle Tr. at 16-17; Wilder Tr. at 50-52.[13]  Dresner was specifically tasked with selling Stik/Strip's assets in a very short period of time.  See Riddle Tr. at 12-13.  Thus, Dresner had to find a buyer quickly.  Dresner prepared an "Offering Memorandum," which it distributed to potential buyers of Stik/Strip.  See Offering Memorandum, dated June 2000 (Appendix, Exhibit 41); Kacergis Tr. at 14, 26-27; Riddle Tr. at 21-22.[14]

Dresner received a variety of bids for Stik/Strip, from a number of potential purchasers, including StoneHouse Marketing Services, Lucas Color Card, and Norwood/Plastag.  See Kacergis Tr. at 15-19; Riddle Tr. at 27-33; StoneHouse Bid Proposal (Appendix, Exhibit 42); Lucas Color Card Bid Proposal (Appendix, Exhibit 42).  Dresner evaluated these bid proposals and provided reports to Heller and DSI's Board of Directors.  See Wilder Tr. at 50-51.  None of these potential buyers were aggressive in pursuing a deal.  See Riddle Tr. at 35-36.  Norwood and StoneHouse eventually developed cold feet and backed away from the deal.  See Riddle Tr. at 41, 43-44.

Lucas submitted an attractive $4.3 million offer for the purchase of Stik/Strip's assets.  See Riddle Tr. at 42.  Dresner worked extensively with Lucas, but simply ran out of time to close the transaction, because Lucas could not raise the capital needed to complete the transaction in the

---

[13] Dresner originally attempted to sell DSI and Stik/Strip as a single operation, but the bidders were interested in buying the assets of Stik/Strip as a stand-alone operation.  See Riddle Tr. at 12-13; 23-24.

[14] Dresner also prepared a list of companies to whom the Offering Memorandum was not to be sent.  See Kacergis Tr. at 26.  Vanguard was included on the list due to the fact that Vanguard was, at the time, prosecuting the Patent Action against Stik/Strip and DSI.  See id. at 26-27; Riddle Tr. at 35-36.  Goade was not involved in preparing the excluded list.  See Kacergis Tr. at 27-28; Riddle Tr. at 39-40.

limited amount of time available. See Riddle Tr. at 42-43. The time pressure stemmed from the

fact that as of mid-July, 2000, Heller would no longer continue to loan money to keep Stik/Strip

operating. See Riddle Tr. at 35-37; Kacergis Tr. at 21. If Heller stopped funding Stik/Strip,

Stik/Strip would have been forced to close its doors, and the company would "have been worth no

more that the auction value of its equipment." See Riddle Tr. at 43.

Dresner also approached Goade as a potential bidder on the assets of Stik/Strip, due to the

fact that Goade was the original owner of Stik/Strip. See Riddle Tr. at 33-35; Kacergis Tr. at 20,

29; Goade '04 Tr. at 123-124. Initially, Goade was not interested in making an offer due to the fact

that Stik/Strip's reputation had deteriorated since the 1998 Closing, and the fact that the business

was not performing well. See Riddle Tr. at 34-36; Goade '04 Tr. at 122-126; Kacergis Tr. at 29-30.

However, when Dresner informed Goade that Heller intended to shut Stik/Strip down in mid-July,

Goade decided to make an offer for Stik/Strip's assets, because he did not want to see the company

shut down and the employees lose their jobs. See Goade '04 Tr. at 128-129; Riddle Tr. at 44-45;

Kacergis Tr. at 20-21.

On July 13, 2000, only days before Stik/Strip's doors were set to close, Goade submitted a

written offer to Dresner. See Riddle Tr. at 44-45; E-mail from R. Goade to J. Riddle, dated

7/13/00 (Appendix, Exhibit 44); Goade '04 Tr. at 129-130.[15] Goade offered $2 million in cash, and

"suggested he could close within a couple of days." See Riddle Tr. at 45. The fact that Goade's

---

[15] That same day (July 13, 2000), Dresner was instructed to open bidding up to "previously excluded parties,"
including Vanguard. See Memo to R. Kane from J. Kacergis, dated 7/13/00, and attachments (Appendix, Exhibit
45); Riddle Tr. at 45-46. In response, Vanguard apparently submitted an offer for the assets of DSI, see Wilder Tr.
at 122, although neither of the two Dresner employees who worked on the asset sale could recall receiving such a
bid. See Kacergis Tr. at 26; Riddle Tr. at 46-47 ("If we had a legitimate offer from [Vanguard], they would have
been at the table. . . . We [Dresner] are hired . . . to sell an operation . . . , our incentive is to sell it for the highest
price. If we had an offer from a party, we would include them in the mix and assess that against the other bids that
we had"). It is undisputed that neither Wilder (the Heller representative), nor the Dresner representatives assigned to
the asset sale, could recall receiving a ***written*** bid from Vanguard. See Wilder Tr. at 122 (indicating that while he
recalls Vanguard submitting a bid, he does not recall any written bid). Wilder opined that Vanguard's bid was never
seriously considered because it contained "a level of uncertainty for closure," and thus "the bank group decided that
it was not willing to take the risk of an uncertain sale for whatever additional proceeds may have been available
through a Vanguard bid." See id.

cash offer was not contingent on financing, and the fact that Goade was willing to close the deal quickly, with little to no "due diligence," made the offer attractive to Dresner and Heller. See Wilder Tr. at 52-59; Riddle Tr. at 47-49. With no other viable offer on the table, Dresner recommended to Code Hennessy and Heller that they approve the sale of Stik/Strip's assets to Goade. See Riddle Tr. at 47-48; Kacergis Tr. at 24-25. The sale could not go forward without Heller's assent. See Riddle Tr. at 47-48. Indeed, Heller had the ultimate authority as to whom the assets of Stik/Strip would be sold. See Wilder Tr. at 116. In the end, Heller approved the sale to Goade for the following reasons:

> [T]he bank group made the decision that Mr. Goade's offer provided an acceptable level of recovery with the higher certainty of closure. In other words, the additional dollar amounts that may have been on the table for the company, for SSI, at that time, in light of the contingencies or the requirements of that deal getting done, were viewed to be too risky in light of the continued operating losses that were being suffered at the business.

Wilder Tr. at 60-61.

On July 14th, 2000, all of the assets of Stik/Strip were sold to defendant REG Oklahoma Acquisition, LLC ("REG"), which is owned by the Goade Trust. See Letter from Altheimer & Gray to the creditors of Stik/Strip, dated 7/27/00 (Appendix, Exhibit 46) (indicating that REG had submitted the highest and best offer for those assets, and that REG had purchased the assets of Stik/Strip only, not its liabilities") (emphasis added); Foreclosure Agreement, dated 7/14/00 (Appendix, Exhibit 47) ("Foreclosure Agreement"). The sale of DSI's assets raised approximately $18 million, $2 million of which came from the purchase of Stik/Strip's assets by REG. See Wilder Tr. at 83-84. Since DSI's debt to Heller was far in excess of $18 million (in fact, it was approximately $55 million), DSI had no money left to satisfy the Judgment in the Patent Action. See id. Thus, the Judgment was essentially worthless. Goade did not learn that

the Judgment had entered until around the time he was contacted to submit a bid for the purchase

of Stik/Strip's assets. See Goade '04 Tr. at 89-91.

J.    **REG becomes SSI Technologies**

Goade bought the assets of Stik/Strip in order to build a new company. See Goade '04 Tr.

at 95. Given the damage Stik/Strip's reputation had sustained in the industry since the 1998

Closing, Goade considered his purchase of the assets of Stik/Strip to be "like starting all over

again." See id. at 123-26. He gave his new company the name "SSI Technologies" to

distinguish it from the entity from which he had purchased the assets. See id. at 170. The name

"Stik/Strip Laminating Company" was reserved for the use of the selling corporation in the

winding-up of its affairs, and Goade could not have used it in any case. See Foreclosure

Agreement, Schedule 2-1. Goade did not agree to assume Stik/Strip's liabilities when he bought

Stik/Strip's assets, and SSI Technologies did not pay any vendors who were owed money by

Stik/Strip. See Goade '04 Tr. at 177; Foreclosure Agreement.

Goade also invested $1.3 million in order to enable SSI Technologies to manufacture

products. See Goade '04 Tr. at 145-46. In fact, Goade had developed a new system for running

plastic cards since he had been terminated by DSI, and he bought new equipment to facilitate this

innovation. See id. at 148. Goade also had to buy new equipment, including a magnetic

stripping encoder, in order to allow his new company to commence production. See id. at 157.

Likewise, REG began to use Teslin to manufacture REG's products, as opposed to "T2," the

inferior material used by DSI to manufacture Stik/Strip's products. See Goade Aff., ¶ 11.

After the asset purchase sale, REG and DSI/ Stik/Strip disagreed about whether a particular

patent ("SSI Patent") had been transferred to REG as a result of the sale. See Wilder. Tr. at 95-96.

Goade filed suit against Stik/Strip in Oklahoma State Court, seeking a determination that REG had,

indeed, acquired the SSI Patent as part of the July 2000 Foreclosure sale. See Petition in <u>REG</u>

<u>Oklahoma Acquisitions, LLC v. Stik/Strip Laminating Co., Inc.</u>, No. CJ-2002-2959 (D. Court,

Oklahoma County) (attached hereto as <u>Exhibit 48</u>). The SSI Patent was in fact part of the July 14,

2000 purchase of Stik/Strip's assets by REG. See Wilder Tr. at 95-98 (indicating that Heller was

aware of the dispute between DSI/Stik/Strip and REG regarding a patent, but Heller was of the

opinion that the patent had been transferred to REG as a result of the foreclosure sale in July 2000);

Affidavit of H. Wilder, dated June 22, 2002 (submitted by Wilder in support of REG's claim of

entitlement to the disputed patent, confirming that Heller had sold the patent to REG during the

July 2000 Foreclosure sale) (Appendix, <u>Exhibit 49</u>). It is undisputed that Vanguard intervened in

the Oklahoma action, in an attempt to prevent the SSI Patent from being transferred from Stik/Strip

to REG. Eventually, both the Oklahoma court and this court decided in REG's favor, concluding

that the SSI Patent had indeed been transferred to REG as a result of the asset purchase sale. See

Order, dated 5/27/03 in <u>Vanguard Identification Systems, Inc. v. Stik/Strip Laminating Company,</u>

<u>Inc.</u>, No. 97-6790 (E.D. Pa.) (Appendix, <u>Exhibit 50</u>) (attaching order of Oklahoma court in <u>REG v.</u>

<u>Stik/Strip</u>).

