**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| VANGUARD IDENTIFICATION SYSTEMS, INC., | : | |
| | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| | : | **NO. 02-2943** |
| v. | : | |
| | : | |
| RONNIE E. GOADE, SR., et. al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 50 MOTION**
**FOR JUDGMENT AS A MATTER OF LAW**

**I. INTRODUCTION**

Contrary to Defendants' Motion, Vanguard's Counts I - II and VI - VII[1] claims are not barred by the two-year limitations statute because damages are an element of the causes of action and Vanguard was not damaged until 1) the Judgment was entered on July 10, 2000, and 2) Vanguard was then unable to collect – well within two years of filing.   The wrongful conduct in each of the Counts prevented Vanguard from collecting from the defendants in the Patent Action, and Vanguard had no basis for executing against the assets of the Patent Action defendants until the Court entered judgment.  Vanguard's claim in this action did not accrue until those two events occurred.

The facts related to Goade's state of mind are more than sufficient to send the fraud-

---

[1]     The Counts are as follows: Count I - Fraud; Count II - Conspiracy to Defraud; Count III - Negligent Misrepresentation (denominated "promissory estoppel"); Count IV - Successor Liability; Count V - Uniform Fraudulent Transfer Act; Count VI - Breach of Duty of Liquidating Trustee; Count VII - Accounting; Count VIII - Constructive Trust.

related claims – fraud, conspiracy to defraud, promissory estoppel or negligent misrepresentation – to the jury. In fact, the "transactional documents" that Goade said did not encumber the assets did, in fact, grant security interests in the assets. Goade signed at least two transactional documents directly on point. Moreover, multiple documents received by Goade long before the fraudulent misrepresentation and omission indicated that the assets would be encumbered. With testimony that he was too preoccupied to open his mail for thirty days, Goade's credibility is, to say the least, at issue.

Vanguard's successor liability claim must go to the jury. Vanguard must prevail under the substantial continuity doctrine of successor liability. Moreover, other successor liability doctrines, such as the "mere continuation" or "*de facto* merger" doctrine, support summary judgment in Vanguard's favor against REG. REG inherited every aspect of SSI. Further, REG was, and held itself out to be, the successor to the business operation that was SSI. Further, as a patent judgment, the judgment is enforceable against a party in privity.

That REG purchased SSI through a sale under UCC Article 9 does not save Defendants. Under the choice of law rules properly applied, Pennsylvania law applies, and hence the *Continental Insurance* case, applying the successor liability doctrine in the context of Article 9, governs this action. But even if the *Continental* case did not apply, Defendants did not participate in the foreclosure, obtaining the property of SSI, in good faith as the UCC requires of a transferee who would acquire assets without liability.

The May 1998 transaction was a *de facto* liquidation in that it rendered the assets unavailable to creditors while compensating Goade.

Finally, the Uniform Fraudulent Transfer Act applies both to the May 1998 transaction

and to Goade's and REG's July 2000 repurchase of SSI.   First, Goade's sale of SSI to Docusystems was an effort to hinder, delay, and defraud Vanguard.  Second, the instant Defendants need not be debtors to be liable; the purpose of the statute is to void a transfer or extend liability to transferees.   Secondly, there are factual issues on the "badges of fraud" that would establish intent.

## II. STATEMENT OF FACTS

### A.    Fraud Related Facts

On May 26, 1998, Vanguard's attorney in the Patent Action, Gary A. Rosen, Esquire, learning that SSI was to be sold,  wrote SSI's lawyer seeking:

> (2) confirmation that SSI's assets will not be encumbered or depleted by this transaction, and that there will be no material adverse impact on its balance sheet;

Clearly, Rosen was asking whether SSI's buyer, Docusystems, would be encumbering the assets, thereby preventing Vanguard from collecting.   Obviously Goade and SSI, being sellers, would not encumber the assets.  Only the buyer would leverage the assets.   And if Goade did not know, Rosen was asking him to find out, not to feign knowledge and stick his head in the sand.

Titterington, relying on Goade, drafted a reply to Rosen's Letter.  It stated, in part:

> We have checked with our client and have been authorized to inform you of the following:
>
> *   *   *
>
> 2.    The transaction involves a sale of stock and as far as is known to Ron Goade, Sr., there is nothing in the transactional documents which leads him to believe that SSI's assets will be encumbered or depleted by the sales transaction or that the sale will have a material adverse impact on SSI's balance sheet.

There were no statements that Goade did not know what Docusystems was doing, that Goade did

not make an inquiry of Docusystems, or that Goade was unable to provide an answer to the question because he did not know what the buyer was doing. Rather, there was a representation that the assets would not be encumbered and that the sale would not adversely affect the balance sheet. Defendants hide behind a rhetorical fig leaf, a qualification that they claim relieves them of making a complete and/or properly investigated response: "as far as is known to Ron Goade, Sr."

