# Exhibit B

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                              - - -

VANGUARD IDENTIFICATION     :  CIVIL ACTION NO. 02-2943
SYSTEMS, INC.               :
                            :
            v.              :  Philadelphia, Pennsylvania
                            :  September 21, 2004
RONNIE E. GOADE, SR.,       :  10:01 o'clock a.m.
Individually and as Trustee :
for the Ronnie E. Goade, Sr.:
Revocable Trust, et al      :
. . . . . . . . . . . . . . .

                          JURY TRIAL
            BEFORE THE HONORABLE JOHN P. FULLAM
               UNITED STATES DISTRICT COURT JUDGE

                              - - -

APPEARANCES:

For the Plaintiffs:    GEORGE BOCHETTO, ESQUIRE
                       Bocchetto & Lentz, PC
                       1524 Locust Street
                       Philadelphia, PA 19102

For the Defendants:    MARC L. ZAKEN, ESQUIRE
                       Edwards & Angell, LLP
                       Three Stanford Plaza, Suite 1310
                       Stanford, CT 06901

                              - - -

Audio Operator:        John Stasny

Transcribed by:        Diane Gable

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by AAERT-certified
transcribers.)
```



Laws Transcription Service
48 W. La Crosse Avenue
Lansdowne, PA 19050
(610) 623-4178

## CERTIFICATION

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____     _10/20/04_
Geraldine C. Laws, CET                 Date
Laws Transcription Service

1  documents which leads him to believe that SSI's assets will
2  be encumbered or depleted by the sales transaction, or that
3  the sale will have a material adverse impact on SSI's balance
4  sheet." Do you see that?
5  A   I do.
6  Q   All right. When you received that letter, did you
7  communicate it, or the substance of it, to your clients?
8  A   I did. I'm sure I sent a copy of the letter.
9  Q   And what did you tell them about it?
10 A   I could not give you chapter and verse of any discussion
11 we had at that point, other than this letter we deemed to be
12 responsive to the requests I had made, I think it was earlier
13 the same day, that it provided the assurances of Mr. Goade,
14 who we understood to be -- from our point of view, he was the
15 man. He was the president of the company. He was -- or his
16 interests were the owners of the company. He was the guy we
17 wanted to hear from, and we believed he was responding in his
18 capacity as the president and owner of the company, and was
19 in a position to know these things, and was giving us the
20 assurances we had asked for.
21 Q   As a result of receiving that letter, Mr. Rosen, from Mr.
22 Titterington, with that language in the letter, did you
23 thereafter pursue the injunction with the Court, seeking an
24 escrow account or that type of thing?
25 A   No. We stuck with the original strategy, which was to go

Rosen - Direct                                                                42

1  straight ahead, try to get the case to trial on as
2  expeditious a path as we could --
3  Q    Okay.
4  A    -- until final judgment.
5  Q    Why didn't you pursue the injunction after receiving that
6  letter?
7  A    Well, as I mentioned before, pursuing these other
8  remedies had the down side to us of potentially delaying the
9  final resolution of the case.  These could have been side
10 tracks.  In getting these assurances, we felt that the sale
11 was not changing the status of the action or the status of
12 the defendant, and therefore, taking those steps would be
13 unnecessary and we could continue with the primary goal of
14 getting the case to a final resolution.
15 Q    As a result of receiving that letter from Mr.
16 Titterington, did you have an understanding as to whether the
17 assets of SSI would be encumbered or liened in connection
18 with the sales transaction that was to take place three days
19 later?
20 A    We understood that Mr. Goade, through his attorneys, had
21 represented to us in writing that that would not be the case.
22 Q    And this is the writing that assured you of that, is that
23 correct?
24 A    Yes.
25 Q    Now, you were here in the courtroom during the opening

Rosen - Cross                              75

1   Q   All right.  Well, let me talk to you about this delay
2   issue.  Now, one of the things you threatened to do in this
3   letter was to -- I'm sorry -- let me go back to the prior
4   letter -- one of the things that you threatened to do was to
5   get an injunction, a temporary order of the court restraining
6   any disposition of the funds, right?
7   A   The proceeds of the sale transaction.
8   Q   Right.  So -- and that's something that you threatened to
9   do at that time, but you never did, after getting the letter
10  from Mr. Titterington on May 26th.
11  A   We didn't do it then, and it's not something that could
12  have been done later.
13  Q   All right.  You say it couldn't have been done later, but
14  you never attempted to go before the judge at any time
15  between May 26, 1998 and say that, we got a letter saying
16  that the assets wouldn't be encumbered, we found out that the
17  assets are going to be encumbered, and now we want a pile of
18  money put aside in case we win.  You never brought that to
19  the Court's attention, did you?
