# Exhibit C

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                            - - -

VANGUARD IDENTIFICATION       :  CIVIL ACTION NO. 02-2943
SYSTEMS, INC.                 :
                              :
              v.              :  Philadelphia, Pennsylvania
                              :  September 22, 2004
RONNIE E. GOADE, SR.,         :  10:07 o'clock a.m.
Individually and as Trustee   :
for the Ronnie E. Goade, Sr.  :
Revocable Trust, et al        :
. . . . . . . . . . . . . . . .

                          JURY TRIAL
            BEFORE THE HONORABLE JOHN P. FULLAM
              UNITED STATES DISTRICT COURT JUDGE

                            - - -


APPEARANCES:

For the Plaintiffs:    GEORGE BOCHETTO, ESQUIRE
                       Bocchetto & Lentz, PC
                       1524 Locust Street
                       Philadelphia, PA 19102

For the Defendants:    MARC L. ZAKEN, ESQUIRE
                       Edwards & Angell, LLP
                       Three Stanford Plaza, Suite 1310
                       Stanford, CT 06901

                            - - -

Audio Operator:        John Stasny

Transcribed by:        Grace Williams, CET

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by AAERT-certified
transcribers.)
```



**Laws Transcription Service**
48 W. La Crosse Avenue
Lansdowne, PA 19050
(610) 623-4178

## CERTIFICATION

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_Geraldine C. Laws_           10/20/04

Geraldine C. Laws, CET           Date
Laws Transcription Service

Riddle - Direct                                93

1  Docusystems.
2  Q    You said that you dealt with the management of the
3  company, Docusystems, as well?
4  A    Yes.
5  Q    And who -- who did you deal with in management at
6  Docusystems?
7  A    You're going to test my memory of -- of this company. I
8  can't. I -- I don't recall the -- the names of -- of the
9  management there.
10 Q    Let me mention some names to you --
11 A    The C.F. --
12 Q    -- to see I can help you.
13 A    -- the C.F.O. is Jim McMahon and that's really who we
14 primarily dealt with.
15 Q    That was the name I was going to give you.
16      All right. And you said that the company was in
17 financial distress.
18      What did you mean by that?
19 A    The business, prior to our getting involved with it, had
20 been generating operating cash flow of around $15 million.
21 It had a bank debt of roughly $60 million, as I recall.
22 There was a leveraged buy-out Code, Hennessey. Literally,
23 within six months, that level of profitability dropped below
24 zero. It was losing money. And so was unable to service its
25 financial obligations. Basically, it was in jeopardy of --

1  of a -- a bankruptcy filing.
2  Q    And that's the condition the company was in when you
3  were first retained?
4  A    Yes.
5  Q    And you said that you were initially retained to sell
6  some businesses in the late 1999 time frame?
7  A    Correct.
8  Q    Do you recall what businesses those were?
9  A    I do. The company had a small label operation in Ohio.
10 The company had a ticket manufacturing operation in the U.K.
11 And the company had a -- a legacy business that was an -- an
12 old airline ticket manufacturer or carbon ticket plant in
13 Nashville, Tennessee.
14        Those are really the primary operations, as I
15 recall.
16 Q    Now, were you aware of a business that Docusystems
17 operated called S.S.I. Technologies or Stickstrip Laminating?
18 A    Yes.
19 Q    What did you know about S.S.I.?
20 A    S.S.I. was one of their -- and I'm -- you may get here,
21 but that was one of the -- sort of businesses to be retained.
22 It was a card-making operation, utilized a specific
23 substrate, specific end-market application, and it was going
24 to be retained along with another card-making operation in
25 Nashville, Tennessee.

Case 2:02-cv-02943-JF   Document 94-4   Filed 11/11/2004   Page 6 of 13

Riddle - Direct                                                    103

