# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

|  |  |  |
|---|---|---|
| VANGUARD IDENTIFICATION SYSTEMS, INC. | : | CIVIL ACTION NO. 02-2943 |
|  | : |  |
| v. | : | Philadelphia, Pennsylvania |
|  | : | September 23, 2004 |
| RONNIE E. GOADE, SR., | : | 10:00 o'clock a.m. |
| Individually and as Trustee | : |  |
| for the Ronnie E. Goade, Sr. | : |  |
| Revocable Trust, et al | : |  |

. . . . . . . . . . . . . . .

JURY TRIAL
BEFORE THE HONORABLE JOHN P. FULLAM
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:     GEORGE BOCHETTO, ESQUIRE
                        Bocchetto & Lentz, PC
                        1524 Locust Street
                        Philadelphia, PA  19102

For the Defendants:     MARC L. ZAKEN, ESQUIRE
                        Edwards & Angell, LLP
                        Three Stanford Plaza, Suite 1310
                        Stanford, CT  06901

- - -

Audio Operator:         John Stasny

Transcribed by:         Tracey Williams, CET

(Proceedings recorded by For The Record Gold digital sound recording; transcript provided by AAERT-certified transcribers.)



## CERTIFICATION

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Geraldine C. Laws, CET
Laws Transcription Service

10/20/04

Date

1          (At this time excerpts of the videotape deposition

2   of Mr. Riddle were continued to be played as follows:)

3   Q    Did you interpret this to mean that the bank could

4   withdraw its approval to finance Lucas Color's acquisition if

5   it didn't feel that their due diligence had been satisfied?

6   A    Correct.

7   Q    Did you receive a written offer from Norwood Plastag?

8   Just looking now at Dresner Exhibit 8, there's mention of

9   Norwood Plastag; did you receive a written offer, do you

10  recall?

11  A    I don't, I don't.  We may have had communication with

12  them.   They would have been a very good buyer, you can see we

13  had them down at 4 million.  They also, as you see noted in

14  the comments, Exhibit 8 and Exhibit 9, they were financed by

15  Heller, so the agent for the credit facility of Docusystems

16  also would have a comfort level with the buyer, in this case

17  Norwood; however, they ultimately backed away from the deal.

18  Q    Okay.  So, Norwood withdrew their bid?

19  A    Correct -- or at least -- candidly, I don't remember the

20  exact detail, but at least they weren't moving quickly enough

21  given the needs of the situation.

22  Q    And of course the last bidder that's -- or potential

23  buyer that's on Dresner Exhibit 8 is Ron Goade.  Let me start

24  you out by asking this:  How is it that Ron Goade became a

25  bidder for SSI?

Riddle - Deposition                                    4

1   A    I believe we approached him.

2   Q    We, meaning Dresner?

3   A    Correct.

4   Q    Who at Dresner approached Ron Goade?

5   A    Candidly, I don't recall.  It would have either been Joe

6   or me.

7   Q    That's Joe Cosergis or you?

8   A    Correct.

9   Q    And do you have any recollection of Mr. Goade's initial

10  reactions to your contacting him regarding him being a bidder

11  in SSI?

12  A    I don't, although I do recall that in our conversations

13  Ron was conflicted, meaning -- not in a legal sense, but

14  rather on the one hand he wanted to reacquire and in effect

15  save his company, on the other hand he saw that there was a

16  bit of risk in acquiring the company.  The business was not

17  performing very well.

18  Q    Now, did Mr. Goade ultimately make an offer to purchase

19  SSI?

20  A    He did.

21  Q    And what was his offer?

22  A    2 million cash.

23  Q    Did he have any contingencies?

24  A    No.

25  Q    Did he have any due diligence requirements?

Riddle - Deposition                                          5

1    A    No.   The benefit of selling a company back to the founder

2    of that company is that he would know it very well, he likely

3    hired almost everybody that was working at the company, he

4    likely purchased all of the equipment, he likely established

5    relationships with all of the company's key customers, he

6    clearly knew the business.   So, his diligence requirements

7    were little, if any.

8    Q    Did he have any financing requirements?

9    A    No.

10   Q    At the time that you prepared this Dresner Exhibit 8 or

11   Dresner -- withdrawn.

12        At the time that your company, Dresner Investments,

13   prepared Dresner Exhibit 8, were you aware of a company

14   called Vanguard?