### K.    <u>Vanguard Files the Instant Action on May 26, 2002</u>

On May 26, 2002, nearly two years after the entry of the Judgment in the Patent Action,

and after confirming that DSI had no assets against which to recover, Vanguard filed the instant

action against Goade, REG, and the other named Defendants. Vanguard's factually unsupported

theory is that all of the afore-described transactions – from the sale of Stik/Strip to DSI in 1998,

through the purchase by REG of the assets of Stik/Strip in a foreclosure sale in 2000 – were a

complex and elaborate scheme, spearheaded by Goade, in order to prevent Vanguard from

collecting on its $2 million judgment in the Patent Action.

## III. ARGUMENT

Defendants are entitled to summary judgment on each and every one of Vanguard's claims because there are, in this case, "no genuine issues of material fact and the relevant law entitles [Defendants] to judgment." Fed. R. Civ. Pro. 56; see also Ryan Beck & Co., Inc. v. Faust, No. 03-CV-636, 2003 U.S. Dist. LEXIS 15164, at *4 (W.D. Pa. Aug. 6, 2003) ("When the non-moving party will bear the burden of proof at trial, the moving party's burden can be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case."). Specifically, the testimony and evidence in this action demonstrate that there is no genuine issue of material fact that: (A) Vanguard's fraud-based claims (Counts I-III, VII) and breach of fiduciary duty claims (Count VI) are barred by 42 Pa. Cons. Stat. § 5524(7), Pennsylvania's two-year statute of limitations for such claims; (B) Vanguard's fraud-based claims (Counts I-III, VII) fail because there is no evidence of any fraud in this case, and Vanguard's fiduciary duty claim (Count VI) fails because Defendants did not owe a duty to Vanguard, and did not breach such a duty even if one existed; (C) Plaintiff's successor liability claim against REG (Count IV) fails because REG is not the successor-in-interest to Stik/Strip; (D) Vanguard's Uniform Fraudulent Transfer Act ("UFTA") claim (Count V) fails because none of the Defendants in this action qualify as "debtors" under the UFTA, and regardless, Vanguard has failed to demonstrate any fraudulent intent on the part of Defendants in connection with any of the transactions at issue in this litigation; and (E) Vanguard's application for a constructive trust (Count VIII) fails because all of the underlying claims upon which such an application is sought fail for the reasons set forth herein.

**A.    Vanguard's Fraud-Based Claims (Counts I-III, VII) and Breach of Fiduciary Duty Claims (Count VI) are Barred By The Applicable Two-Year Statute of Limitations.**

Vanguard's fraud-based and breach of fiduciary claims are barred by Pennsylvania's two-year statute of limitations, because they are all based on conduct which occurred well over two years before Vanguard commenced this action. See 42 Pa. Cons. Stat. § 5524(7);[16] accord Zimmer v. Gruntal & Co., 732 F. Supp. 1330, 1336 (W.D. Pa. 1989) ("Common law fraud is a tort claim governed by Pennsylvania's two-year statute of limitations. Likewise, breach of fiduciary duty is tortious conduct and subject to the two year limitations period."); Oxford Indust's v. Luminco, Inc., No. 86-6417, 1991 U.S. Dist. LEXIS 7099, at *5 n.1 (E.D. Pa. May 22, 1991) (holding that fraud claim and conspiracy claim derived from fraud claim are subject to the two-year limitations period).

Vanguard claims that Defendants committed fraud (Count I), conspired to commit fraud (Count II), and breached a fiduciary duty (Count VI) by stating that the assets of Stik/Strip would not be encumbered when Stik/Strip was sold to DSI. See Complaint, Count I, ¶ 52(a)-(c); Count VI, ¶ 75-76. This same alleged "misrepresentation" forms the basis for Vanguard's promissory estoppel claim (Count III) and request for an accounting (Count VII). See Complaint, Count III, ¶64; Count VII, ¶ 75. It is undisputed that the basis for the purported "misrepresentation" in this action is the May 1998 Letter sent by Goade's attorney to Vanguard's attorney in the Patent

---

[16] The statute provides: "The following actions and proceedings must be commenced within two years: . . . Any other action . . . to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud . . . ." 42 Pa. Cons. Stat. § 5524(7). In this diversity case, the Court must apply Pennsylvania's choice of law rules in determining the applicable statute of limitations. See In re: Asbestos School Litig., 768 F. Supp. 146, 149 (E.D. Pa. 1991). Pennsylvania "generally treats statutes of limitations as 'procedural,' applying Pennsylvania's statutes of limitations not only to wholly domestic causes of action but also to causes of action arising in other jurisdictions (unless, pursuant to Pennsylvania's borrowing statute, a Pennsylvania court is directed to apply a *shorter* limitation statute of another jurisdiction.)." See AAMCO Transmissions, Inc. v. Harris, 759 F. Supp. 1141, 1143-44 (E.D. Pa. 1991). Thus, the Court must apply Pennsylvania's statute of limitatations, 42 Pa. Cons. Stat. § 5524(7), to Vanguard's fraud-based and breach of fiduciary duty claims.

Action, **four years** before Vanguard commenced this action. See Letter from J. Titterington to Attorney Rosen, dated 5/26/98 (Appendix, Exhibit 15) (" . . . as far as is known to Ron Goade, Sr., there is nothing in the transactional documents which leads him to believe that Stik/Strip's assets will be encumbered or depleted by the sales transaction").

A fraud cause of action "does not accrue until the fraud has been discovered by the exercise of due diligence." Nova Ribbon Prods. v. Lincoln Ribbon, No. 89-4340, 1995 U.S. Dist. LEXIS 4322, at *25 (E.D. Pa. Mar. 30, 1995). Here, Vanguard has not provided any explanation, and has in fact refused to provide any evidence, as to why it waited until 2002 to commence this action. When asked at his deposition why Vanguard waited until 2002, Vanguard's CEO refused to answer, on a baseless claim of attorney-client privilege. See Warther Tr. at 182-183.

While a "statute of limitations can be tolled where a defendant has acted to prohibit the plaintiff from discovering the fraud," Zimmer, 732 F. Supp. at 1336, Vanguard has not alleged such conduct on Defendants' part, nor is there any evidence of such conduct in this case. See also Turtzo v. Boyer, 88 A.2d 884, 885 (Pa. 1952) ("In an action based upon a fraud, the statute of limitations will run from the date of the fraudulent act complained of, unless such fraud has been actively concealed by the wrongdoer."). To the contrary, the evidence indisputably shows that if Vanguard had exercised even the slightest degree of diligence, it would have easily discovered, as early as the first week of June, 1998, that Heller had taken a security interest in all of Stik/Strip's assets.

In June, 1998, Heller, the commercial bank which financed DSI's purchase of Stik/Strip, filed UCC statements with the Illinois and Oklahoma Secretaries of State giving notice to the general public of the encumbrance of Stik/Strip's assets. See UCC-1 Filing, dated 6/1/98; UCC-1

Filing, dated 6/2/98 (Appendix, <u>Exhibits</u> <u>21</u> and <u>22</u>, respectively). The UCC forms clearly and unambiguously indicate that Heller took a security interest in Stik/Strip's assets only a few days after the 1998 Closing. <u>See id.</u>

It is undisputed that Vanguard failed to conduct UCC searches in order to determine whether, in fact, the assets of Stik/Strip had been encumbered as a result of the 1998 Closing. <u>See</u> Rosen Tr. at 37-39; Warther Tr. at 164-166 (indicating that Warther, Vanguard's CEO, was familiar with UCC statements and their purposes, but that he did not bother to check whether the assets of Stik/Strip had been encumbered); Kane Tr. at 159-164 (same, with respect to Vanguard's CFO). Likewise, it is undisputed that Defendants did not take any actions to prevent Vanguard from performing a UCC search. Therefore, it is undisputed that Vanguard could have discovered, as early as June 1998, four years before this action was commenced, that the assets of Stik/Strip had been encumbered as a result of the 1998 Closing. Vanguard's fraud-based and breach of fiduciary duty claims are, therefore, barred by 42 Pa. Cons. Stat. § 5524(7). <u>See</u> <u>Turtzo v. Boyer</u>, 88 A.2d 884, 885-886 (Pa. 1952) ("In determining whether [a fraud claim] should have been more promptly asserted, **plaintiff is chargeable not only with what he knew but also with what he could have discovered with reasonable diligence**. . . . Where ignorance of rights or wrongs is relied on, to account for laches and failure to seek relief within the limitation provided by statute, **it must be alleged and proved why the plaintiff was kept in ignorance, and why the facts could not have been discovered by the exercise of due diligence**.") (emphasis added) (citations omitted).

Moreover, evidence produced by Vanguard in this action shows that Vanguard **actually knew**, as early as October 29, 1999, **three years prior to commencing this suit**, that Heller had taken a security interest in the assets of Stik/Strip. Vanguard has produced from its files copies of

D&B reports for Stik/Strip, dated October 29, 1999, and DSI, dated October 12, 1999, both of which clearly report that Heller had taken a security interest in both Stik/Strip's and DSI's assets. See D&B Report, dated 10/29/1999 (Appendix, Exhibit 24); D&B Report, dated 10/12/1999 (Appendix, Exhibit 25). [17]  Vanguard's CFO, Robert Kane, specifically requested that Vanguard's counsel obtain the Dun & Bradstreet report regarding DSI. See Kane Tr. at 59-61.  Kane was intimately involved in Vanguard's prosecution of the Patent Action, and had requested that Vanguard's attorneys obtain the DSI Dun & Bradstreet report in connection with settlement negotiations between Vanguard and DSI regarding the Patent Action. See id. at 70-73; 75-78.

The D&B/InfoAccess reports produced by Vanguard, combined with the UCC statements filed by Heller, demonstrate that as early as June 1998, but by no means later than October 1999, Vanguard knew, or should have known, that the assets of Stik/Strip had indeed been encumbered by Heller as a result of the 1998 Closing.  Vanguard's failure to assert its fraud-based and breach of fiduciary duty claims until well over two years after it acquired, or could have acquired, the knowledge which forms the basis for those claims is unjustified, and unexplained by Vanguard. Therefore, Counts I through III, VI and VII of Vanguard's Complaint are barred by the applicable two-year statute of limitations.