Of course, the transactional documents did indeed indicate that the assets would be encumbered. The security interests could not have been put in place, the leveraged buyout could not have occurred, without their being encumbered. The transaction involved a credit line for approximately $55 million from Heller Financial to Docusystems, secured by the assets of Docusystems, including the assets of SSI. The transaction, precisely the transaction about which Rosen was inquiring, included the securitization of the assets in question, and the documents naturally established the security interest. Plaintiff's Exhibit 40, for example, is the Security Agreement that pledges the assets of SSI. There can be no question that the transactional documents, and what any reasonable person would understand to be the transactional documents, especially in the context of Rosen's inquiry, indicated that the assets would be encumbered.

Likewise, there can be no question that Goade knew the assets would be encumbered. Indeed, two of the transactional documents referencing the security interest were signed by Goade. Thus, even if he claims he never saw the documents actually granting the security interest, he signed at least two that dealt with it. Plaintiff's Exhibit 37 is a Subordination Agreement signed by Goade. On page 1, it identifies Heller and the **Senior** Loan Agreement between it and Docusystems and the **Junior** Creditors. Moreover, on page 3, it refers to the

assets securing the **Senior** Obligations, which would be the obligations to Heller. Plaintiff's Exhibit 38 is an Assignment of Representations, Warranties and Indemnities, for which Goade signed the accompanying acknowledgment. On its first page, it, too, refers to Heller and the Credit Agreement it entered. More importantly, Section D of the Preliminary Statement states that Docusystems and SSI Acquisition Corporation granted a security interest in all of the assets of Docusystems and SSI. It is precisely such documents, both those unsigned by Goade and granting the security interest and those signed by Goade and referring to it, that Vanguard was inquiring about and about which Goade knowingly provided a misrepresentation.

There can be no question that Goade knew that the assets would be encumbered long before the misrepresentations in the May 26, 1998 letter. It was obvious because, as Goade well knew, he would be receiving, as part of the consideration for the sale of SSI, a **Junior Subordinated** Promissory Note and because he knew that Heller would be Docusystems' senior lender. That, as a result of the transaction, Goade would be receiving a note junior to the debt to Heller was driven home to him time and again. For example, as early as February 10, 1998, he received and signed a commitment letter indicating he would be receiving the $1.3 million junior subordinated note.

Thereafter, he received numerous documents discussing the Junior Subordinated Note, whether they were letters or drafts of the Stock Purchase and Merger Agreement itself, which obviously described the Note as well as attached it as an exhibit.[2] May 22,1998 Letter from Chris Coleman copied to Ron Goade, Plaintiff's Exhibit 23; April 2, 1998 Letter from Chris

---

[2]    The Note, and its drafts, begins with a preface stating that it is subordinate to the senior obligations of Heller.

Coleman to Ron Goade, Plaintiff's Exhibit 10;  Letter from Chris Coleman copied to Ron Goade

transmitting draft of Purchase Agreement, Plaintiff's Exhibit 11; April 15, 1999 Letter from

Chris Coleman copied to Ron Goade, Plaintiff's Exhibit 13; May 22, 1999 Letter from Chris

Coleman copied to Ron Goade, Plaintiff's Exhibit 23.

On April 10, 1998, Goade received a copy of a letter from his attorney to Docusystems'

attorney that not only discussed the Junior Subordinated Note but asked, "where and under what

terms is it [Docusystems] obtaining this financing?" – exactly the same question Rosen asked

Titterington and for which he received a false response.   Plaintiff's Exhibit 12.  The letter also

sought assurances that the note would be paid.  On May 11, 1998, Goade received a copy of a

letter from his attorney to Docusystems' attorney that, in addition to referring to Goade's junior

subordinated note and certain senior obligations, asked for a copy of the new credit facility

agreement.  Plaintiff's Exhibit 15.

Goade even admitted receiving drafts of the Merger Agreement, which mentions the

senior obligations, his junior note, and Heller, and which attaches the note as an exhibit.

Goade received a copy of the May 26, 1998 Letter from Titterington to Rosen.

Nevertheless, neither Goade nor any agent of Goade's, including his attorneys, corrected the false

statements that the assets would not be encumbered or that the transaction would have a negative

impact on the balance sheet

### B.    Successor Liability Facts.

REG is the functional successor to Stik/Strip.  REG acquired Stik/Strip's real properties

in both Edmond and Oklahoma City, Oklahoma.  Further, REG acquired all of the plant and

equipment located at those sites. Plaintiff's Exhibit 61 at Response 4.