20  A   That's something that would have to have been done before
21  contemporaneous with the transaction, and we did not do that,
22  in light of the representations Mr. Goade made.
23  Q   You never sought to obtain an attachment against any of
24  Docu-Systems' assets during the pendency of the case after
25  you added Docu-Systems to the case.

1  the contents of that letter?
2  A   Yes.
3  Q   And did you review the following paragraph, "The
4  transaction involves a sale of stock, and as far as is known
5  to Ron Goad, Senior, there is nothing in the transactional
6  documents which leads him to believe that SSI's assets will
7  be encumbered or depleted by the sales transaction, or that
8  the sale will have a material adverse impact on SSI's balance
9  sheet?"  Did you read that?
10 A   Yes, I did.
11 Q   Did you then --
12            THE COURT:  You're asking leading questions.
13 Let's --
14            MR. BOCHETTO:  Okay.
15            THE COURT:  -- stop leading your witness.
16 BY MR. BOCHETTO:
17 Q   Did you -- having read that, did you rely on that?
18 A   I relied completely on that, because who else -- who else
19 were we going to believe, other than Ron Goad?  I mean, if
20 Ron Goad didn't know it, who would?
21 Q   At that particular time, Mr. Warther, did you have any
22 knowledge about who Docu-Systems was?
23 A   None whatsoever.
24 Q   Did you have any of the transactional documents that were
25 going to be signed or used by Mr. Goad in selling the

1  company?
2  A  No. And we -- you have to understand. We relied
3  completely on this letter. Otherwise, we would have gone
4  forth with an injunction.
5  Q  Did you have at that time any Dunn and Bradstreets or --
6  A  No.
7  Q  -- any other types of information?
8  A  No.
9  Q  Did you seek to get any?
10 A  No. And we didn't seek it because we didn't think we
11 needed it. It wasn't necessary.
12 Q  Why not?
13 A  Because we had the letter. When you've got a lawyer
14 letter like that, you got to be able -- that's -- for us,
15 that was solid gold.
16 Q  Did you thereafter continue with the patent action, the
17 patent lawsuit?
18 A  Well, we continued to try to collect.
19 Q  Okay.
20 A  And I instructed Gary to try to get the money.
21 Q  All right. And that -- the -- were you aware that about
22 two years later, in July of 2000, a judgment was entered in
23 that patent action?
24 A  Yes.
25 Q  And at that time, did you have any knowledge that you

1   THE COURT: You don't get paid much for that,
2   though, do you?
3   THE WITNESS: Not enough, your Honor.
4   BY MR. BOCHETTO:
5   Q   How long have you been the chief financial officer for
6   Vanguard?
7   A   Since approximately 1998.
8   Q   All right. Were you the chief financial officer for
9   Vanguard in or around May of 1998?
10  A   Yes.
11  Q   Did there come a time in that month that you learned that
12  SSI might be sold to Docu-Systems?
13  A   Yes.
14  Q   Okay. How did you learn, sir?
15  A   Mr. Rosen called me and informed me that that was going
16  to take place.
17  Q   And at that time, were you also aware that there was a
18  patent lawsuit pending against SSI or Stick Strip?
19  A   Yes.
20  Q   And when you heard that from Mr. Rosen, what was your
21  reaction?
22  A   I became very concerned.
23  Q   Why?
24  A   We felt that we had a very strong underlying patent
25  infringement case, and we didn't know who the assets were

Kane - Direct 137

1 going to be sold to. We were suspicious that they might be
2 being transferred into a related entity to avoid the
3 prosecution of the infringement, those sorts of things.
4 Q   Did you ask Mr. Rosen to take any action?
5 A   Yes.
6 Q   What?
7 A   Well, actually, I asked him what actions we could take.
8 Q   What did he tell you?
9 A   We could have filed to have the money from the sale --
10 the proceeds from the sale put into an escrow account, file
11 and ask the Court to do that, or we could seek assurances
12 from Mr. Goade, through his attorneys, and/or his attorneys,
13 that the assets would be available, in the event we were
14 successful, which we expected to be, in the patent
15 infringement lawsuit.
16 Q   And did there come a time when Mr. Rosen asked for those
17 assurances from Mr. Goad's attorneys?
18 A   Yes.
19 Q   Now, before I get to those --
20         MR. BOCHETTO:  -- if I might, your Honor, I'm just
21 going to transfer over to that microphone.
22 BY MR. BOCHETTO:
23 Q   -- before I get to that correspondence, Mr. Kane, you
24 mentioned that one of the things that you were thinking about
25 was asking for an escrow account from the sale proceeds of

Kane - Direct 138

1  the business, is that correct?
2  A   Yes.
3  Q   And I'd like to direct your attention to the time line,
4  May 29th, 1998. Do you see that in front of you?
5  A   Yes, sir.
6  Q   And the sale proceeds that you're referring to are what,
7  sir?
8  A   The $8 million in cash.
9  Q   That went to?
10 A   To Mr. Goade.
11 Q   And the promissory note --
12 A   And the promissory note that was payable to the Goade
13 Trust in the amount of $1,360,000, and those were the sale
14 proceeds that Mr. Goade was going to receive.
15 Q   Now, if you were going to move to have that escrowed,
16 when did you have to do that?
17 A   Prior to the sale.