```
 1  position with S.S.I. at Docusystems?
 2  A    When we were handed the mandate, Ron was not employed by
 3  S.S.I. to my knowledge.  Did he have a relationship with the
 4  company?  Was he on the board?  I -- I don't know.
 5  Q    All right.  And what steps did you take to sell off
 6  S.S.I.?
 7  A    We -- typical to any transaction process like this, we
 8  prepared a selling memorandum.  We contacted potential
 9  buyers.  We distributed information.  We followed up on
10  qualified interest.  In effect, we ran a -- a sales process.
11  Q    And with respect to a selling memorandum, did you
12  prepare one for S.S.I.?
13  A    We did.
14  Q    And did you prepare one for Docusystems?
15  A    We did.  They were part of the same package, I believe,
16  but there were separate sections for each of the -- for each
17  of the businesses.
18  Q    All right.  I -- I sent you some documents last week.
19       Did you bring them with you today?
20  A    I did.
21  Q    Could you take a look at the document that's been marked
22  as Dresner Exhibit 1.
23  A    I got it.
24  Q    Can you tell me what this document is.
25  A    This is the offering memorandum that I eluded to.
```

1  Q    This is the offering memorandum that you prepared around
2  June of 2000?
3  A    Yes.
4  Q    And can you tell me -- refer me to where the sections
5  are that relate to the S.S.I. business. You'll notice that
6  the document is stamped at the bottom with DRES, and then
7  some numbers that start 000057, and then numbered
8  consecutively after that.
9  A    Yeap.
10 Q    And this document starts from 0057 and ends at 00124; is
11 that right?
12 A    Correct.
13 Q    Tell me which pages refer to the S.S.I. business.
14 A    Okay. Typically, we'll have an executive summary in the
15 document, as we do here. Section 1 beginning with 00064.
16 And with the businesses that we were selling, we mention the
17 S.S.I. business first, I believe in -- on Page 00067 under
18 the section 'Card Business.'
19      And there's a paragraph that -- that leads in,
20 Teslon transaction cards.
21      Do you see that?
22 Q    Yes.
23 A    And we mention the Edmond facility. That would be the
24 Stickstrip business.
25      Furthermore, we have a section on the quote 'card

Riddle - Direct                                                           106

1  in Nashville.  The same plant that made, in effect, credit
2  cards in Nashville.
3  Q    All right.  So Docusystems had a plant in Nashville that
4  made these cards and they had the S.S.I. operation in
5  Oklahoma that made cards?
6  A    Correct.
7  Q    And then the one in Oklahoma, I think you said, used a
8  substrate called Teslon and the one in Nashville used a
9  substrate called PVC?
10 A    Correct.  PVC is -- vinyl is what you're accustomed to
11 seeing in a credit card.
12 Q    Now, did you get companies that were interested in
13 purchasing the Docusystems and/or S.S.I. business?
14 A    We did.
15 Q    All right.  Let's -- let's talk about the S.S.I.
16      Did you get bidders who were interested in buying
17 S.S.I. by itself or buying S.S.I. as part of Docusystems?
18 A    Most of the bidders, if not all, were in -- in buying
19 S.S.I. as a stand-alone operation.  What really happened here
20 was, if -- if you look at the -- the record as is sort of
21 laid out in the -- the series of documents that you sent me,
22 we were engaged on -- on this piece of the sales transaction
23 sometime in early June.
24      We ended up selling the core of the business, which
25 was the Nashville facility, sometime immediately following

1  anticipation of the need to move on these businesses, we were
2  instructed by the company to begin to prepare the offering
3  memorandum sometime in late May, perhaps early June, but they
4  had not decided to actually begin the sales process sometime
5  prior to June 21st, maybe a few days, they formally gave us
6  the mandate to move ahead on a sales process.
7        And here I'm following up to that. So you can see
8  book completion fee. Sometime in May they suggested why --
9  don't you write the book. We'll pay you $30,000. Get it
10 done. And if we need move out into the market, we'll do it.
11 That's why it says, 'Already agreed to.'
12 Q   All right. Now, at some point you received bids for
13 S.S.I. as a stand-alone business?
14 A   Yes.
15 Q   And who did you receive bids from?
16 A   Well, if you look at Dresner Exhibit 8?
17 Q   Okay, go ahead.
18 A   Which is the same as Dresner Exhibit 9 for the most
19 part.
20 Q   Dresner Exhibit 9 has some handwriting?
21 A   Correct.
22 Q   Whose handwriting is that, do you know?
23 A   That's Joe Casurgis's.
24        This gives a summary of the -- the actual offers
25 that we had on S.S.I.

Riddle - Direct                                                    110