15   A    We were.

16   Q    And had Vanguard made a bid for SSI?

17   A    I don't believe so.

18   Q    Had you made any efforts to contact Vanguard to see if

19   they were interested in making a bid for SSI?

20   A    We did contact Vanguard, I don't recall the timing of

21   that relative to our preparing this exhibit.   Vanguard was a

22   competitor, I believe, of this business and, as I recall,

23   they and others were initially on an excluded list, and what

24   I mean by that is that the company did not want us to contact

25   certain potential buyers for various reasons.   This is very

1    typical in a sale process, many times it's for competitive

2    issues, the belief being that if you share information about

3    the company that you're selling to a competitor, it could

4    damage that company, the value of that company, relative to

5    suppliers, customers, what have you.  At some point, as your

6    -- some of the documents that you sent us show, we did

7    contact Vanguard.

8            Part of what's going on, and you can see in the date

9    order of some of these documents, I believe we were initially

10   precluded from contacting Vanguard.  We ran a process, we

11   surfaced a handful of potential buyers.  None of these buyers

12   were overly aggressive in pursuing this deal, even though

13   Ron, as you show in one of the exhibits you sent me, sent an

14   e-mail with an offer subject to no contingencies, et cetera.

15   As I recall, he was of two minds as to whether he wanted to

16   acquire the business; on the one hand, he did; on the other

17   hand, as I recall, he backed away.  And so there was a

18   question as to whether we had a real buyer to acquire this

19   business.

20           The timing of some of the communication here -- as I

21   mentioned, in June, the banks began to pressure the company

22   from the standpoint of suggesting that they were running out

23   of the ability to continue to finance Docusystems.  Some time

24   in early to mid-July, they suggested that they were not going

25   to fund beyond a certain date, I believe that date was July

Riddle - Deposition                                    10

1   A    I don't believe so.  At the end of the day, you know, our

2   diligence of the company, looking at employment records, et

3   cetera, I can't say categorically no.  But Ron didn't work

4   for the company, as far as we knew, and my understanding of

5   his relationship is he sold the company to Docusystems, and

6   typically in that situation the seller moves on and

7   Docusystems had installed its own management in running SSI,

8   so Ron was not involved with the company.

9   Q    Now, did you at some point undertake an analysis or

10  evaluation of the bids that you had received that are

11  reflected on Dresner Exhibit 8?

12  A    Yes.

13  Q    And can you take me through that analysis of those bids

14  as you recall it --

15  A    Sure.

16  Q    -- at the time?

17  A    Sure.  We have -- in this case, the analysis was fairly

18  simple.  Norwood, we had 4 million.  I don't remember if we

19  had a letter that backed that up, you didn't provide me one

20  from the records that we sent to you, but that would have

21  been -- in all cases, they would have been cash-for-assets

22  kind of transactions.  Their offer was 4 million but, as I

23  said earlier, they really started to back away and we

24  discounted them as a legitimate buyer.  Lucas was 3 million,

25  without the land and building, so... whereas Stonehouse was

Riddle - Deposition                    11

1   2.6 million, I believe inclusive of the land... let me look

2   at our analysis here.

3        (Pause.)

4   A    Yes, that's inclusive of the land and building.  It looks

5   like we assigned a million, two to the land and building and

6   there were -- there were two parcels, as I recall.  So, net

7   of the building, their offer was a million, four for the

8   operating business and a million, two for the building.  If

9   you compare that to Lucas, then Lucas's offer was 3 million

10  for the operations and the company would retain the land and

11  building.  So, apples to apples, to compare the two, Lucas

12  was 3 plus the million, two, so 4.2, Stonehouse was 2.6.