---

[17] Vanguard has also produced copies of "InfoAccess" company profiles of DSI, both of which bear the date October 7, 1999, and both of which clearly indicate that Heller had taken a security interest in DSI's accounts receivable, equipment, furniture, fixtures, inventory, and "undefined" assets, in June 1998, only five days after the 1998 Closing. See InfoAccess Profiles, dated 10/5/99 (attached hereto, respectively, as Exhibit 26 and Exhibit 27). Thus, Vanguard was on notice that Heller had taken a security interest in the assets of DSI.  Had Vanguard conducted a reasonable search, it would have requested similar "InfoAccess" reports concerning Stik/Strip and discovered, in October 1999, that Heller had also taken a security interest in the assets of Stik/Strip. See Patton v. Commonwealth Trust Co., 119 A. 834, 836 (Pa. 1923) ("**Knowledge of facts which would put a person of ordinary prudence and diligence on inquiry is, in the eyes of the law, equivalent to a knowledge of all the facts which a reasonably diligent inquiry would disclose**.") (emphasis added).

**B.**    **To the Extent That Vanguard's Fraud-Based Claims And Fiduciary Duty Claim Are Not Barred By The Two-Year Statute of Limitations, Defendants Are Still Entitled To Summary Judgment, Because There Is No Evidence Of Fraud Or A Breach Of Fiduciary Duty In This Case.**

Vanguard's fraud claims in this action fall into two categories. First, Vanguard claims that Goade, the Goade Trust, and REG (collectively, "REG Defendants") committed fraud in connection with the 1998 sale of Stik/Strip to DSI (i.e., the 1998 Closing). See Complaint, ¶ 52(a)-(c). Second, Vanguard claims that the REG Defendants committed fraud in connection with the 2000 sale of Stik/Strip's assets to REG (hereinafter "2000 Sale"). See Complaint, ¶ 52(d)-(g). The REG Defendants are entitled to summary judgment on these claims, because Vanguard can point to no evidence in support of its contention that the REG Defendants committed fraud in connection with either the 1998 Closing or the 2000 Sale.

**(1)    There Is No Evidence That the REG Defendants Committed Fraud Or Breach Of A Fiduciary Duty In Connection With The 1998 Closing.**

**(i)    No Evidence Of A Misrepresentation**

The evidence in the record indisputably shows that no reasonable jury could find by clear and convincing evidence that any of the REG Defendants' statements or conduct in connection with the 1998 Closing amounted to a "misrepresentation." See Velez v. QVC, Inc., 227 F. Supp. 2d 384, 423 (E.D. Pa. 2002) (granting summary judgment in defendants favor where "no reasonable jury could find by clear and convincing evidence that defendant's statements or conduct . . . were misrepresentations."); see also Neuman v. Corn Exchange Nat. Bank & Trust Co., 51 A.2d 759, 763, 765 (Pa. 1947) (the elements of fraud are: (1) **a misrepresentation,** (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage

to the recipient as the proximate result. . . . A misrepresentation is fraudulently made if the maker knows of its falsity when uttering it.") (emphasis added).

With respect to the 1998 Sale, Vanguard's fraud claims revolve entirely around the statement in the May 1998 Letter that "as far as is known to Ron Goade, Sr., there is nothing in the transactional documents [relating to the 1998 Closing] which leads him to believe that SSI's assets will be encumbered or depleted by the sales transaction or that the sale will have a material adverse impact on SSI's balance sheet." See Letter from J. Titterington to Attorney Rosen, dated 5/26/98 (Appendix, Exhibit 15); Complaint, ¶ 52(a)-(c). Try though it might, Vanguard cannot demonstrate that there is anything false or misleading in this statement.

The statement is qualified by the phrase "**as far as is known to Ron Goade, Sr**. . . ." Vanguard's contention that the REG Defendants affirmatively stated, without any qualifications, that "the assets of SSI would not be encumbered when SSI was sold to DSI," see Complaint, ¶ 52(a), is indisputably incorrect. To the extent Vanguard relied on such a qualified statement in determining whether or not it would take steps to prevent the sale of Stik/Strip to DSI, its reliance was unreasonable as a matter of law. See, e.g., EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 882 (3rd Cir. 2000) (reliance on qualified and disclaimed statements is unreasonable as a matter of law).

Likewise, Vanguard cannot point to any evidence which demonstrates that Goade knew, when the May 1998 Letter was sent, that the assets of Stik/Strip would be encumbered as a result of the sale to DSI. Goade testified that he did not know that DSI had financed the purchase of Stik/Strip through Heller. See Goade '04 Tr. at 25-28; 50-52; Wilder Tr. at 15-16. Likewise, Goade testified that he had no idea that Heller planned to take a security interest in all of the assets of Stik/Strip as a result of the 1998 Closing. See Goade '04 Tr. at 50-52; Wilder Tr. at 15-

18. There is no proof whatsoever that Goade knew that the assets of Stik/Strip were going to be encumbered by the sale when the May 1998 Letter was sent.

To the contrary, the only evidence put forward in this case indicates that there **was not**, in fact, anything in the transactional documents relating to the 1998 Closing which would lead Goade, or any other reasonable person, to believe that the Stik/Strip's assets would be encumbered by the 1998 Closing. Stik/Strip's Controller at the time of the 1998 Closing, Jay Beller, the senior-most financial employee at Stik/Strip at the time, reviewed copies of the financial documents exchanged between Stik/Strip and DSI prior to the closing. See Beller Tr. at 7-10, 13-14. These documents included drafts of the Letter of Intent and the proposed Stock Purchase Agreement. See id. at 15-17. Mr. Beller also had numerous conversations with DSI's employees regarding the 1998 Closing prior to the closing. See id. at 11-12. Mr. Beller confirmed that as of the date of the 1998 Closing, as far as he knew, there was "nothing in the transactional documents which [led him] to believe that Stik/Strip's assets [would] be encumbered or depleted" by the sale of Stik/Strip to DSI. See id. at 22.

A review of the Letter of Intent and the proposed Stock Purchase Agreement confirms Goade's and Beller's testimony that neither of these two documents contains any information which would lead a reasonable person to conclude that the result of the 1998 Closing would be the encumbrance of all of Stik/Strip's assets. See Stock Purchase Agreement (Appendix, Exhibit 18); Letter of Intent (Appendix, Exhibit 5); Junior Subordinated Promissory Note of DSI (Appendix, Exhibit 19). At the most, these documents demonstrate that Heller was DSI's "senior" lender, and that the promissory note given to Goade at the 1998 Closing was entitled a "junior subordinated" note. There is simply nothing in the documents which leads to the conclusion that Heller was going to take a security interest in all of Stik/Strip's assets at the 1998

Closing. As such, the statements in the May 1998 letter were, quite simply, true: Based on his

review of the transactional documents, as far as was known to Goade, there was nothing in the

transactional documents which lead Goade to believe that Stik/Strip's assets would be

encumbered as a result of the sale of DSI to Stik/Strip. To the extent Vanguard's fraud claims are

based on the statements contained in the May 1998 Letter, those claims fail, because the

statements in the May 1998 letter were true when made, and there is no evidence to the contrary.

### (ii)    No Evidence Of Fraudulent Concealment Or Breach Of Fiduciary Duty

To the extent Vanguard's fraud claims with respect to the 1998 Closing are premised on

the idea that Defendants perpetrated a fraud by "failing to disclose that the assets of SSI were to

be encumbered when SSI was sold to DSI," Complaint, ¶ 52(b), Defendants are entitled to

summary judgment because Vanguard has produced no evidence demonstrating that Defendants

had any duty to make such a disclosure. See In re Chrysler Corp. Paint Litig., No. MDL 1239,

2000 U.S. Dist. LEXIS 2332, at *39 (E.D. Pa. Mar. 2, 2000) ("For fraudulent concealment,

**Plaintiff must demonstrate the Defendant had a duty to disclose a fact that it failed to**

**reveal**.") (emphasis added). Similarly, Vanguard has produced no evidence to establish that

Defendants owed a fiduciary duty to Vanguard.

However, even if there was such a duty, Goade testified that he did not learn that the

assets of Stik/Strip had actually been encumbered as a result of the 1998 Closing until he was

sued by Vanguard in 2002. See Goade '04 Tr. at 28.[18]  Vanguard has produced no evidence to

the contrary. Vanguard's claim that the REG Defendants perpetrated a fraud by "failing to

disclose that as a result of the sale of SSI to DSI and the encumbering of the assets of SSI, SSI

---

[18] While Goade testified that he knew Heller was involved in DSI's purchase of Stik/Strip at the 1998 Closing, the undisputed evidence demonstrates that Goade did not know that Heller took a security interest in all of Stik/Strip's assets as a result of the 1998 Closing.

and DSI would be unable to satisfy the obligation to Vanguard," see Complaint, ¶ 52(c), fails for

the same reasons.

In addition, DSI specifically represented to Goade and the Goade Trust in the Stock

Purchase Agreement that after the 1998 Closing, Stik/Strip (defined in the Purchase agreement as

"Surviving Corporation"):

> will not (i) be insolvent (either because its financial condition is such that the sum of its
> debts is greater than the fair value of its assets as a going concern or because the present
> fair salable value of its assets as a going concern will be less than the amount required to
> pay its liabilities on its debts as they mature), (ii) have unreasonably small capital with
> which to engage in its business, or (iii) have incurred or plan to incur indebtedness beyond
> its ability to pay as it matures.

Purchase Agreement, ¶ 4.1(i). With this provision, DSI warranted that Stik/Strip would **not** be

insolvent as a result of the 1998 Closing. Therefore, Vanguard's argument that the 1998 Closing

constituted a "de facto liquidation," see Complaint, ¶ 35, has no basis whatsoever in fact. More

importantly, however, this provision demonstrates that at the time of the 1998 Closing, neither

Goade nor any of the other Defendants had any reason to believe that Stik/Strip would not be able

to satisfy any Judgment eventually entered in the Patent Action or that Stik/Strip would eventually

be driven out of business under DSI's control. Thus, even if Defendants had a "fiduciary duty" to

Vanguard, as Vanguard claims in Count VI of its Complaint, Paragraph 4.1(i) of the Purchase

Agreement demonstrates that they did not breach this duty.

Further, the REG Defendants could not have made, nor did they have any duty to make,

such a disclosure to Vanguard, even after the entry of the Judgment in the Patent Action. Goade

was no longer employed by either DSI or Stik/Strip at the time the Judgment was entered, nor

was Goade, or any entity owned or controlled by Goade, a party to the Patent Action in July

2000. See Goade '04 Tr. at 136, 163-164 (indicating DSI terminated Goade, and that as of July

2000, Goade had not been on Stik/Strip's facilities since October 1999, when he was terminated by

DSI); Patent Action Complaint (to which neither Goade nor any of the other Defendants in this action were a party). Goade was not involved in the negotiations which led to the entry of the Judgment in the Patent Action, see Goade '04 Tr. 88-94 (indicating Goade did not learn about the Judgment in the Patent Action until after it had entered); Kane Tr. at 122-125 (indicating that Vanguard's CFO has no knowledge as to whether Goade was involved in the settlement discussions which led to the entry of the consent judgment, and that he is not aware of any settlement discussions in which Goade participated); Warther Tr. at 38-39 (indicating that Vanguard's CEO has no knowledge as to whether Goade participated in settlement discussions). Thus, when the Judgment entered in July 2000, and DSI/Stik/Strip became "obligated" to pay Vanguard, Goade was not obligated to, nor was he in a position to, make the disclosure that forms the basis for this aspect of Vanguard's "fraudulent concealment" claim.