REG acquired substantially all of the assets of Stik/Strip including:

1.      All inventory;

2.      All furniture, art work, fixtures, and equipment;

3.      All trade accounts receivable, notes receivable, negotiable instruments, and chattel paper;

4.      All license agreements, distribution agreements, sales representative agreements, service agreements, supply agreements, franchise agreements, computer software agreements, and technical service agreements to which Stik/Strip Laminating Company, Inc. is a party;

5.      All customer lists and customer records and information;

6.      All books and records;

7.      All rights in connection with prepaid expenses with respect to the assets listed in this Request for Admission;

8.      All computer software, including all documents and sources codes with respect to such software, and all licenses and leases of software;

9.      All letterhead, sales and promotional materials, catalogues, and advertising literature;

10.      All telephone numbers of Stik/Strip Laminating Company, Inc.'s and all lock boxes to which Stik/Strip Laminating Company, Inc.'s account debtors remit payments; and

11.      Stik/Strip Laminating Company, Inc.'s rights, title and interest in the lease for certain storage space at 3601 S. Broadway, Suite 1000, Edmond, Oklahoma.

Plaintiff's Exhibit 62 (Second Set of Requests for Admission were not deemed admitted); Goade

Testimony.

 In essence, all of the assets necessary to operate the business were transferred to REG.

 But the continuity between Stik/Strip and REG extends beyond just the real estate and

operating assets.  For one, the name under which they were doing business was functionally

identical.  Stik/Strip was known in the industry as "SSI," and its full doing-business-as name was

"SSI Custom Data Cards."  After REG's purchase, Goade – instead of calling the company REG –

began doing business as "SSI Technologies."  This was shortened to SSI.  Plaintiff's Exhibit 59 and

66.  Indeed, both the July 25, 2001 and the May 26, 2004 website printouts, stand as admissions that

Stik/Strip (publicly known and even defined on the website as "SSI") is the same as REG (also

referred to as "SSI").   For example, the SSI Technologies website states "For over 30 years SSI has

been the leader in card manufacturing," relying on the common trade name ("SSI") while

acknowledging that the repurchased company is the same as Stik/Strip of decades ago.  The "History

of SSI Technologies" provided on the September 2004 printout also admits to identity between the

two companies.

     REG also retained all of its employees, except one.

     Finally, there is shareholder continuity.  Goade and/or his Trust owned thirteen percent (13%)

of Docusystems, which owned SSI, and Goade and/or his Trust own one-hundred percent (100%)

of REG.

### III. ARGUMENT

**A.    Plaintiff's Claims Are Not Barred by the Two-Year Statute of Limitations.**

     Although Defendants argue that Counts I, II, III, VI, and VII should be dismissed because the

Complaint was filed more than two years after the fraudulent May 26, 1998 letter, they ignore that

damages are an element of each cause of action and that Vanguard was not damaged until the

Judgment was entered and Vanguard was unable to collect.[3]  There can be no dispute that damages

---

[3]     Count I is a claim for fraud; Count II, conspiracy to defraud; Count III, promissory
estoppel or negligent misrepresentation; Count VI, breach of fiduciary duty; Count VII, an
accounting.  Defendants observe that fraud and breach of fiduciary duty are governed by

are an element of the pertinent causes of action. *Donahue v. W.C.A.B.* (*Philadelphia Gas Works*), 2004 WL 1631424 (Pa. Cmlwth.) (Damages element of fraud.); *Goldstein v. Phillip Morris, Inc.*, 2004 PA Super 260, 854 A.2d 585 (2004) (same); *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882 (1994) (In negligent misrepresentation claim, injury must result to one relying on representation.); *McDermott v. Party City Corp.*, 11 F.Supp.2d 612 (E.D. Pa. 1998) (Injury is an element in a breach of fiduciary duty claim.)

Obviously, the cause of action arises only after the damage element is obtained. *Ross v. Johns-Manville Corp.*, 766 F. 2d. 823, 826 (3d Cir. 1985) ("A claim arising under Pennsylvania law accrues at 'the occurrence of the final significant event necessary to make the claim suable,'" citing *Mack Trucks, Inc. v. Bendix-Westinghouse Automotive*, 372 F. 2d. 18, 20 (3d Cir. 1966); *Baron v. Allied Artists Pictures Corp.*, 717 F. 2d. 105 (cause of action accrues only when it could be prosecuted to a successful conclusion – in tort, that is when damages occur.) For example, on a claim for indemnity, contribution, or reimbursement for a third party, the injury element accrues for statute of limitations purpose only after judgment or settlement. *Shocey,* ex rel *Litt v. Duck Head Apparel Co., Inc.*, 4a F. Supp. 413 (M.P. Pa. 1999) *Site-Blauvelt Engineers, Inc. v. First Union Corp.*, 153 F. Supp. 2d. 707 (E.D. Pa. 2001).