18 Q   All right. Rather than doing that, you received
19 assurances, is that your testimony?
20 A   Yes, sir.
21 Q   And were the assurances that you received contained
22 within the letter from Dunlop and Cotting to Gary Rosen, who
23 was the attorney at the time?
24 A   I think I'm familiar with that letter --
25 Q   All right.

1   A    -- but I really can't see it, Mr. Bochetto.
2   Q    If you'd turn to tab 28 in your book, you'll see that.
3   And I may be cutting off one of the jurors here.
4   A    I have it.
5   Q    All right. And did you have an opportunity to review
6   this letter with Mr. Rosen, once he had received it?
7   A    Yes, sir.
8   Q    And were you -- having received that letter, were you
9   satisfied that you had received the assurances about SSI's
10  assets that you wanted?
11  A    Yes, with the addition that I had discussed with our
12  transaction attorney, who has also been referred to as our
13  general corporate counsel, I had them confer with Mr. Rosen
14  as to what assurances we should seek to insure that we were
15  protected. I didn't feel that I was qualified to create the
16  list of the assurances that we need. I thought we should go
17  to an attorney that could give us those things.
18  Q    And if you turn to Exhibit 26, that's the letter that Mr.
19  Rosen had previously -- or -- strike that -- on that same
20  day, written to Mr. Titterington, and it lists assurances of
21  one, two and three, one, the identity of the prospective
22  purchaser; two, the confirmation that SSI's assets will not
23  be encumbered or depleted; and three, the confirmation that
24  Mr. Goade and other employees identified in your recent
25  interrogatories' responses will be remaining with the

1  company.  Were those the three things that you had developed
2  in consultation with Mr. Rosen and this other corporate
3  attorney?
4  A   I don't recall those specifically, but as I see this
5  letter, that seems correct.
6  Q   Okay.  And so this letter from Mr. Rosen was written
7  after a conference with you and with this other lawyer, is
8  that correct?
9  A   Yes, sir.
10 Q   All right.  Now, after the sale in May of 1998 of SSI to
11 Docu-Systems, did you, either in May of 1998 or let's say,
12 the month after June of 1998, did you instruct anyone to go
13 do a UCC search, or to go see if any liens had been filed on
14 SSI's assets?
15 A   No.
16 Q   Why not?
17 A   We didn't feel that it was needed because we had received
18 a letter from an attorney that said he consulted with his
19 client, and there was nothing in the documents that was going
20 to encumber the assets of the company.
21 Q   In October of 1999, about a year and a half later, a Dunn
22 and Bradstreet was ordered by your commercial attorneys, is
23 that correct?
24 A   Yes, it is.
25 Q   All right.  At that point in time, did you still have the

1   option of going and getting an escrow on Mr. Goade's $8
2   million?
3   A   No.
4   Q   Okay. At that point in time, why -- strike that.
5           Up until that point in time, were you still relying
6   on the letter sent by Mr. Goade's attorney --
7           MR. ZAKEN: Your Honor, I --
8   BY MR. BOCHETTO:
9   Q   -- to you?
10  A   Yes.
11          MR. ZAKEN:   -- you know --
12          THE COURT:   Stop leading the witness.
13          MR. ZAKEN:   -- I object to all the leading --
14          THE COURT:   Objection sustained.
15          MR. ZAKEN:   -- and testifying that Mr. Bochetto is
16  doing.
17          THE COURT: You're testifying. Please stop doing
18  it.
19          MR. BOCHETTO: I'm sorry.
20  BY MR. BOCHETTO:
21  Q   Up until the time that you ordered that Dunn and
22  Bradstreet, had you had any knowledge or any specific facts
23  about Docu-Systems or its financial statements?
24  A   No. Once we received that letter, the attorneys just --
25  our patent infringement attorney just proceeded with the case

1  and gave us updates periodically.  We were running a
2  business, and this lawsuit was not the primary focus of our
3  business.  So we just relied on him to take care of all the
4  legal proceedings.  We had received the assurances that we
5  needed at the time, and we moved on with our business.
6  Q  At the time that the Dunn and Bradstreets were ordered,
7  in October of 1999, were you involved in the request for the
8  ordering of those?
9  A  Yes.
10 Q  And why were Dunn and Bradstreets ordered at that time?
11 A  Well, at some point, discussions about a settlement to
12 the lawsuit were occurring, and I was concerned that perhaps
13 the lawyers were butting heads.  And that may be one of the
14 reasons why we couldn't get a settlement in this thing,
15 because they seemed to be close all the time.  So I began to
16 have direct conversations with the chief financial officer
17 and the -- and some other individuals that -- whose name we
18 really didn't recognize.
19 Q  Chief financial officer of what company?
20 A  Of Docu-Systems.  I'm sorry.  And there was a lot of
21 correspondence back and forth between myself and them, trying
22 to bring this case to a settlement, so we could put it behind
23 us and just focus on running our business.
24 Q  What was the purpose of ordering the Dunn and Bradstreet?
25 A  Well, at some point after we had reached an agreement to