1  Q     All right. And I see four companies listed there.
2  Norwood Plastique, Lucas Color Guard, Ron Goade, and
3  Stonehouse (ph); is that right?
4  A     Yes.
5  Q     And when was Dresner Exhibit 8 prepared? Do you have
6  any idea?
7  A     I don't. It would have been perhaps sometime in early
8  July.
9  Q     Of 2000?
10 A     Yes.
11 Q     All right. And take a look at Dresner Exhibit 4.
12 A     Okay.
13 Q     Have you seen that before?
14 A     I have.
15 Q     Did you see it in July of 2000?
16 A     I did.
17 Q     And what is it?
18 A     It's a -- a preliminary offer from one of the four
19 bidders, Stonehouse Marketing to wire the operations of
20 Stickstrip.
21 Q     And did you review the terms of this offer?
22 A     I did.
23 Q     And can you summarize for me the -- what you consider to
24 be the material terms of the offer at the time?
25 A     Sure. In effect, they -- they bid -- if you look at --

1   at the -- the way this is laid out, this is a -- a bid for
2   the assets of the -- of the company, the land and building,
3   the operating assets, the receivables and inventory, and the
4   equipment. If you look at how they've done it, it's a
5   percent of some value to be determined.
6          In our Exhibit 8, we did analysis of the offer to
7   come up with what we thought it might yield. You'll see a
8   number assigned to it of $2.6 million.
9          Again, this -- this would have been a -- a
10  guesstimate, a value. Typically, this would end up being
11  negotiated as they got in, looked at the condition of the
12  receivables, assigned a value, looked at the condition of the
13  inventory and signed -- assigned a value in -- in the
14  equipment and so on.
15  Q   And what leads you to conclude that Stonehouse wanted to
16  come in and look at the condition of the assets and look at
17  the -- and evaluate the receivables?
18  A   If you look at the language on Dresner, this document is
19  also numbered Dresner 01139, under Paragraph 1, transaction
20  terms, they list the assets and then they list the value that
21  they're going to assign to those assets.
22         And so, for example, if accounts receivable say 85
23  percent, if less than 60 days old and considered collectible.
24  (Indiscernible) to be determined.
25         So that while looks like a hard number, there's a

Riddle - Direct                                                         112

1  lot of subjectivity there.
2  Q    And if you can refer next to the second page of this
3  Exhibit 4, which is numbered DRES01140, there's a Paragraph 2
4  that days 'Due Diligence.'
5  A    Yes.
6  Q    What did you understand that to mean?
7  A    Well, your -- your previous question, they were looking
8  to do their due diligence, their invest -- investigatory work
9  on site.
10 Q    Meaning that Stonehouse wanted to come to Oklahoma and
11 do some investigation on site?
12 A    Correct.
13 Q    All right. Going to the next document, which is Dresner
14 Exhibit 5, can you tell me that is.
15 A    Okay. This is a -- an offer from another bidder, Lucas
16 Color Guard. This company is based down in Oklahoma City.
17 At the time it was a relatively new company.
18      As I recall, they were not even $2 million of
19 revenues. And it's a similar offer to acquire the business.
20 Q    And again if you could look at Dresner Exhibit 5, and
21 summarize what you consider to be the material terms of the
22 Lucas Color Guard offer.
23 A    The face amount of their bid was $3 million. As I
24 recall, they were not going to acquire the owned real estate.
25 They, too, needed to do their final diligence. And the issue

1  with this bidder was that their offer was subject to
2  financing, which is why you see them providing us on -- on
3  Page DRES01468, a support letter from their bank, Bank First,
4  that suggests that they are supporting the transaction."
5          THE COURT:  How much longer is this --
6  "Q    Meaning they needed to" --
7          THE COURT:  -- deposition going?
8  "Lucas Color needed a loan to be able to make this" --
9          MR. ZAKEN:  We can stop here, your Honor.
10 "-- transaction happen?
11 A    Correct."
12         THE COURT:  How much longer is it?
13         MR. ZAKEN:  A substantial time.
14         THE COURT:  Might as well.
15 "If you notice, the" --
16         THE COURT:  Let him finish his answer if you want.
17 "The letter from Bank First, the final sentence from their
18 president reads -- let me back up -- the letter suggests that
19 the bank has approval to support the transaction, but the
20 final sentence reads:  This approval has contingencies
21 including but not limited to completion of our due diligence.
22         So from our perspective, that's not firm support."
23         (The videotaped deposition was stopped at this
24 time.)
25         THE COURT:  We'll recess until tomorrow morning at