13       We spent a fair amount of time with the principals

14  of Lucas Color Card, we got very far down the road with them

15  in pursuing a transaction.  They -- I think they brought an

16  investor, they actually identified an equity partner that

17  would supplement their bank financing, and he may have

18  actually come to Chicago.  We worked with them extensively

19  and ultimately we just ran out of time to try to do a deal

20  with Lucas.  It was a good fit for their company, it would

21  have really made them a larger business, but they just

22  couldn't react quickly enough in raising the --

23  Q    What do you mean by ran out of time?

24  A    Well, again, the banks were suggesting that they were not

25  going to be forbear any longer, that they were not going to

Riddle - Deposition                    12

1  continue to lend, which would have, in effect, made the

2  company illiquid.  Basically, the company would not have been

3  able to pay payroll, buy supplies, and, thus, would have had

4  to shut their doors.  If that happens, given the number of

5  potential suppliers in the marketplace, the franchise value

6  of Stickstrip would have gone away and, in effect, would have

7  been -- the company would have been worth no more than the

8  auction value of its equipment.

9       So that's what I mean by we ran out of time, in

10 effect, to allow Lucas to get a deal done with us.

11 Q   And what happened to the Stonehouse bid?  You basically

12 gave me a comparison that suggested that the Lucas bid was a

13 better bid than the Stonehouse bid.

14 A   Correct.  Stonehouse, as our -- as the comments suggest

15 on --

16 Q   You mean the comments on Exhibit 8?

17 A   Exhibit 8 and Exhibit 9, they're the same document.  It

18 says, "going," c-o-l, that means -- that was probably cold,

19 "going cold on transaction."  They were interested --

20 Stonehouse is actually in Oklahoma, I believe, so it would

21 have been easy for them to do the deal, but, you know,

22 they're a small company as well.  At even two and a half

23 million, it would have been a decent amount of capital going

24 out the door for them and, as I recall, they were sort

25 backing away from the deal, as did Norwood.

Riddle - Deposition                                13

1   Q    And what was your analysis of Mr. Goade's bid at the

2   time?

3   A    Well, if you look at this exhibit, this was clearly

4   prepared before he sent the e-mail that you have marked as

5   Exhibit... 10.  We were unclear as to what Ron was going to

6   bid; he was, as I said earlier, showing interest, then he was

7   showing caution, then showing interest.  He knew that

8   Docusystems was running out of cash and that the company may

9   be shut down, he didn't want to see that happen.   So,

10  ultimately, as you see in Exhibit 10, he made an offer of $2

11  million to cash and suggested that he could close within a

12  couple of days.  This offer was made on a Thursday, he closed

13  it on a Monday or a Tuesday the following week.

14  Q    And this Dresner Exhibit 10, is that an e-mail that you

15  received from Ron Goade on July 13 of 2000?

16  A    Yes.

17  Q    And is that his written offer?

18  A    Yes.

19  Q    Now, if you could take a look at Dresner Exhibit 11?

20  A    Yes, I've got it.

21  Q    That is also dated July 13, 2000?

22  A    Yes.

23  Q    Which is the same day you received Mr. Goade's bid?

24  A    Correct.

25  Q    And do you recall Dresner Exhibit 11?

1   whole company, our incentive is to sell it for the highest

2   price.  If we had an offer from a party, we would include

3   them in the mix and assess that against, you know, the other

4   bids that we had.

5   Q    Okay.  And as of July 13, did you have an offer from

6   Vanguard, do you recall?

7   A    I don't believe so.

8   Q    And what decision was ultimately made with respect to --

9   selling the assets of SSI?

10  A    The company decided to move forward with Ron Goade's

11  offer.

12  Q    And who at the company made that decision?

13  A    Candidly, I don't recall.

14  Q    Was Code Hennessey a participant in that decision?

15  A    They would have been, yes.

16  Q    Was Heller a participant in that discussion?

17  A    From the standpoint of a secured lender, they would have

18  to assent to a transaction that -- where their assets were

19  -- the assets that they were lending against were sold, they

20  would have to release collateral, so in effect they were --

21  they would have to assent to the transaction, but ultimately

22  the company would approve any transaction.

23  Q    And did you make a recommendation to the company as to

24  who to sell the assets of SSI to?

25  A    I'm sure I did, I don't recall.  But looking at the track

Riddle - Deposition                    16

1   record of what happened here, really the only offer we had

2   that was able to get closed in a reasonable period of time

3   was Ron Goade's offer.  So, I would have to say that we did

4   have a fair bit of interaction with Lucas, they did a lot of

5   work, they got close, but ultimately it was unclear whether

6   they could close, so... you know, we likely recommended they

7   go ahead with Ron Goade.