### (2) There Is No Evidence That the REG Defendants Committed Fraud In Connection With The 2000 Sale.

Vanguard's fraud claims with respect to the 2000 Sale suffer from the same infirmities as Vanguard's fraud claims with respect to the 1998 Closing. Specifically, there is no triable issue of fact as to whether any of the REG Defendants made any misrepresentation to Vanguard in connection with the 2000 Sale. Vanguard has also failed to create a triable issue of fact as to whether any of the REG Defendants failed to disclose any facts to Vanguard that they had a legal duty to disclose.

### (i) No Evidence Of A Misrepresentation

The only aspect of Vanguard's fraud claim that even comes close to alleging that the REG Defendants made an affirmative misrepresentation to Vanguard in connection with the 2000 Sale is paragraph 52(e) of the Complaint, where Vanguard alleges that the REG Defendants led "Vanguard to believe that it could purchase SSI from DSI and satisfy the [Judgment] when REG

was the only intended purchaser." See Complaint, ¶ 52(e). Defendants are entitled to summary

judgment on this aspect of Vanguard's fraud claim because Vanguard has produced absolutely no

evidence demonstrating that any of the REG Defendants actually made such a representation to

Vanguard.

To the contrary, the only evidence in this case demonstrates that none of the REG

Defendants made any representations to Vanguard as to whether Vanguard could purchase

Stik/Strip to satisfy the Judgment. See Riddle Tr. at 47-48 (indicating that the asset sale could

not go forward without Heller's assent); Kacergis Tr. at 24-25 (indicating that Dresner

recommended to Heller that the assets of Stik/Strip be sold to Goade); Wilder Tr. at 116

(testifying that Heller had the ultimate authority as to whom the assets of Stik/Strip would be sold).

It is undisputed that Dresner contacted Goade as a potential buyer of Stik/Strip's assets. See

Goade '04 Tr. at 122-123. It is also undisputed that neither Wilder (the Heller representative),

nor the Dresner representatives assigned to the asset sale could recall receiving a ***written*** bid

from Vanguard. See Wilder Tr. at 122 (indicating that while he recalls Vanguard submitting a

bid, he does not recall any written bid); Riddle Tr. at 45-46; Kacergis Tr. at 26-27. Wilder, the

only witness not employed by Vanguard who even recalls Vanguard making a bid for the assets

of Stik/Strip, testified that Vanguard's bid was never seriously considered because it contained "a

level of uncertainty for closure," and thus "the bank group decided that it was not willing to take

the risk of an uncertain sale for whatever additional proceeds may have been available through a

Vanguard bid." See id. There is, quite simply, no evidence whatsoever that Goade, or any of the

other REG Defendants, had anything to do with the decision as to whom would ultimately be the

purchaser of the assets of Stik/Strip.

Moreover, contrary to Vanguard's bald assertion, the record unequivocally demonstrates that REG was not the "only intended purchaser" of Stik/Strip.[19] In fact, Dresner considered bids from several other potential buyers. See Kacergis Tr. at 15-19; Riddle Tr. at 27-33; StoneHouse Bid Proposal (Appendix, Exhibit 42); Lucas Color Card Bid Proposal (Appendix, Exhibit 43). Dresner evaluated these bid proposals and provided reports to Heller and DSI's Board of Directors. See Wilder Tr. at 50-51. Goade was chosen as the purchaser of Stik/Strip's assets because his offer was not contingent on his ability to obtain financing (it was a cash offer), and because he could close the deal quickly. See Wilder Tr. at 52-59; Riddle Tr. at 47-49. Heller, which had to approve the sale before it could be consummated, see Riddle Tr. at 47-48, approved the sale to Goade because it believed that it was in Heller's best interest to do so. See Wilder Tr. at 64-65. Thus, Vanguard has put forth no evidence that REG was the "only intended purchaser" of Stik/Strip in July 2000, and in fact, the only evidence in this case completely contradicts this assertion.

## (ii)     No Evidence of Fraudulent Concealment

Vanguard alleges that the REG Defendants fraudulently concealed three aspects of the 2000 Sale. Vanguard claims that the REG Defendants committed fraud by: (1) "failing to disclose that Stik/Strip's assets were to be sold for $2 million to REG," see Complaint, ¶ 52(d); (2) "failing to disclose that, even after the sale of Stik/Strip's assets to REG, Stik/Strip was receiving revenue or other monies and/or maintained property, such as patents," see Complaint, ¶ 52(f); and (3) "failing to disclose REG's efforts to induce Stik/Strip to transfer a Patent to REG." See Complaint, ¶ 52(g).

---

[19] The record reveals that Vanguard could have purchased Stik/Strip if it had submitted an attractive bid to Dresner. See Kacergis Tr. at 26; Riddle Tr. at 46-47 ("If we had a legitimate offer from [Vanguard], they would have been at the table. . . . We [Dresner] are hired . . . to sell an operation . . . , our incentive is to sell it for the highest price. If we had an offer from a party, we would include them in the mix and assess that against the other bids that we had). All Vanguard had to do was make an attractive offer, which it apparently failed to do.

Vanguard's first "fraudulent concealment" claim – that the REG Defendants committed fraud by "failing to disclose that Stik/Strip's assets were to be sold for $2 million to REG," fails because Vanguard cannot demonstrate that any of the REG Defendants had any duty to make such a disclosure to Vanguard. By the time of the asset sale in July 2000, Goade was no longer an employee of DSI, see Goade '04 Tr. 36, 163-164, had been removed from DSI's board of directors, see Consent of Stockholder of DocuSystems Holdings Corporation, dated 2/14/00 (Corporate resolution removing Goade from DSI's board of directors) (Appendix, Exhibit 30), was no longer making any decisions in the Patent Action, see Goade '04 Tr. at 68-70; Titterington Tr. at 56-59 (indicating, *inter alia*, that after the 1998 Closing, Titterington no longer dealt with Goade regarding the Patent Action, but instead dealt with Jeff Bainter, another Stik/Strip employee), and was, in fact, not a party to the Patent Action. See Patent Action Complaint (Appendix, Exhibit 2). These facts do not give rise to a duty on the REG Defendants' part to notify Vanguard that the assets of Stik/Strip were going to be sold to REG for $2 million.

Vanguard's second and third "fraudulent concealment" allegations concern the dispute between REG and Stik/Strip regarding a Patent held by Stik/Strip (hereinafter "SSI Patent"). See Complaint, ¶ 52 (f) & (g). Vanguard claims that the REG Defendants "attempted to induce SSI to transfer [the SSI Patent] to REG that had not been part of the July 14, 2000 purchase of SSI by REG and attempted to conceal this transaction from Vanguard." See Complaint, ¶ 50. However, the only evidence put forward in this action indicates that the SSI Patent **was in fact part of the July 14, 2000 purchase of Stik/Strip's assets by REG**. See Wilder Tr. at 95-98 (indicating that Heller was aware of the dispute between DSI/Stik/Strip and REG regarding a patent, but Heller was of the opinion that the patent had indeed been transferred to REG as a result of the foreclosure sale in July 2000); Affidavit of H. Wilder, dated June 22, 2002 (submitted by Wilder in support of

REG's claim of entitlement to the disputed patent, confirming that Heller had indeed sold the patent to REG during the July 2000 Foreclosure sale) (Appendix, Exhibit 49). Vanguard has produce no evidence to the contrary, let alone any evidence that REG's suit to recover the SSI Patent was in any way related to Vanguard or the Judgment in the Patent Action.[20]

As the above demonstrates, there are no triable issues of fact as to whether any of the REG Defendants perpetrated a fraud on Vanguard or breached a fiduciary duty to Vanguard in connection with either the 1998 Closing or the 2000 Sale. Therefore, the REG Defendants are entitled to summary judgment on Vanguard's fraud and breach of fiduciary duty claims.

### C.    Vanguard's Successor Liability Claim Against REG (Count IV) Fails Because REG is Not the Successor-In-Interest to Stik/Strip.

REG is entitled to summary judgment because REG is not, as a matter of law, the successor-in-interest to Stik/Strip.[21] First, as is discussed below, under the provisions of the UCC, REG was a bonafide purchaser of the assets of Stik/Strip from a secured creditor pursuant

---

[20] Moreover, Vanguard has produced no evidence whatsoever that REG attempted to "conceal" its dispute with DSI over the SSI Patent. To the contrary, Goade filed suit against REG in Oklahoma State Court seeking a determination that REG had, indeed, acquired the SSI Patent as part of the July 2000 Foreclosure sale. See Complaint in REG Oklahoma Acquisitions, LLC v. Stik/Strip Laminating Co., Inc., No. CJ-2002-2959 (D. Court, Oklahoma County). Thus, far from being "concealed," the dispute between REG and Stik/Strip regarding the SSI Patent took place in public. Both the Oklahoma court and this court ultimately decided in REG's favor on this point, concluding that the SSI Patent was indeed transferred to REG as a result of the 2000 Sale. See Order, dated 5/27/03 in Vanguard Identification Systems, Inc. v. Stik/Strip Laminating Company, Inc., No. 97-6790 (E.D. Pa.) (Appendix, Exhibit 50) (attaching order of Oklahoma court in REG v. Stik/Strip).