The encumbering of SSI's assets impacted Vanguard because it prevented Vanguard from collecting, but Vanguard had no basis for collection until the judgment was entered. The encumbrance prevented Vanguard from collecting because it left no assets against which Vanguard could execute, because it allowed Heller to foreclose on all of the assets four days after the Judgment

---

Pennsylvania's two-year limitations statute and that the other counts are based on the same misrepresentation.

was entered, and – if Defendants' arguments on successor liability are believed – because the encumbrance and foreclosure bar Vanguard from collecting from SSI's corporate successor.  It was not until the judgment that Vanguard was damaged for purposes of the claims in this action. Obviously, Vanguard had no right to collect until Judgment was entered on July 10, 2000.  Because the lawsuit was initiated on May 16, 2002, Vanguard filed within two years of when its claims accrued.

Indeed, as of September 1999, around the time Vanguard is said to have the Dunn & Bradstreet reports in its file, Vanguard had settled the case with Docusystems – although Goade rejected the settlement. Plaintiff's Exhibit 50. Thus, at that pre-judgment moment, there might have been no damages whatsoever in this action.

Defendants tend to confuse the Motion for Injunctive Relief or the naming of Goade individually in the Patent Action, the recourse threatened in the May 26 fraudulent letter, with the instant action.  They argue that, with reasonable diligence, Vanguard would have discovered the falsity of the May 26 letter sooner than it did, by, for example, finding the financing statements filed in Oklahoma and Illinois.[4]   Vanguard therefore – according to Defendants – should have done something.  But the something it ultimately did, the act relevant to the statute of limitations analysis, in **this** case, was not going back and bringing a motion for injunctive relief in the Patent Action but bringing the instant action with new claims against new Defendants.  Yet these claims did not accrue until the Judgment was entered and Vanguard discovered it was unable to collect.

---

[4]      Of course, Vanguard had no reason to undertake to look for the financing statements, given Goade's misrepresentation.  Surely, Defendants are not arguing that Vanguard should have investigated because it should have suspected Goade was misrepresenting the truth.

### B.    The Facts Support Jury Consideration Of Vanguard's Negligent Misrepresentation, Fraud, And Related Claims

The elements of negligent misrepresentation are:

> (1) a misrepresentation of a material fact;  (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it;  and (4) injury must result to the party acting in justifiable reliance on the misrepresentation.

*Gibbs* at 210, 890.    As stated in *Gibbs*:

> Thus, negligent misrepresentation differs from intentional misrepresentation in that to commit the former, the speaker need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words.

*Id.*

The elements of fraud are:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Goldstein.*

Defendants argue a lack of scienter, for which there are three applicable standards: negligence or failure to make a reasonable investigation (under negligent misrepresentation theory), recklessness (under fraud theory) and knowledge of the misrepresentation (under fraud). Defendants, play rheoretical games by couching their argument as if there were no misrepresentation whatsoever, as if Vanguard was asking, and Goade was only making a statement, about the extent of his knowledge; they place all the weight on the prefatory clause, which was not really part of Rosen's inquiry, "as far as is known to Ron Goade, Sr...."    But, in context,  the gist of the

misrepresentation does not concern the extent of Goade's knowledge but whether the assets would be encumbered or the balance sheet affected by the transaction under which SSI was sold to Docusystems. The misrepresentation is that the assets would not be encumbered or the balance sheet impacted. Alternatively, there is no disclosure that Goade does not know what Docusystems is doing, no disclosure that the meaning of "transactional documents" is myopically restricted, or no disclosure that Goade made no inquiry of Docusystems. When the inquiry was made, Goade had a duty to respond without artifice or deceit.

At the least, scienter must be considered by the jury. First, Vanguard has presented evidence that, at a minimum, creates a factual issue as to the fraud standards of recklessness and intentional misrepresentation. Documents that Goade received long before the May 29, 1998 transaction repeatedly indicated that there would be a senior and secured debt stemming from loans made by Heller. A sophisticated businessman, Goade understood the implications of these documents, or, at the very least, the jury is entitled to assess any professions of ignorance or lack of sophistication. In addition, the security agreements that created the encumbrance were part of the transactional documents at the May 29 closing, and, even if Goade did not sign these, he signed other documents that referenced the secured debt. That he received additional information on May 29 indicative of the encumbrance does not relieve him of responsibility for a May 26 misrepresentation; after receiving copies of the May 26, 1998 fraudulent letter, Goade remained silent, allowing its misrepresentations to stand and allowing Vanguard to rely on them.[5]

Even if one were to believe, as Defendants' Memorandum argues, that Goade knew nothing,

---

[5]     It is not necessary to find that Goade owed Vanguard a fiduciary duty to find that he had a duty to correct a misrepresentation.