8   Q   And can you tell me when the Ron Goade transaction of

9   selling to him the assets of SSI occurred?

10  A   Again, I believe it was -- the deal closed the following

11  Monday or Tuesday, so it would have been the 17th or 18th of

12  July.

13  Q   And what was involved in the closing?

14  A   Well, Ron made his offer, as evidenced here in this e-

15  mail in Exhibit 10.  He had to post the banks to ensure that

16  he was a legitimate buyer, require that he post an escrow,

17  here it suggests he posted a $200,000 deposition.  I can't

18  remember if that was a nonrefundable deposit, but he did put

19  money on account to show sincerity.  I believe he was

20  immediately sent and he may have already had actually an

21  asset purchase agreement.  And then he came in to Chicago

22  with his attorney, I believe over the weekend, and they and

23  the company and respective counsel spent the better part of

24  the whole weekend negotiating documentation, probably into

25  Monday, and ultimately closed Monday or Tuesday.

37

1   We've been giving the jury exhibit books, but we haven't

2   included in them all of the exhibits that were presented to

3   these witnesses to streamline it, we've been -- we've gotten

4   some questions from the jury about missing exhibits and I

5   just wanted to make it clear that that was the reason for

6   that.

7           THE COURT:  Whatever.

8           (At this time excerpts of the videotape deposition

9   of Joe Cosergis were played as follows:)

10  Q   Do you know if Ron Goade ever made a bid to purchase the

11  assets of SSI?

12  A   He made a bid in that last week, in that final week.

13  Q   Do you know how that came about?

14  A   Yes, I do.  You know, from the time we had marketed the

15  transaction, which would have been, you know, July, late

16  June, early July, we had spoken to him once or twice and he

17  was considering it.  And then, you know, at one point I think

18  he just -- he even backed away and decided he was no longer

19  interested in it.  And then, as we got the asset purchase

20  agreement, we sent it down to him, and I think he had, you

21  know, kind of a personal desire to purchase the business, you

22  know, seeing the company was about ready to be closed down,

23  and came in and bought the business.

24  Q   What do you mean by a personal desire?

25  A   You know, you know, saving the employee jobs.  And, you

1    know, I was down there that last week on some investor

2    presentations and, you know, the employees were worried that

3    the business was literally going to be shut down on Friday, I

4    think the bank group may have even been saying, hey, we're

5    going to shut this thing down on Friday, which is kind of a

6    typical thing to be said during these turn-around situations,

7    and so a little bit -- you know, it was a little bit chaotic.

8    Q    Do you recall exactly what Friday it was?

9    A    You know, I see on this one e -- let's see, where was it

10   -- I saw that we e-mailed to him -- or Chris Gannon, who was

11   my associate, e-mailed something to him on the 10th, and then

12   I believe it was literally the Friday, the 14th, where I

13   think he may have wired in some money, and I think the

14   following Monday it was closed, I believe, somewhere in that

15   time frame.

16   Q    The deal was closed, to sell the assets to Mr. Goade

17   closed on July 17th?

18   A    I think that sounds about right.

19   Q    Okay, but you were saying before that there was a Friday

20   that the doors of SSI were going to be closed and shut?

21   A    Yes.  I mean, it was the last asset of all Docusystems,

22   the bank group and, you know, the investors are impatient

23   and, you know -- had, you know, made some announcements and

24   inclinations that the business may be shut down and -- which,

25   again, is typical during these processes and sometimes they

1    stating that he's going to include a deposition of 2 million

2    on Friday the 14th and then pay the balance on Monday, the

3    17th.

4    Q    Did you participate in any conversations with Mr. Goade

5    relative to his $2 million offer?

6    A    I may have had a conversation with him that week, but --

7    that he was going to send something in, you know, I was

8    asking if he was in fact going to bid, I wasn't sure, and he

9    corresponded via the e-mail that he was going to put in a

10   bid.

11   Q    Did you participate in any discussions at Dresner

12   regarding who the assets of SSI would be sold to?

13   A    You know, we had discussions on, you know, the four or

14   five groups on that previous exhibit, you know, Stonehouse,

15   Norwood, you know, Ron Goade, there were three or four groups

16   that were becoming -- looked like they were becoming more

17   finalists and we had discussions in relation to those groups.