[21] In its Motion for Partial Summary Judgment, Vanguard incorrectly assumes, without any analysis, that Pennsylvania law applies to its successor liability claims. However, under Pennsylvania's choice of law rules, which must be applied by this court in this diversity action, either Illinois or Oklahoma law should apply to Vanguard's successor liability claims. See Southeastern Penn. Transp. Auth. v. International Eng'g, No. 91-7179, 92-2053, 1993 U.S. Dist. LEXIS 5698, at *3-4 (E.D. Pa. May 3, 1993) (in diversity, a federal court in Pennsylvania applies Pennsylvania's choice of law rules, which requires a determination as to whether the laws of the states at issue actually conflict, and if so, which state "has the most significant relationship to the events and parties and the greatest interest in the particular question at issue."). Here, the facts show that the 2000 Sale had no connection whatsoever to Pennsylvania. The 2000 Sale of Stik/Strip's assets to REG closed in Illinois, and the Foreclosure Agreement pursuant to which REG acquired the assets of Stik/Strip contains an Illinois choice of law provision. See Foreclosure Agreement, § 20.4; Goade Aff.., ¶ 16. Likewise, Oklahoma law could apply to Vanguard's successor liability claims, because Oklahoma was the situs of the assets that were sold to REG as a result of the 2000 Sale, and REG's principal place of business is in Oklahoma. See Goade Aff., ¶ 16. As is discussed, infra, note 21, Pennsylvania's law on successor liability conflicts with the laws of Oklahoma and Illinois in aspects that are material to Vanguard's claims in this litigation. Nonetheless, Defendants submit that they are entitled to summary judgment on Vanguard's successor liability claims regardless of whether Pennsylvania, Oklahoma or Illinois or law applies.

to a commercially reasonable foreclosure sale.  As such, REG cannot be deemed to have

acquired the liabilities of Stik/Strip as a result of the 2000 Sale.  Second, even if the UCC does

not preclude successor liability in this case, REG is entitled to summary judgment because under

the traditional "successor liability" analysis, the facts indisputably demonstrate that REG is not

the successor-in-interest to Stik/Strip.

> **(i)    REG Purchased The Assets of Stik/Strip In A Commercially
> Reasonable Foreclosure Sale Pursuant To The UCC And Thus
> Cannot Be Deemed To Be The Corporate Successor Of Stik/Strip For
> Liability On The Judgment In The Patent Action.**

It is undisputed that REG purchased the assets of Stik/Strip in a foreclosure sale

conducted pursuant to the UCC.  See Foreclosure Agreement, Recital B (indicating that Heller

sold the assets of Stik/Strip to REG under the provisions of "the applicable Uniform Commercial

Code.") (Appendix, Exhibit 47).  Section 9-610 of the UCC Provides:

> § 9610. Disposition of collateral after default
>
> (a)  Disposition after default.--After default, a secured party may sell, lease,
> license or otherwise dispose of any or all of the collateral in its present
> condition or following any commercially reasonable preparation or
> processing.
>
> (b)  Commercially reasonable disposition.--Every aspect of a disposition of
> collateral, including the method, manner, time, place and other terms, must
> be commercially reasonable.  If commercially reasonable, a secured party
> may dispose of collateral by public or private proceedings, by one or more
> contracts, as a unit or in parcels and at any time and place and on any terms.

13 Pa. Cons. Stat. Ann. § 9610; accord 12A Okla. Stat. § 1-9-610 (substantially the same); 810

Ill. Comp. Stat. 5/9-610 (substantially the same).  A good-faith transferee who acquires the assets

of the selling company at a commercially reasonable foreclosure sale takes the assets free of the

bank's security interest, and free of "***any subordinate security interest or other subordinate***

***lien***." 13 Pa. Cons. Stat. Ann. § 9617 (emphasis added); accord 12A Okla. Stat. § 1-9-617; 810

Ill. Comp. Stat. 5/9-617 (same).

The evidence in this case establishes that REG was a good-faith purchaser of the assets of Stik/Strip in the 2000 sale, and that the 2000 Sale was commercially reasonable. See Kacergis Tr. at 15-19; Riddle Tr. at 27-33 (testifying that Dresner evaluated a number of different bids for the assets of Stik/Strip); Wilder Tr. at 64-65 (testifying that Heller accepted Goade's bid for the assets of Stik/Strip because it believed that it was in Heller's best interest to do so). As has been discussed at length above, there is no evidence in this case that the 2000 Sale was tainted in any way by a desire on behalf of any of the Defendants, or for that matter, DSI, Stik/Strip, Heller or Dresner, to structure the asset sale specifically to preclude Vanguard from recovering on its Judgment. Heller chose to sell the assets of Stik/Strip in an asset sale (rather than an attempt to sell Stik/Strip as a going concern) because a straight sale of Stik/Strip would have required extensive due diligence by the purchaser, whereas an asset sale would allow Heller to sell Stik/Strip quickly. See Wilder Tr. at 47-49. Goade, Heller and Dresner have harmoniously testified that Goade submitted a bid for the assets of Stik/Strip simply because he did not want to see the company shut down, and because he did not want to see all of Stik/Strip's employees lose their jobs. See Goade '04 Tr. at 128-129 (indicating that Goade decided to bid on the assets of Stik/Strip because he did not want to see Stik/Strip close down, and because he wanted to save the jobs of Stik/Strip's employees); Riddle Tr. at 44-45 (same); Kacergis Tr. at 20-21 (same). Vanguard has presented no evidence to the contrary.

As a good faith transferee of the assets of Stik/Strip, REG took those assets free of the claims of Stik/Strip's unsecured creditors, such as Vanguard. Thus, Vanguard cannot now proceed against REG under a successor liability theory.[22]

---

[22]The one lower Pennsylvania Superior Court decision cited by Vanguard is neither binding on this court, as it is not a decision of Pennsylvania's highest court, nor is it even applicable, as Pennsylvania law does not govern this Count. See Continental Ins. Co. v. Schneider, Inc., 810 A.2d 127, 129 (Pa. Super. Ct. 2002). In any event, the superior court's ruling in Continental Ins. Co. is currently on appeal to the Pennsylvania Supreme Court. See Continental Ins.

     **(ii)**     **There Is No Evidence That Any Of The Exceptions to The General Rule of Non-Liability Apply In This Case**

It is undisputed that none of the traditional exceptions to the general rule of non-successor-liability are applicable in this case. When one company sells its assets to a successor company, the successor company generally does not acquire the liabilities of the predecessor company merely due to its acquisition of the predecessor company's assets. See Husak v. Berkel, Inc., 341 A.2d 174, 176 (Pa. Super. Ct. 1975); Pulis v. United States Electrical Tool Co., 561 P.2d 68, 69 (Okla. 1977); Nguyen v. Johnson Machine & Press Corp., 433 N.E.2d 1104, 1106 (Ill. App. Ct. 1982). The first exception to the general rule is where "the purchaser expressly or impliedly agrees to assume the obligations" of the predecessor corporation. See Husak, 341 A.2d at 176; Pulis, 561 P.2d at 69; Nguyen, 433 N.E.2d at 1143. It is undisputed that REG did not expressly or impliedly assume the liabilities and debts of Stik/Strip as a result of the 2000 Sale. The Foreclosure Agreement through which REG acquired the assets of Stik/Strip specifically provides that REG did "not assume or be deemed to assume any liabilities or accrued liabilities of the Debtor" except for the liabilities expressly indicated on Schedule 2-3 of the Foreclosure Agreement. See Foreclosure Agreement, § 2.3. It is undisputed that the July 2000 Judgment in the Patent Action is not contained on Schedule 2-3 of the Foreclosure Agreement,

---

Co. v. Schneider, No. 629 WAL 2002, 2003 Pa. LEXIS 965 (Pa. June 5, 2003). Defendants' research has yielded no comparable Illinois cases or Oklahoma cases. Thus, the Continental Insurance case creates a conflict between the laws of Pennsylvania on the one hand, and Illinois and Oklahoma on the other. As is discussed *supra*, note 20, the states with the most significant relationship to the issue of whether REG should legally be considered the "corporate successor" to Stik/Strip for liability purposes are Illinois and Oklahoma. As such, the Pennsylvania's "successor liability" case law is not applicable in this case, and the Pennsylvania court's holding in Continental Insurance is not binding on this court. In any event, the reasoning in the Continental Ins. Co. decision does not preclude summary judgment in Defendants' favor. After determining that the UCC did not *automatically* entitle the defendant to summary judgment, the Continental Ins. Co. court went on to conduct a traditional successor liability analysis, concluding that issues of fact precluded summary judgment in that case. In this case, as is explained in the following section, there are no such issues of fact, and REG is entitled to summary judgment on Vanguard's successor liability claims under the traditional successor liability analysis.

nor is there any description of a liability assumed by REG as a result of the sale that even arguably encompasses the Judgment. See id., Schedule 2-3. Thus, it is undisputed that this exception is inapplicable.

The second exception is where "the transaction is fraudulently entered into to escape liability." Husak, 341 A.2d at 176; Pulis, 561 P.2d at 69; Nguyen, 433 N.E.2d at 1143. As has been explained at length above, there is no evidence that there was anything fraudulent about the 2000 Sale. Likewise, as has been explained at length above, there is no evidence in the record indicating actual intent on the part of any of the Defendants to hinder, delay or defraud Vanguard.

Moreover, the 2000 Sale could not have been "fraudulently entered into to escape liability," because Heller, the senior lender, had final approval over to whom the assets would be sold. See Riddle Tr. at 47-48; Wilder Tr. at 116. As a secured lender, Heller had absolutely no incentive to structure the 2000 Sale in such a way as to avoid Vanguard's Judgment in the Patent Action. See Davila, 2000 U.S. Dist. LEXIS 2784, at *40 (noting in a situation virtually identical to the one at issue in this case, that a secured lender who approves the sale of assets to a third party in a foreclosure sale has no incentive to structure the foreclosure sale to avoid a judgment held by an unsecured judgment creditor). Indeed, Heller's representative confirmed that Heller decided to sell the assets of Stik/Strip in a foreclosure sale to Goade, because Heller believed it was in Heller's best interest to do so. See Wilder Tr. at 60-61, 65-66 (testifying that the only reason Heller chose to sell the assets of Stik/Strip to Goade in a foreclosure sale was because it was in Heller's best interest to do so, and that Heller had absolutely no incentive to "feather Mr. Goade's nest in some way."). Vanguard cannot point to any evidence that there was a "conspiracy" between Goade and Heller to prevent Vanguard from collecting on the Judgment in the Patent Action, and in fact the

only evidence in the record establishes that there was no such conspiracy. See Wilder Tr. at 38 (indicating that Wilder, the Heller executive intimately involved in the 2000 Sale, had never even spoken to Goade until after the instant lawsuit was commenced). The 2000 Sale was not tinged with an "actual intent to hinder, delay or defraud any creditor," and thus the "fraudulent purpose" exception to the general rule of non-liability is inapplicable in this case. See Davila, 2000 U.S. Dist. LEXIS 2648, at *26.

The third exception to the general rule of non-liability is where "the transfer was made without adequate consideration and provisions were not made for creditors of the transferor." Husak, 341 A.2d at 176. The only allegation in Vanguard's Complaint that has any relation to this exception is paragraph 44, where Vanguard alleges that "REG . . . purchased all, or nearly all, of Stik/Strip's assets for an artificially depressed price of $2 million." See Complaint, ¶ 44. There is no evidence whatsoever in the record that would lead a reasonable jury to conclude that the $2 million price paid by REG for the assets of Stik/Strip was "artificially depressed."