Goade would be liable for a failure to inquire of Docusystems about encumbering the assets or a failure to disclose that he made no inquiry of Docusystems.    Obviously, Vanguard was asking whether the purchaser, whose identity Vanguard was then unaware of, was going to encumber the assets.  Goade does not, and cannot, claim that he made any inquiry.   SSI's Controller admitted that, if confronted with the same questions from Rosen, he would have asked Docusystems about the assets being encumbered.    Likewise, Goade does not, and cannot, claim, that he or his agents informed Vanguard that he made no inquiry of Docusystems and did not know what Docusystems was going to do.    Upon receiving the May 26, 1998 fraudulent letter, he made no effort to correct its deficiencies.  At the very least, there is a factual issue on Vanguard's negligent misrepresentation and conspiracy to defraud claims, on the basis of Goade's inaction and/or omissions that resulted in Vanguard's being deceived.

There is also a clear, factual issue on the fraud claim.  It is for the jury to decide whether, after receiving multiple indications of a senior secured debt, Goade knew about it.

### C.    Vanguard Is Entitled To Summary Judgment On Its Count IV Successor Liability Claim.

The doctrines that impose successor liability on a corporation that purchased a predecessor's assets are flexible in that they identify a number of factors to be considered, no single factor being determinative.    The facts in this case are uniquely appropriate for imposing liability for the Judgment entered against SSI and Docusystems on REG.    As Vanguard observed, finding REG liable does not punish a stranger to the wrongful conduct, as successor liability typically risks doing. In this case, the liability would not follow merely a set of assets, but also an individual corporate owner whose actions gave rise to the original wrongdoing and to the patent infringement liability.

-13-

Liability should be imposed under the substantial continuity doctrine and also under the more general rule, from which the substantial continuity doctrine was derived, of *de facto* succession – i.e. that the purchasing corporation is merely a continuation of the predecessor.

There are significant exceptions to the general rule that when one company sells all of its assets to another the successor does not acquire the liabilities of the transferor merely because it acquired its assets. Specifically, the transferee will be liable for the transferor's obligations where 1) the purchaser expressly or impliedly agrees to assume such obligation; 2) the transaction amounts to a consolidation or merger; 3) the purchasing corporation is merely a continuation of the selling corporation; or 4) the transaction was fraudulently entered into to escape liability. *Raytech Corporation v. White*, 54 F. 3d. 187, n. 6 at 192 (3rd Cir. 1995); *Dawejko v. Jorgensen Steel Company*, 290 Pa. Super. 15, 18, 434 A. 2d. 106, 107 (1981).

The third exception listed above has given rise to the substantial continuity exception, which allows for the imposition of liability on a successor even where there is not identity of officers directors or shareholders; in general, the doctrine applies "where the public policy vindicated by recovery from the implicated assets is paramount to that supported by the traditional rules delimiting successor liability." *United States of America v. Keystone Sanitation Company, Inc.*, 1996 WL 672891 (M.D. Pa.) at *5 quoting *United States v. Mexico Feed and Seed Co., Inc.*, 980 F. 2d 478, 487 (8th Cir. 1992); *Andritz Sprout-Bauer, Inc. V. Beazer East Inc.*, 12 F. Supp. 2d. 391, 404-405 (M.D. Pa. 1998); *United States v. Atlas Minerals and Chemicals, Inc.*, 824 F. Supp. 46, 49-50 (E.D. Pa. 1993): *Conway v. White Trucks*, 692 F. Supp. 442, 450-450 (M.D. Pa. 1988); *Dawejko*; See also, *Commonwealth v. Lavelle*, 382 Pa. Super. 3567, 555 A. 2d 218 (1989) (applying *de facto* merger doctrine under circumstances also subject to substantial continuity doctrine.)

-14-

In applying the substantial continuity doctrine – also known as the "continuity of enterprise theory" – courts have weighed a number of factors. *Id.* The factors, none of which constitutes a requirement, were succinctly articulated in *United States of America v. Keystone Sanitation Company, Inc.* as follows:

(1) retention of the same employees;

(2) retention of the same supervisory personnel;

(3) retention of the same production facilities in the same location;

(4) production of the same product;

(5) retention of the same name;

(6) continuity of assets;

(7) continuity of general business operations; and

(8) whether the successor holds itself out as the continuation of the previous enterprise.[6]

In support of its list of factors, the *Keystone* court cited *United States v. Carolina Transformer Co.*, 978 F. 2d 832, 838 (4th Cir. 1992).

Significantly, that a transfer of assets occurs as a foreclosure sale under Article 9 of the Uniform Commercial Code, as in this case, does not insulate the purchaser of the assets from a successor liability claim. *Continental Insurance Company v. Schneider*, 2002 Pa Super 323, 810 A.2d 127 (2002). (Company that had purchased assets of debtor company from secured creditor pursuant to UCC was subject to successor liability claim.) Thus, REG can find no refuge in the Uniform Commercial Code.