18   Q    And at some point obviously the decision was made to sell

19   the assets to Ron Goade?

20   A    Correct.

21   Q    And did you participate in the discussions that led to

22   that decision?

23   A    No, we simply -- to Code Hennessey and to the bank group,

24   we presented the offers, and -- and then they -- then they

25   came back to us and said this is who we're going with, and

1  then that was it.

2  Q    And who at Code Hennessey communicated to you that they

3  would sell the assets to Ron Goade?

4  A    You know, Steve Brown was the lead there and I believe he

5  would have done that to probably either John or myself.

6  Q    Could you take a look at Dresner Exhibit 11?

7  A    Yes.

8  Q    This -- do you recognize this?

9  A    I -- I don't recollect it, no.

10  Q    It says it's from Joe Cosergis to Bob Kane, do you see

11  that?

12  A    I do.

13  Q    Do you know who Bob Kane is?

14  A    I don't.

15  Q    Do you recall having any discussions with anyone -- it

16  says below that -- withdrawn -- it says below that, "To Bob

17  Kane, company Vanguard," do you see that?

18  A    Yes, I do.

19  Q    Do you know what Vanguard is?

20  A    I know who Vanguard is, yes.

21  Q    And tell me what you know about Vanguard.

22  A    I knew they were a company that was in the transaction

23  card business and I was aware that there was some, you know,

24  ongoing litigation with Vanguard and with SSI.

25  Q    Do you recall any discussion with Bob Kane about this

Cosergis - Deposition                    44

1   have come back with the exclusions.

2   Q    Code Hennessey, I believe you said, was the stockholders

3   in Vanguard?

4   A    That's correct.

5   Q    That's the company you were working with that had Steve

6   Brown?

7   A    Correct.

8   Q    Do you know whether Mr. Goade, Ron Goade, ever worked for

9   Docusystems?

10  A    Do I -- I don't -- not to my knowledge, I don't believe

11  he worked for them.

12  Q    Do you know whether Mr. Goade was ever on the board of

13  directors of Docusystems?

14  A    To my knowledge, I don't know.

15  Q    Other than in your dealings with Mr. Goade when he --

16  withdrawn.

17         Was your dealings with Mr. Goade limited to the

18  period of time when he was a bidder to by the assets of SSI?

19  A    That's correct.

20  Q    And do you know how he -- who contacted Mr. Goade or --

21  withdrawn.

22         Do you know how Mr. Goade became involved in being a

23  bidder for the assets of SSI?

24  A    Yes.   I mean, we were aware that he was a previous owner

25  and we contacted him, thinking he may want to purchase it

1   again, and had, you know, a few conversations with him via

2   the phone and -- and, as I mentioned earlier, you know, I

3   think he decided to take a pass on it initially and then came

4   back during that last week, after he got the purchase

5   agreement, and decided this is something he wanted to do.

6   Q    And did you participate in those conversations with Mr.

7   Goade?

8   A    I had a couple of conversations with him, yes.

9   Q    About his interest in the company?

10  A    Yes.

11  Q    And when you spoke to him initially he was not interested

12  and then, ultimately, he did make an offer?

13  A    Correct.

14         MR. ZAKEN:   I have no other questions.   Thank you,

15  Mr. Cosergis.  Mr. Perlman may have some questions for you.

16         (Videotape stopped.)

17         MR. ZAKEN:   That's it for this witness, your Honor.

18         THE COURT:   That's nice.   Anything further?

19         MR. ZAKEN:   Yes.   We have another videotape of Hugh

20  Wilder, it's about an hour long, and then we have one more

21  videotape after that, which is about 15 minutes.   And that

22  will be it for the videotapes.

23         (Pause.)

24         COUNSEL:   Your Honor, we have another exhibit binder

25  to give to the jury to -- with the corresponding exhibits

1  A    July, 2000.

2  Q    Of 2000?

3  A    Yes.

4  Q    And was one of those assets the sale of the assets of SSI

5  Technologies?

6  A    Yes, it was.

7  Q    And do you know who had placed bids to purchase the

8  assets of SSI Technologies?

9  A    I don't recall.

10  Q    Was Ron Goade one of those bidders?

11  A    Yes, he was.

12  Q    And you know that because Ron Goade is the one who bought

13  the assets?