To the contrary, the only testimony in this action on this issue indicates that Goade's $2 million offer was accepted because it was in Heller's best interest to accept the offer. See Wilder Tr. at 64-65. A representative from Dresner testified that aside from Goade's offer, there was no other *viable* offer for the assets of Stik/Strip on the table. See Riddle Tr. at 47-48 ("really, the only offer we had that was able to get closed in a reasonable period of time was Ron Goade's offer"). Heller wanted to sell the assets of Stik/Strip quickly because it did not want to continue paying money to keep Stik/Strip operating. See Riddle Tr. at 35-37; Kacergis Tr. at 21. Although other offers were made for the assets of Stik/Strip, the uncontroverted testimony in this action indicates that Goade's offer was chosen because it was a cash offer, not contingent on Goade's ability to obtain financing, and because Goade did not require any substantial due diligence. See Wilder Tr.

at 52-59; Riddle Tr. at 47-49.[23]  Thus, there is no evidence whatsoever in this case that the $2

million purchase price through which REG acquired the assets of Stik/Strip was "artificially

depressed," or was otherwise "inadequate consideration."

The fourth and fifth exceptions are where "the transaction is a consolidation or merger of

the two corporations," or "the purchasing corporation is a mere continuation of the selling

corporation."  See Husak, 341 A.2d at 176; Pulis, 561 P.2d at 69; Nguyen, 433 N.E.2d at 1143.

It is undisputed that REG's purchase of the assets of Stik/Strip in July 2000 was not an actual

consolidation or merger of REG and Stik/Strip.  See Foreclosure Agreement (describing an asset

purchase) (Appendix, Exhibit 47).  Nonetheless, in determining whether these two exceptions

apply, courts in Pennsylvania, Oklahoma and Illinois have applied the doctrine of "de facto"

merger, which focuses on whether there is a continuity of the successor corporation as evidenced

by:

> (1) continuity of ownership/stockholders; (2) a cessation of ordinary business of the
> predecessor and its prompt dissolution; (3) assumption by the successor of the liabilities
> ordinarily necessary for daily operation of the business; and (4) continuity of
> management, personnel, physical locations, aspects and general business operation.

Ryan Beck & Co., Inc. v. Faust, No. 03-CV-636, 2003 U.S. Dist. LEXIS 15164, at *7 (W.D. Pa.

Aug. 6, 2003); accord Pulis, 561 P.2d at 71; Nguyen, 433 N.E.2d at 1143.

In this case, the evidence demonstrates that there was no continuity of ownership of

Stik/Strip through the 2000 Sale.  "The transfer of stock **is a key element** in finding a de facto

merger because it represents continuity of ownership."  Forrest v. Beloit Corp., 278 F. Supp. 2d

471, 477 (E.D. Pa. 2003) (emphasis added); Nilsson v. Continental Machine Manuf. Co., 621,

N.E.2d 1032, 1034 (Ill. App. Ct. 1993) (holding that a continuity of stock ownership is **critical** to

---

[23] By the time Vanguard allegedly made its oral offer to purchase the assets of Stik/Strip, Goade was only one day
away from closing on his bid.  Regardless, the only testimony on the merits of Vanguard's last minute oral bid for
the purchase of Stik/Strip's assets is that the offer was too uncertain to be deemed a viable offer.  See Wilder Tr. at
122.

a finding of successor liability under the "de facto merger" and "mere continuation exceptions to corporate successor liability) (emphasis added); accord Pulis, 561 P.2d at 71. In Forrest, the court granted summary judgment in a defendant's favor because the plaintiff failed to demonstrate that the successor company had purchased the predecessor company entirely with shares of its own stock. See Forrest, 278 F. Supp. 2d at 477.

As in Forrest, it is undisputed in this case that there was no continuity of stock ownership between Stik/Strip and REG. See Foreclosure Agreement, dated 7/14/00. Stik/Strip was a wholly-owned subsidiary of DSI prior to the 2000 Sale. DSI had acquired 100% of Stik/Strip's stock as a result of the 1998 Closing. See Purchase Agreement, ¶¶ 1.1; 1.5 (DSI transferred the stock of Stik/Strip to a newly created subsidiary of DSI, in exchange for which DSI received 100% of the newly-created subsidiary's stock); Goade Aff., ¶ 3. After the 1998 Closing, neither Goade, nor any of the other Defendants, owned any stock whatsoever in Stik/Strip.[24] See Goade Aff., ¶ 3. Thus, at the time of the 2000 Sale, neither Goade, nor any of the other Defendants, were stockholders in Stik/Strip. Moreover, REG acquired the assets of Stik/Strip in a foreclosure sale conducted pursuant to Article 9 of Uniform Commercial Code. See Foreclosure Agreement, Recital B. Far from being a stock transaction, it is undisputed that REG paid $2 million in cash for the assets of Stik/Strip. See id.; Riddle Tr. at 45. There is simply no continuity of stock ownership in this case.

Nor is there any other evidence of "continuity of ownership" between REG and DSI. Goade was not a "common director" or "common officer" of Stik/Strip throughout the course of the events at issue in this litigation. At the time REG acquired the assets of Stik/Strip, Goade was no longer an employee of DSI, nor was he a member of DSI's board of directors, nor had he

---

[24] As a result of the 1998 Closing, Goade acquired a minority stock interest in DocuSystems Holdings Corporation, not Stik/Strip. See Purchase Agreement, ¶ 1.2. Goade's DocuSystems stock did **not** provide Goade with the ability to control DSI, or for that matter, Stik/Strip. See Goade Aff., ¶ 5.

even been to Stik/Strip's facilities since he had been fired by DSI in October 1999. See Goade

'04 Tr. at 136, 163-164; Goade '04 Aff., ¶ 12. Indeed, when REG purchased the assets of

Stik/Strip, Goade was no longer involved in running Stik/Strip, nor could he be said to have been

an "owner," under any definition of the term. See Goade Aff., ¶ 13. Thus, it is indisputable that

there was no continuity of ownership between Stik/Strip and REG as a result of the 2000 Sale.

It is also undisputed that Stik/Strip was not "promptly dissolved" after the 2000 Sale.

Indeed, in 2002 – two years after the 2000 Sale, REG sued Stik/Strip in connection with the

2000 Sale, seeking to recover a patent which Stik/Strip claimed had not been one of the assets

sold to REG during the sale. See Complaint in REG Oklahoma Acquisitions, LLC v. Stik/Strip

Laminating Co., Inc., No. CJ-2002-2959 (D. Court, Oklahoma County) (Appendix, Exhibit 48).

Vanguard claims that this suit was "contrived," see Complaint, ¶ 50, but it can point to no evidence

whatsoever to support its claim, nor can it point to any evidence indicating that Stik/Strip was

"promptly dissolved" after the 2000 Sale.

In its Motion for Partial Summary Judgment, Vanguard dwells on the fact that REG

purchased Stik/Strip's real estate and equipment at the asset sale, and the fact that REG continued

to employ Stik/Strip's employees (with the exception of two) after the 2000 Sale. However, these

facts exist in the vast majority of asset sales, and particularly asset sales like this one, which was

conducted as a foreclosure sale under Article 9 of the UCC. See Davila, 2000 U.S. Dist. LEXIS

2684, at *40-41 (recognizing that a foreclosure sale conducted under Article 9 typically involves

the sale of "all of [the debtor's] assets," and that under such circumstances, there is "nothing

suspicious about the fact that the transfer was for all of [the debtor's] assets."). These facts, by

themselves do not create an issue of fact for summary judgment purposes. See id. (ruling in

defendants favor on successor liability claim under facts remarkably similar to those here).

The evidence shows indisputably that REG was not a "mere continuation" of Stik/Strip. After REG acquired the assets of Stik/Strip, Goade gave the new company the name "SSI Technologies" because he believed that people in the industry associated the initials "SSI" with Ron Goade. See Goade '04 Tr. at 170-171 ("[W]e tried to follow my experience, not the name SSI. . . . [C]ompletely changing things [would have caused] people [to] lose sight of the fact that [REG] was a Ron Goade company,"); Goade Aff., ¶ 14.[25] REG did not agree to assume Stik/Strip's liabilities when it purchased Stik/Strip's assets, and REG did not pay any vendors who were owed money by Stik/Strip. See Goade '04 Tr. at 177; Foreclosure Agreement (Exhibit 47).

By the time of the 2000 Sale, the reputation of the " Stik/Strip" that Goade had sold to DSI in 1998 had been all but destroyed by the changes DSI had made to Stik/Strip's business. See Goade Aff., ¶ 15. Thus, Goade had to "start all over again," and he intended to use the assets of Stik/Strip in order to build a new company. See Goade '04 Tr. at 123-26; Goade Aff., ¶ 15. Goade first needed to take steps that would allow REG to begin manufacturing products out of the Oklahoma facilities he purchased in the 2000 Sale. See Goade Aff., ¶ 15. The building itself was in serious need of repair, a large percentage of the computers and software programs mysteriously disappeared after the 2000 Sale, and a large percentage of the equipment was in terrible condition. See id. REG spent millions of dollars to bring the building up to code and for new equipment that would produce a product comparable to its competitors' products. See id.

Further, under DSI, the majority of Stik/Strip's products were manufactured at DSI's Tennesee facilities. See Goade Aff., ¶ 8. Thus, Goade invested $1.3 million in REG in order to allow the new company to begin manufacturing products. See Goade '04 Tr. at 145-146. REG

---

[25] This is the same reason REG initially indicated on its website that SSI Technologies had been a "leader in the industry" for over thirty years. See Goade '04 Tr. at 168-171. The intent was not to imply that REG/SSI Technologies had actually been in business for years, but rather, that Goade had been a leader in the industry for over thirty years. See id.; Goade Aff., ¶ 14. When Goade first became aware that REG's website insinuated that the new company had been in business for years, he immediately had it changed. See Goade '04 Tr. at 169-70.

used the $1.3 million investment to replace outdated equipment REG had purchased in the 2000

Sale, and to begin a new method of manufacturing. See id. 145-153.

Thus, shortly after the 2000 Sale, REG began manufacturing products in a different

location, using a different method than had been used by Stik/Strip, and on different equipment

than had been used by Stik/Strip. See id.; Goade Aff., ¶ 11. In addition, REG began to

manufacture its products using Teslin. See Goade Aff., ¶ 11. Teslin is a premium product in the

card industry. DSI/Stik/Strip had used an inferior product "T2" to manufacture Stik/Strip's

products. See Goade Aff., ¶ 10. Quite simply, REG was **not** the same business as Stik/Strip, and

there is simply not enough evidence in the record to create a dispute as to whether REG is a "mere

continuation" of Stik/Strip.