---

[6]    Being a CERCLA case, *Keystone* added as a factor whether the transfer to the new corporation was an effort to avoid environmental liability.

Clearly, all of the factors favor imposing liability on REG. It operated with all of the same employees as Stik/Strip, except one, Jeff Bainter ("Bainter"). Bainter was the on-site supervisory person prior to REG's July 10, 2000 repurchase, and naturally, he was replaced by Goade. All other supervisory personnel were the same. Production took place at the same location, using the same facilities. REG used the same name and the same assets. It conducted substantially the same business and holds itself out to be the successor of Stik/Strip.

The policy considerations underlying the substantial continuity doctrine strongly support a finding of successor liability in this case. Stik/Strip's admitted infringement of Vanguard's patents occurred when Goade owned and operated Stik/Strip, and the Patent Action was filed when Goade owned and operated Stik/Strip. Thus, from the policy viewpoint, it was mere happenstance that there was an interim owner, Docusystems. Because the business was reacquired by the original owner/operator, a finding of liability does not penalize an otherwise innocent business owner who happened to acquire the assets and business operations subject to a preexisting liability. Rather, the assets and operations landed in the lap of the responsible individual. In this case, successor liability would cause liability to follow not simply the assets and business operations that gave rise to the liability but also the individual. This is a particularly apt factual setting for application of the substantial continuing doctrine.

Defendants would apply an unjustifiably narrow view of the substantial continuity doctrine. They will argue that it is limited to "cases involving federal statutory rights and public policies, such as CERCLA cases." While it has been applied in CERCLA cases, it has not been limited to CERCLA, or indeed, to federal statutory rights. Consistent application in one context is not equivalent to a limitation. For example, it has been applied to state law products liability claims.

Defendants' Opposition at 16; e.g. *Dawejko v. Jorgensen Steel Company*, 290 Pa. Super. 15, 18, 434 A. 2d. 106, 107 (1981); *Conway v. White Trucks*, 692 F. Supp. 442, 450-450 (M.D. Pa. 1988).

As Vanguard observed, the doctrine applies "where the public policy vindicated by recovery from the implicated assets is paramount to that supported by the traditional rules delimiting successor liability." *United States of America v. Keystone Sanitation Company, Inc.*, 1996 WL 672891 (M.D. Pa.) at *5 quoting *United States v. Mexico Feed and Seed Co., Inc.*, 980 F. 2d 478, 487 (8th Cir. 1992). Public policy is not limited to federal statutes or state product liability law. Just as the successor to a polluter should be liable for clean-up costs and just as the successor to the manufacturer of a defective product should remain liable to support public policy, so SSI's successor should remain liable for patent infringement and for a judgment entered immediately before the succession. Corporations should not be permitted to evade wilful patent infringement or the consequences of a judgment by the trick of an asset sale. Public policy supports enforcement of patents, a Federal right, no less than it supports obligations under CERCLA or the rights of plaintiffs injured by defective products who could not recover but for the doctrine. Moreover, public policy supports the satisfaction of judgments, particularly when the individual who owns and controls the party making the payment was the same as the individual who owned and controlled the party that committed the wrong.

Even without the substantial continuity doctrine, the undisputed facts mandate successor liability. It is true that the *de facto* merger and the mere continuation aspects of successor liability are similar. See, e.g. *Continental Insurance Company v. Schneider*, 2002 Pa Super 323, 810 A.2d 127, 134-135 (2002); *Commonwealth v. Lavelle*, 382 Pa. Super. 356, 374 555 A. 2d 218, 227 (1989) (de facto merger and mere continuation theories are difficult to distinguish.) Under both doctrines, the

factors to be considered are just that – factors and not essential elements. Thus, continuity of ownership, though a factor, is not a requirement. Indeed, the *de facto* merger doctrine has been applied to establish successor liability where there was not continuity of ownership. *Commonwealth v. Lavelle*. Even without continuity of ownership, the other factors merit a finding of liability against REG.

In any event, in the instant case, there is continuity of ownership in two respects. First, prior to the July 2000 transaction, Goade owned 13 percent of Docusystems, which, in turn, owned SSI. Thus, although other Docusystems shareholders have no interest in REG, Goade maintained an ownership interest, albeit through Docusystems, both before and after the July 2000 transaction. Secondly, from an even broader temporal view, especially appropriate to the instant case, there is indeed full continuity of ownership: when the infringement was committed and the Patent Action commenced, Goade owned all of the defendant infringer, SSI, and now he has full ownership of the ultimate successor, REG, against which Vanguard seeks to enforce the Judgment.