14  A    Yes, I do -- yes.

15  Q    And do you know whether anybody else bid or what the

16  terms of their bids were?

17  A    I don't recall.

18  Q    Do you know what the terms of Ron Goade's bid was?

19  A    Not in specifics, but I do know that Mr. Goade was

20  prepared to purchase the company in a very, very expedited

21  period of time for an amount of money, as far as value was

22  concerned, that was in line with Dresner's expectations for

23  the value of that business and there were, as I recall,

24  basically no contingencies on Mr. Goade being able to

25  complete the purchase of the assets.

1  Q    Okay.  Let me just take you through a few of the things

2  that you just said, if I may.  You said Mr. Goade was ready

3  to make the purchase in a short time frame; do you have any

4  recollection as to how quick the time frame was?

5  A    Other than it was very -- it was on an expedited basis, I

6  would -- he was in a position to buy -- from looking at

7  Exhibit 21, the sale to Mr. Goade was completed within almost

8  30 days of -- of when we had decided to exercise our remedies

9  and foreclose on the assets of Docusystems.

10 Q    All right, that's 30 days from when Heller made the

11 decision --

12 A    Right.

13 Q    -- that it would foreclose and sell off the assets of

14 Docusystems, including SSI, right?

15 A    Less than 30 days, yes.

16 Q    But that's not necessarily 30 days from when Mr. Goade

17 was first contacted about purchasing the assets?

18 A    I don't know when Mr. Goade was originally contacted as

19 far as purchasing the assets.

20 Q    Okay.  But from the time he was contacted to the time

21 that he actually closed on purchasing the assets was within

22 those 30 days you're talking about?

23 A    I don't know when Mr. Goade was originally contacted, the

24 only time frames I can recall from the documents is that he

25 purchased the assets within 30 days of our foreclosing on the

Wilder - Deposition                          66

1   assets.

2   Q    All right.  And you mentioned that he was willing to pay

3   cash without contingencies, is that right?

4   A    As I recall, yes.

5   Q    And what types of contingencies might there be that Mr.

6   Goade did not have in this instance but someone else in a

7   similar circumstance, some other buyer might have had?

8   A    There could be an extensive list of additional

9   investigations that a possible buyer would want to make on a

10  business ranging, from environmental concerns to review of

11  the company's books and records, to conversations with its

12  customer base to establish that those customers are satisfied

13  with the company and will continue to be their customer,

14  legal due diligence, any -- basically, anything that the

15  buyer chooses to do additional investigation on to provide

16  his comfort that -- as far as the business that he is looking

17  to purchase.

18           And also the --

19  Q    You mentioned earlier --

20  A    And also, sir -- I'm sorry -- and also many times there

21  is a financing contingency that the deal cannot move forward

22  if the buyer is unable to get sufficient financing to

23  complete the transaction.

24  Q    And you mentioned earlier a time -- in this deposition

25  the phrase, due diligence and further investigation, would

1   these things that you're talking about a buyer potentially

2   investigating such as environmental issues, books and

3   records, customers, et cetera, those things would fall within

4   the umbrella of what you referred to earlier as due

5   diligence?

6   A    Yes.

7   Q    So, if I understand you, your testimony is that Mr. Goade

8   was willing to buy the assets without conducting any due

9   diligence, is that fair to say?

10  A    I don't know what due diligence Mr. Goade had done at any

11  point in time in the transaction, what I do know is Mr. Goade

12  was ready to move forward with the transaction which had a

13  very, very high certainty of closure within a very short

14  period of time.

15  Q    Okay.  And you mentioned a financing contingency, does

16  that mean a loan --

17  A    Yes.

18  Q    -- that a purchaser -- and Mr. Goade was not seeking a

19  loan to purchase the assets, as far as you knew, correct?

20  A    He did not require a financing contingency as part of his

21  purchase agreement.

22  Q    And, just generally, can you tell me what a financing

23  contingency is?

24  A    He had the money to close the deal, he didn't -- he

25  didn't need to go and get a loan from anybody else to make

1   the deal come to conclusion.

2   Q   And why would a financing contingency be problematic, if

3   it was, for Heller in determining a good purchaser for the

4   assets of Docusystems?