As the above demonstrates, Vanguard cannot point to evidence sufficient to establish its

claim that REG is the successor to the liabilities of Stik/Strip. As such, REG is entitled to

summary judgment on Vanguard's "successor liability" claim.

### D.    Defendants Are Entitled To Summary Judgment on Vanguard's UFTA Claims.

The Defendants in this action cannot be held liable under the provisions of the

Pennsylvania Uniform Fraudulent Transfer Act, the Oklahoma Uniform Fraudulent Transfer Act,

or the Illinois Uniform Fraudulent Transfer Act (collectively, "UFTA"),[26] because the facts in this

case show indisputably that none of the Defendants qualify as "debtors" under those statutes. Even

if one or any of the Defendants qualify as "debtors" under the UFTA, Vanguard's claims still fail

because Vanguard cannot point to any evidence in support of its claim that the 1998 Closing or

---

[26] As with Vanguard's successor liability claims, Pennsylvania law does not apply to Vanguard's UFTA claims, as
Pennsylvania has no connection to either the 1998 Closing or the 2000 Sale. It is more likely that the law of Illinois
would apply, as both the Purchase Agreement, which memorializes the 1998 Closing, and the Foreclosure
Agreement, which memorializes the 2000 Sale, contain Illinois choice of law provisions. See Foreclosure
Agreement, § 20.4; Purchase Agreement, § 10.7. In addition, Oklahoma law could apply, as the principle places of
business of Stik/Strip and REG are located in Oklahoma, as are the tangible assets acquired by REG as a result of
the 2000 Sale. Nonetheless, Defendants are entitled to summary judgment regardless of which state's laws apply.

the 2000 sale occurred with the actual intent of escaping liability on the Judgment in the Patent Action. See 12 Pa. Cons. Stat. § 5105 (requiring UFTA plaintiff to prove that a transfer was made or obligation incurred by a debtor with the actual intent to "hinder, delay or defraud any creditor of the debtor"); Okla. Stat. tit. 24, § 116 (same); 740 Ill. Comp. Stat. 160/5(a)(1) (same). Nor is there any evidence in this case of any transfer of assets made for insufficient value while the "debtor" was insolvent or that rendered the "debtor" insolvent. See 12 Pa. Cons. Stat. § 5105 (requiring UFTA plaintiff to prove that a transfer was made or obligation incurred by a debtor without receiving a reasonably equivalent value in exchange for the transfer or obligation); Okla. Stat. tit. 24, § 116 (same); 740 Ill. Comp. Stat. 160/5 (same).

> **(i)    None of the Defendants In This Action Qualify as "Debtors" under the UFTA.**

In order to prove liability under UFTA, Vanguard must demonstrate that one or all of the Defendants in this action qualify as "debtors" as that term is defined in the two respective statutes. See Okla. Stat. tit. 24, § 116 ("A transfer made or obligation incurred **by a debtor** is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, **if the debtor** . . . .") (emphasis added); 12 Pa. Cons. Stat. § 5104 (same); 740 Ill. Comp. Stat. 160/5 (same); Okla. Stat. tit. 24, § 117 ("A transfer made or obligation incurred **by a debtor** is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred **if the debtor** . . . .") (emphasis added); 12 Pa. Cons. Stat. § 5105 (same); 740 Ill. Comp. Stat. 160/6 (same). Vanguard's three paragraph UFTA claim provides absolutely no insight as to which of the defendants allegedly constitute "debtors" under the UFTA. See Complaint, Count V, ¶ 71-72. Instead, Vanguard simply asserts its UFTA claim against "All Defendants." See id.

The UFTA defines the term "debtor" as "a person who is liable on a claim." <u>See</u> Okla. Stat. tit. 24, § 113(6); 12 Pa. Cons. stat. § 5101(same); 740 Ill. Comp. Stat. 160/2 (same). A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment." <u>See</u> Okla. Stat. tit. 24, § 113; 12 Pa. Cons. Stat. § 5101; 740 Ill. Comp. Stat. 160/2. In this case, Vanguard seeks to hold Defendants liable for the judgment in the Patent Action. <u>See</u> Complaint, ¶ 1 ("This action is brought against various individuals and entities to collect on a $2 million judgment . . . entered in favor of [Vanguard] in a patent infringement suit . . . ."). It is, however, undisputed that the Judgment in the Patent Action is against DSI and Stik/Strip. <u>See</u> Judgment. None of the Defendants in this action were a party to the Patent Action, and none of the Defendants in this action are bound by the Judgment. Thus, Vanguard's UFTA claims fail for the simple reason that none of the Defendants in this action qualify as "debtors" under the provisions of UFTA. <u>See, e.g.</u>, <u>Aps Sports Collectibles, Inc. v. Sports Time, Inc.</u>, 299 F.3d 624, 629 (7th Cir. 2002) (applying Illinois law, affirming grant of summary judgment in favor of individual defendants on plaintiff's UFTA claims because none of the individual defendants were parties to the loan transaction which gave rise to the debt the plaintiff was attempting to collect).

### (ii)    There Is No Evidence Of Intent To Hinder, Delay or Defraud.

The UFTA lists certain "badges of fraud," which "when present in sufficient number, may support an inference of actual fraudulent intent." <u>Davila v. Magna Holding Co.</u>, No. 07-C-1909, 2000 U.S. Dist. LEXIS 2648, at *32 (N.D. Ill. Feb. 28, 2000). UFTA's "fraud" factors include whether:

(1)    the transfer or obligation was to an insider;

(2)    the debtor retained possession or control of the property transferred after the transfer;

(3)    the transfer or obligation was disclosed or concealed;

(4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)    the transfer was of substantially all the debtor's assets;

(6)    the debtor absconded;

(7)    the debtor removed or concealed assets;

(8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)   the transfer occurred shortly before or after a substantial debt was incurred; and

(11)   the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Okla. Stat. tit. 24, § 116;12 Pa. Cons. Stat. Ann. § 5104(b); 740 Ill. Comp. Stat. 160/5(b). The presence of these factors "does not create a presumption of actual intent [to defraud]," Matthews v. Serafin, 319 Ill. App. 3d 72, 77 (2001), but rather, these factors are "are merely considerations" in examining the facts of a particular case in order to determine the answer to the overarching question:  Whether there is, in fact, an intent to hinder, delay or defraud. See Bank of Joliet v. Firstar Bank Milwaukee, N.A.A., No. 96C1145, 1997 U.S. Dist. LEXIS 15384, at *48-49 (N.D. Ill. Sept. 30, 1997).

### (a)    No Evidence of Intent to Hinder, Delay or Defraud In Connection With the 1998 Sale

With respect to the 1998 Closing, it is undisputed that factors (5) through (9), and (11) of the "badges of fraud" are inapplicable.  Construed in a light most favorable to Vanguard, Vanguard's Complaint contains no allegations that any of the Defendants in this action transferred "substantially all" of their assets to a third party (the 5th Factor); that any of the Defendants in this action "absconded" (the 6th Factor); that any of the Defendants in this action "removed or concealed" assets (the 7th Factor); that the value of the consideration received by

Defendants in the 1998 Closing was not reasonably equivalent to the value of the asset(s) transferred by Defendants (the 8th Factor); that any of the Defendants became "insolvent" at any point in time (the 9th Factor); or that any of the Defendants "transferred the essential assets of the business to a lienor who transferred the assets to an insider" (the 10th Factor). Okla. Stat. tit. 24, § 116; 12 Pa. Cons. Stat. Ann. § 5104(b); 740 Ill. Comp. Stat. 160/5(b). Therefore, none of these factors weigh in favor of Vanguard's claim. The remaining factors 1 through 4, and 10, also do not give rise to any disputed issues of material fact.

First, the fact that DSI provided Goade with a job after the 1998 Closing, in addition to a position on DSI's board of directors, does not render Goade an "insider" (Factor 1) for purposes of the UFTA. Nor do those facts illustrate that Goade "retained possession or control" of Stik/Strip after the 1998 Closing. Indeed, the undisputed facts make clear that Goade did not have control over Stik/Strip after the 1998 Closing. See Goade Aff., ¶ 4. To the contrary, Goade's position on DSI's board of directors was a minority position (the Goade Trust only held approximately 13% of DSI's stock). See Goade Aff., ¶¶ 4-5. This did not provide Goade with the power to control Stik/Strip, or to direct Stik/Strip's day-to-day operation. See id., ¶ 5. After the 1998 Closing, despite Goade's position on DSI's board, DSI began to conduct business in a manner that was directly at odds with the way Goade had run Stik/Strip prior to the 1998 Sale. See id. ¶ 6. As a minority shareholder in DSI, Goade could, and did, voice his concerns regarding the drastic changes DSI effected after the 1998 Closing, but his words fell on deaf ears, as Goade's input was largely ignored by DSI. See id. ¶ 6. The tension between Goade and DSI led to Goade's eventual termination from DSI in October 1999, and his removal from DSI's board of directors in February 2000. See Goade Aff., ¶ 6.

In addition, Goade's role in Stik/Strip's defense in the Patent Action defense diminished after the 1998 Sale, and DSI began to make decisions in connection with the litigation without seeking Goade's prior approval. See Goade '04 Tr. at 68-70; Titterington Tr. at 56-59. Importantly, DSI did not consult with Goade before it decided to agree to the Consent Judgment in the Patent Action on behalf of Stik/Strip. See Goade '04 Tr. at 88-94; Kane Tr. at 122-125 (indicating that Robert W. Kane, Vanguard's Chief Financial Officer, has no knowledge as to whether Goade was involved in the settlement discussions which led to the entry of the consent judgment, and that Kane is not aware of any settlement discussions in which Goade participated); Warther Tr. at 38-39 (same testimony from Owen Warther, Vanguard's CEO). The facts demonstrate, therefore, that the sale of Stik/Strip to DSI in 1998 was **not** a sale to an "insider," nor did Goade, or any of the other Defendants, maintain any control over Stik/Strip after the 1998 Sale.

Nor is there any proof that Factor 3 applies, because there is no evidence that the "transfer '[of Stik/Strip to DSI] was concealed." Indeed, it is undisputed that Goade's attorney voluntarily informed Vanguard of the 1998 Closing several weeks prior to the actual date of the closing. See Titterington Tr. at 12, 38-39. Vanguard will no doubt point to the statements in the May 1998 letter regarding whether the assets of Stik/Strip would be encumbered by the 1998 Sale. However, as has been demonstrated above, the statements made in the letter were reasonably believed by Goade to be true when made, and do not evidence an intent by Goade to "conceal" any aspects of the 1998 Closing. Moreover, as is explained at length above, Heller recorded UCC statements with the Secretaries of State of Oklahoma and Illinois evidencing its security interest in substantially all of Stik/Strip's assets only days after the 1998 Closing. Far

from being concealed, the nature of the 1998 Closing was apparent to the general public, including Vanguard, only days after the 1998 Closing.