REG is without refuge in the Uniform Commercial Code, both because the *Continental Insurance Company* case precludes it and because the assets of SSI obtained through a foreclosure sale were not, in fact, purchased in good faith. Defendants' way around the *Continental Insurance* case will be to argue that Pennsylvania law does not apply. However, their choice of law analysis is superficial and fundamentally flawed. Pennsylvania's choice of law methodology involves two-steps: first, a determination whether a conflict exists, and then, if there is a conflict, a determination of which state has the greater interest in application of its laws. The methodology was well-described in *Harsh v. Petroll*, 840 A. 2d. 404, 418 (Cmwlth. 2003):

In Pennsylvania, the choice of law analysis is a two-step process. First, the trial court

-18-

determines whether a true conflict exists between the laws of the competing states. If a false conflict exists, no further analysis is necessary. "A false conflict exists if only one jurisdiction's governmental interest would be impaired by the application of the other jurisdiction's law. In such a situation, the court must apply the law of the state whose interests would be harmed if its law were not applied." *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 (3d Cir.1991). If the court determines that a true conflict exists, it then analyzes the governmental interests and determines which state has the greater interest in the application of its law. *Ratti v. Wheeling Pittsburgh Steel Corporation,* 758 A.2d 695 (Pa. Super.2000), *petition for allowance of appeal denied,* 567 Pa. 715, 785 A.2d 90 (2001).

The instant case calls for the application of Pennsylvania law on both counts. First, there is no true conflict. Pennsylvania has determined that, despite UCC § 9-617 (13 Pa. Cons. Stat. Ann. § 9617), which allows a transferee who acts in good faith to take foreclosed-upon property irrespective of liens, the successor liability doctrine will apply. A party who purchases an entire business operation at a foreclosure sale – and retains the same employees and identifies itself with the debtor business – will inherit liabilities, for he has bought a functioning business, not a mere asset. Illinois and Oklahoma have not ruled on the issue. Consequently, there is not a true conflict, at most only a "false conflict." If this Court ruled that the successor liability doctrine did not apply, Pennsylvania's interest would be impaired. If, however, it held that the successor liability doctrine applied, neither Illinois' nor Oklahoma's interest would be affected since neither jurisdiction has not ruled on the issue.

Although it is difficult, if not impossible, to move to the second step of the analysis when neither Illinois nor Oklahoma have made a determination that actually conflicts with Pennsylvania's, one can see how Pennsylvania's interest would predominate. Pennsylvania has an interest in enforcing its judgments, particularly against defendants – in both the Patent Action and this action – over which it has jurisdiction. It has an interest in ensuring that obligations to Pennsylvania

creditors who have become creditors by virtue of Pennsylvania judicial proceedings are not evaded when an entire functioning business becomes the subject of an Article 9 foreclosure. But to apply the law that the parties selected in their foreclosure document (in this case, Illinois) or that the purchasing entity self-servingly chose as the place of its incorporation would make evasion possible in all instances, for the interested parties could always opt for the favorable law.

But even if the Continental case did not exist or is overturned, Defendants cannot pass the good faith requirement of § 9-617. 13 Pa. Cons. Stat. Ann. § 9617 provides:

§ 9617. Rights of transferee of collateral

(a) Effects of disposition.--A secured party's disposition of collateral after default:

> (1) transfers to a transferee for value all of the debtor's rights in the collateral;

> (2) discharges the security interest under which the disposition is made; and

> (3) discharges any subordinate security interest or other subordinate lien.

(b) Rights of good-faith transferee.--A transferee that acts in good faith takes free of the rights and interests described in subsection (a) even if the secured party fails to comply with this division or the requirements of any judicial proceeding.

(c) Rights of other transferee.--If a transferee does not take free of the rights and interests described in subsection (a), the transferee takes the collateral subject to:

> (1) the debtor's rights in the collateral;

> (2) the security interest or agricultural lien under which the disposition is made; and

> (3) any other security interest or other lien.

To find that Goade acted in good faith ignores his conduct in May 1998. That conduct

allowed for the security interests to be imposed without Vanguard protecting itself, which security interests, in turn, gave Heller the right to foreclose – and, if Defendants were to have their way, would give Goade and REG the right to evade the Judgment to the detriment of Vanguard.   The connection between Goade's fraudulent conduct in 1998 and the foreclosure in 2000, is anything but attenuated.  The 1998 malfeasance relates directly to the encumbering of assets that was the sine qua non of the Article 9 sale.

> **D.**     **As a Judgment in a Patent Action, the Judgment Is Enforceable Against Reg Because Validity and Infringement Were Admitted and Reg Is in Privity with Stik/Strip**.

Where a patent's validity and patent infringement are established, the judgment will be enforced not only against the defendant to the original action but against a successor who is in privity with that defendant.  *Brunswick Corporation v. Chrysler Corporation*, 408 F. 2d. 335 (7th Cir. 1969); *Arco Polymers, Inc. V. Studiengesellschaft Kohle*, 555 F. Supp. 547 (E. D. Pa. 1982).   In this case, validity and infringement are established not only by the patent Judgment but also by the Stipulation and Order accompanying the judgment, which includes explicit admissions as to both.  Plaintiff's Exhibit 1.  Because REG is undisputably in privity with SSI, the Judgment must be enforced against REG.