5   A   It adds a level of uncertainty as far as the transaction

6   actually happening that --

7   Q   Does that mean that maybe you don't -- maybe the buyer

8   has a contingency that he has to get a loan to be able to pay

9   for the assets and, for whatever reason, the loan doesn't

10  come through --

11  A   Yes.

12  Q   -- is that the problem?

13  A   Yes.  And then you're 45 or 60 days further down the

14  road, incurring losses at the company's operation, and you

15  are basically back at square one.

16  Q   Okay.  Now, in considering an offer for the purchase of

17  assets of Docusystems, would the potential for financing

18  contingencies or due diligence contingencies be a factor in

19  your consideration of whether a buyer was attractive or not?

20  A   Certainly.

21  Q   And would you consider a buyer who had no financing

22  contingencies and no due diligence time frame requirements to

23  be more attractive than one that did have those

24  contingencies?

25  A   All other things being equal, yes.

1   Q   All right.  Now, let me get you to the all-other-things-

2   being-equal part.  Would that -- would the all other things

3   being equal include the purchase price or the amount of money

4   that you were going to get for the assets?

5   A   Not necessarily.  There is -- you make an evaluation, if

6   the, let's call it the more certain transaction has a lower

7   dollar amount versus the transaction with contingencies at a

8   higher amount, you make the economic decision as far as

9   what's best for the institutions that you represent as far as

10   trying to maximize the recoveries on the loan and doing so

11   without incurring additional losses in a transaction.  The

12   institutions within the bank group made the decision that Mr.

13   Goade's offer provided an acceptable level of recovery with

14   the higher certainty of closure.  In other words, the

15   additional dollar amounts that may have been on the table for

16   the company, for SSI at that time, in light of the

17   contingencies or the requirements of that deal getting done,

18   were viewed to be too risky in light of the continued

19   operating losses that were being suffered at the business.

20   Q   Okay.  Would it be fair to summarize what you just said

21   with the old saying of a bird in the hand is better than two

22   in the bush?

23            MR. PERLMAN:  Objection.

24            MR. ZAKEN:  I'll withdraw it.

25   BY MR. ZAKEN:

1    Q    Now, what was Heller's goal in this -- in selling the

2    assets, what --

3            MR. PERLMAN:  I'm sorry, Counsel, can you repeat

4    that?  I didn't hear you.

5            MR. ZAKEN:  Yes.

6    BY MR. ZAKEN:

7    Q    What was Heller's goal, what was Heller looking to

8    accomplish in the sale of the assets of Docusystems,

9    including the sale of SSI?

10   A    We were simply trying to maximize the recovery of our

11   loss.

12   Q    And in connection with the transaction between

13   Docusystems -- withdrawn.

14           Now, who actually sold the assets to Ron Goade, what

15   party?

16   A    A point of clarification, are you distinguishing between

17   the personal assets -- the personal property and the real

18   property?

19   Q    Yes, well, that's a good point.  Let me do that a little

20   bit more carefully.

21           Let me show you -- or why don't you take a look at a

22   document that is marked as Defendants' Exhibit 21?

23   A    I have it.

24   Q    Can you tell me what that is?

25   A    This is the foreclosure agreement that was entered into

1   Q    All right, that's fair.  I didn't mean to suggest that

2   Heller had insisted that Dresner in particular be hired, but

3   Dresner was hired by Docusystems to satisfy a condition that

4   Heller had set that Docusystems retain some financial advisor

5   to sell assets --

6   A    Yes.

7   Q    -- right?

8        And was there any reason that Heller chose to sell

9   the assets of Stickstrip to Mr. Goade through this

10  foreclosure agreement other than that it was in Heller's best

11  interest to do so?

12  A    None that I can recall.

13  Q    What I'm really getting at is whether there was any...

14  purpose to feather Mr. Goade's nest in some way or to benefit

15  Mr. Goade to the detriment of maybe other purchasers who

16  would have been, you know, a higher bid or more attractive

17  just because of some favoritism to Ron Goade, was anything

18  like that going on in this transaction?

19  A    Absolutely not.

20  Q    Did Heller Financial have any loyalties to Ron Goade?

21  A    No.

22  Q    Did Heller Financial have any particular interest in

23  seeing that Ron Goade was benefitted by this transaction to

24  Heller's detriment?

25  A    No.