Likewise, the undisputed facts demonstrate that the 1998 Closing did not occur "shortly before . . . a substantial debt was incurred" (Factor 10), despite the eventual entry of the consent Judgment in the Patent Action. It is undisputed that at the time of the 1998 Closing, no Judgment in the Patent Action had entered. Indeed, Stik/Strip's attorney in the Patent Action, Joseph Titterington, believed that Stik/Strip had a number of strong defenses in the Patent Action, and he believed that Stik/Strip had a good chance of succeeding on those defenses. See Titterington Tr. at 50-56. Thus, at the time of the 1998 Closing, it was not a foregone conclusion that the Patent Action would result in a "substantial debt," and there is nothing in the record which indicates that Goade, or any of the other Defendants, believed at the time of the 1998 Closing that the Patent Action would result in a judgment in favor of Vanguard. Thus, the facts do not support the application of the Factor 10 in this action.

Therefore, the one and only applicable Factor is number 4. It is undisputed that prior to the 1998 Closing, Vanguard threatened to sue, *inter alia*, Goade and the Goade Trust. See Letter from Attorney Rosen to J. Titterington, dated 5/26/98 (Appendix, Exhibit 14). The applicability of this sole factor alone, however, does not preclude summary judgment in Defendants favor. See Davila, 2000 U.S. Dist. LEXIS 2684, at *38 (granting defendants summary judgment motion on UFTA claim, holding that "a finding that [defendant] knew that it faced potential liability does not, without more, give rise to an inference that the sale of its assets was made with the intent of escaping liability.").

As is demonstrated above, the facts of the 1998 Closing, when viewed against the eleven "fraud factors" of the UFTA, do not give rise to any inference of an intent on behalf of any of the

Defendants to delay, hinder or defraud Vanguard's ability to collect on the Judgment entered two years later in the Patent Action. Therefore, with respect to the 1998 Closing, Defendants are entitled to summary judgment on Plaintiff's UFTA claim.

### (b) No Evidence of Intent to Hinder, Delay or Defraud In Connection With the 2000 Closing

There is also no evidence in this case of an intent by any of the Defendants in this action to hinder, delay or defraud Vanguard in connection with the 2000 Sale of Stik/Strip's assets to REG. The clearest and most important indication of this is the fact that Heller – the commercial lender that conducted the foreclosure sale and had final approval over to whom the assets of Stik/Strip would be sold – had absolutely no incentive to assist in the perpetration of a "fraud" on Vanguard. Indeed, to Heller – a secured lender – the judgment in the Patent Action was meaningless, and would not have factored into Heller's decision as to who would be the ultimate purchaser of Stik/Strip's assets. See Davila, 2000 U.S. Dist. LEXIS 2784, at *40 (noting in a situation virtually identical to the one at issue in this case, that a secured lender who approves the sale of assets to a third party in a foreclosure sale has no incentive to structure the foreclosure sale to avoid a judgment held by an unsecured judgment creditor).

To the contrary, Heller approved the sale to Goade because it was in Heller's best interest to do so. See Wilder Tr. at 60-61, 65-66. Heller had no incentive to use the foreclosure sale to "feather Mr. Goade's nest in some way." See id. There is no evidence that there was a "conspiracy" between Goade and Heller to prevent Vanguard from collecting on the Judgment in the Patent Action, and in fact the only evidence in the record indicates that there was no such conspiracy. See Wilder Tr. at 38 (indicating that the Heller executive involved in the 2000 Sale had never even spoken to Goade until after the instant lawsuit was commenced). Thus, the 2000 Sale was not tinged with an "actual intent to hinder, delay or defraud" Vanguard.

Analyzing the facts of this case in light of the UFTA's "fraud factors" does not alter this conclusion. First, the 2000 Sale was not a "transfer to an insider" (Factor 1). It is undisputed that Goade was no longer employed by DSI at the time of the 2000 Sale, nor was he on DSI's board of directors. Indeed, by the time of the 2000 Sale, Goade had not been to Stik/Strip's plant since his termination from DSI in 1999. See Goade '04 Tr. at 163-164. Likewise, in February 2000, Goade had been removed from DSI's board of directors. See Consent of Stockholder of DocuSystems Holdings Corporation, dated 2/14/00 (removing Goade from DSI's board of directors). (Appendix, Exhibit 30). Thus, it is undisputed that at the time of the 2000 Sale, Goade was not an "insider" as that term is defined in the UFTA.

The evidence also demonstrates that the 2000 Sale was not concealed from Vanguard (Factor 3). The clearest proof of this is the fact that Dresner solicited a bid for the assets of Stik/Strip from Vanguard, and would have entertained any competitive offer received from Vanguard for those assets. See Wilder Tr. at 122 (indicating Vanguard submitted a bid for the assets of Stik/Strip); Riddle Tr. at 46-47 ("If we had a legitimate offer from [Vanguard], they would have been at the table. . . . We [Dresner] are hired . . . to sell an operation . . . , our incentive is to sell it for the highest price. If we had an offer from a party, we would include them in the mix and assess that against the other bids that we had"); Memo to R. Kane from J. Kacergis, dated 7/13/00, and attachments (Appendix, Exhibit 45) (soliciting bid from Vanguard). There is no evidence indicating an attempt by any of the Defendants to "conceal" the 2000 Sale.

Factor 4 – "before the transfer was made . . . the debtor had been sued or threatened with suit" – is inapplicable because none of the Defendants in this action were parties to the Patent Action or were threatened with suit to enforce the Judgment prior to the 2000 Sale. However, as is stated above in connection with the 1998 Closing, even if Vanguard's prior threat in May 1998

to sue Goade and the Goade Trust were considered relevant, the applicability of this factor alone does not preclude summary judgment in Defendants favor. See Davila, 2000 U.S. Dist. LEXIS 2684, at *38

Factor 5 – whether the transfer was "of substantially all the debtor's assets" – is true in most foreclosure sales conducted by a secured creditor who holds a lien over substantially all of the assets of the company whose assets are being sold in the foreclosure sale. Accordingly, Factor 5 without more does not lead to the conclusion that the 2000 Sale was fraudulent. See Davila, 2000 U.S. Dist. LEXIS 2684, at *37. The same can be said of Factor 9 – whether Stik/Strip was "insolvent or became insolvent shortly after the transfer was made." See id. at *38 ("[I]nsolvency was the reason for the transfer, just as it is in every forced sale of collateral by a secured creditor conducted under the UCC.").

There are no allegations in the Complaint – nor any evidence, for that matter – that any of the Defendants "absconded," that any of the Defendants "removed or concealed assets," that the assets of Stik/Strip were transferred to a "lienor who transferred the assets to an insider of the debtor" in connection with the 2000 Sale, or that DSI/Stik/Strip maintained control over Stik/Strip's assets after the 2000 Sale. Thus, Factors 2, 6, 7 and 11 are inapplicable in this action.

Factor 8 – whether the "value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred" – likewise does not lead to the conclusion that the 2000 Sale was tinged with fraud or intent to hinder or delay Vanguard in collecting on the Judgment in the Patent Action. Despite Vanguard's claims in the Complaint to the contrary, there is no evidence in the record indicating that REG purchased Stik/Strip's assets for an "artificially depressed price." See Complaint ¶ 44. The only evidence in the record on this issue indicates that Dresner and Heller evaluated several bids for the assets of Stik/Strip, and that they

decided to accept Goade's offer for Stik/Strip's assets only because Goade's offer had a greater likelihood of closing. While other companies had submitted more higher bids for the assets of Stik/Strip, Goade's bid was approved by Heller due to the certainty that the deal with Goade would close. Goade's cash offer was unique amongst the other bidders because it was not contingent on Goade's ability to obtain financing, and because Goade did not require substantial "due diligence" prior to the sale. Thus, the fact that other bidders made higher offers does not render Goade's offer "artificially depressed."

The last remaining Factor 10, i.e., whether the transfer occurred "shortly before or shortly after a substantial debt was incurred" likewise does not create a disputed issue of fact which should preclude summary judgment. It is true that DSI and Stik/Strip had agreed to the Judgment in the Patent Action only a few weeks before the 2000 Sale, Goade did not participate in the decision to enter into that Judgment. Vanguard has presented no evidence that Goade sold his company in 1998 and then bought it back in the 2000 Sale to avoid being liable for the Judgment in the Patent Action. The only evidence indicates that the 2000 Sale occurred because DSI had been in a financial downward spiral for months prior to the entry of the Judgment in the Patent Action. See Wilder Tr. at 17-20; Riddle Tr. at 7-10. Indeed, DSI had defaulted on its financial obligations to Heller in late 1999, months before the entry of the Judgment in the Patent Action. See Wilder Tr. at 11-12; 16-19. Far from being related in any way to the Patent Action or the Judgment, the 2000 Sale was the culmination of Heller's nearly year-long attempt to turn DSI around. See Riddle Tr. at 8, 16-17.

As is demonstrated above, the facts of the 2000 Closing, when viewed against the eleven "fraud factors" of the UFTA, do not give rise to any inference of an intent on behalf of any of the Defendants to delay, hinder or defraud Vanguard's ability to collect on the Judgment in the

Patent Action. Therefore, with respect to the 2000 Closing, Defendants are entitled to summary judgment on Plaintiff's UFTA claim.

## **CONCLUSION**

For all of the forgoing reasons, Defendants respectfully submit that they are entitled to summary judgment on Counts I through VIII of Vanguard's Complaint.

THE DEFENDANTS
BY THEIR ATTORNEYS

Marc L. Zaken (CT 03110)
mzaken@edwardsangell.com
EDWARDS & ANGELL, LLP
Three Stamford Plaza
301 Tresser Boulevard
Stamford, CT 06901
Tel: (203) 353-6819
Fax: (888) 325-1667

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Defendants' Memorandum in Support of

Defendants' Motion for Summary Judgment was sent mailed first class mail, postage prepaid to

counsel for Plaintiff, addressed as follows:

> George Bochetto, Esquire
> David J. Perlman, Esquire
> 1524 Locust Street
> Philadelphia, PA 19102
>
> A. Richard Feldman, Esquire
> Bazelon, Less & Feldman, P.C.
> 1515 Market Street, Suite 700
> Philadelphia, PA 19102

this 1st day of September, 2004.


_____
Marc L. Zaken