> **E.**     **The May 1998 Sale To Docusystems Was A De Facto Liquidation And Imposed A Duty On Goade To Preserve Assets For Vanguard.**

The May 1998 transaction had the effect of a liquidation of assets that leaves a corporation's creditors holding the proverbial bag.   Goade received over $ 9 million while SSI's assets were placed beyond the reach of creditors.  In effect, the assets were sold to Heller with Goade pocketing the proceeds.   A person who liquidates an entity's assets owes a fiduciary duty to creditors to set

aside a portion of the proceeds. *Heany v. Riddle*, 343 Pa. 453, 456, 23 A.2d 456, 458-59 (1942).

*See also In re Bagel (United States of American v. Bagel*), Bankruptcy No. 92-11440F, Adv. No. 92-0675F, 1992 WL 477052, at *14-*16 (E.D. Pa. Dec. 17, 1992).   By making no provision, Goade breached this duty.

### F.    Goade's May 1998 Sale of SSI To Docusystems was a Fraudulent Conveyance.

Goade violated 12 Pa. C.S.A. § 5104 in that his transfer of SSI to Docusystems in exchange for over $9 million was made with an intent to hinder, delay, or defraud Vanguard.

### G.    The Fraudulent Conveyance Claim Relating To The July 2000 Re-Purchase Must Be Submitted To The Jury.

Defendants begin by misconstruing the Uniform Fraudulent Transfer Act ("UFTA")(12 Pa. C. S. A. § 5104 and 24 Ok. St. §116); its purpose is not to hold a debtor liable, for a debtor would already be liable before application of the UFTA by virtue of being the debtor.   Rather, the fundamental purpose of the act is to void a transaction or hold the transferee liable for the debt. 12 Pa.C.S.A. §§ 5107-5108; 24 OK St.  § § 119-120.

As stated at 12 Pa.C.S.A. § 5104, and similarly at 24 Ok. St. § 116:

(a) General rule.--A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) with actual intent to hinder, delay or defraud any creditor of the debtor... Subsection (b) to each of these statutes, the "badges of fraud," section provides a gloss to "actual intent"under (a)(1):

(b) Certain factors.--In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

> (1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred;  and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

As the statute itself indicates, these are factors to be considered and not requirements.   Of the above factors, 4, 5, 9 and 10 indisputably apply.   In addition, 1 and 8 also apply.   With respect to 1, Goade was an insider despite his employment difficulties.   It was for this reason, in part, that Goade's offer for SSI was chosen over higher bids from Lucas Color Card, Stonehouse and potentially Vanguard.   Defendants' Exhibit 43 (Lucas Color Card $ 3 million bid); Defendants' Exhibit 42 (Stonehouse Bid)  and Riddle Deposition attached as Defendants' Exhibit 31 at 41-42; Kane Deposition at 134-144.   Indeed, his employment lawsuit made him more of an insider in that, by selling to Goade, the Docusystems directors could effectively settle Goade's lawsuit and eliminate further liability.   Consideration 8 favors Vanguard because, as indicated above, the accepted bid was

-23-

for less than the company's value. *Id.*; Kane Deposition at 201-206 (concluding that purchase price of $4 million would have been appropriate.); Goade Deposition at 136-137 (Goade considered $2 million a really good buy); Goade Deposition at 130-134 (Goade offered only what he and his wife were comfortable despite Dresner Investment's request for $5 million).

Finally, Goade's fraud of May 1998 – giving rise the absence of good faith under UCC §§ 9-617 – is among the "other factors" to be considered as a badge of fraud.  It facilitated his re-purchasing SSI in a manner that, he hopes, evades the Vanguard liability.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

GB1066

By: _____
George Bochetto, Esquire
David J. Perlman, Esquire
1524 Locust Street
Philadelphia, PA 19102
Ph: (215) 735-3900
Fx: (215) 735-2455

Date: September 23, 2004                Attorneys for Plaintiff
Vanguard Identification Systems, Inc.

-24-

## <u>CERTIFICATE OF SERVICE</u>

I, George Bochetto, Esquire, hereby certify that I caused to be served a true and correct copy of the Plaintiff's Opposition to Defendants' Rule 50 Motion for Judgment as a Matter of Law upon counsel via hand delivery:

Marc L. Zaken, Esquire
EDWARDS & ANGELL
3 Stamford Plaza
301 Tresser Boulevard
Stamford, CT 06901

**BOCHETTO & LENTZ, P.C.**
GB1066

By:_____
George Bochetto, Esquire

Date: September 23, 2004