# Exhibit E

```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                             - - -

VANGUARD IDENTIFICATION      :  CIVIL ACTION NO. 02-2943
SYSTEMS, INC.                :
                             :
             v.              :  Philadelphia, Pennsylvania
                             :  September 23, 2004
RONNIE E. GOADE, SR.,        :  Witness:  Ron Goade
Individually and as Trustee  :
for the Ronnie E. Goade, Sr. :
Revocable Trust, et al       :
. . . . . . . . . . . . . . .

                    EXCERPT OF JURY TRIAL
            BEFORE THE HONORABLE JOHN P. FULLAM
             UNITED STATES DISTRICT COURT JUDGE

                             - - -

APPEARANCES:

For the Plaintiffs:    GEORGE BOCHETTO, ESQUIRE
                       Bocchetto & Lentz, PC
                       1524 Locust Street
                       Philadelphia, PA  19102

For the Defendants:    MARC L. ZAKEN, ESQUIRE
                       Edwards & Angell, LLP
                       Three Stanford Plaza, Suite 1310
                       Stanford, CT  06901

                             - - -

Audio Operator:        John Stasny

Transcribed by:        Grace Williams, CET
                       Paula Curran, CET

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by AAERT-certified
transcribers.)
```



**Laws Transcription Service**
48 W. La Crosse Avenue
Lansdowne, PA 19050
(610) 623-4178

## CERTIFICATION

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_Geraldine C. Laws_   10/20/04
Geraldine C. Laws, CET                                    Date
Laws Transcription Service

1  Q   He was your direct report before that?
2  A   Yes.
3  Q   And why didn't you stay in the same position?
4  A   It wasn't offered to me.
5  Q   By whom?
6  A   By DocuSystems.
7  Q   Oh, they didn't offer you the position to continue
8  running in the company?
9  A   No.
10 Q   Did you get an employment agreement?
11 A   I did.
12 Q   Let me show you Defendant's Exhibit 47.  And what were
13 you offered by DocuSystems?
14 A   As far as salary?
15 Q   Just generally, what was the deal?
16 A   Well, the deal was is that I would stay involved in my
17 capacity as -- in certain types of sales, but primarily
18 marketing and R&D.
19 Q   Okay.  And after you went to work for DocuSystems in R&D,
20 did the company make some changes in the way Stick Strip was
21 operating -- Stick Strip was being operated?
22 A   It did.
23 Q   What were the changes that were being made?
24 A   Oh, they were significant.  First of all, they asked that
25 I not come back into the plant for two or three weeks, I'm

Goade - Direct                                                                 35

1  not sure whether it was two weeks or three weeks.  And they
2  said, you know, let's give everybody a chance to realize that
3  you're not going to be here and that we're going to make
4  change over.  And then when you come back, you know, it's
5  we'll have everything and the spirit of the company will be
6  for the new company.  And Tom Breen was there during that
7  time and I was -- I didn't feel like I was forbidden to go
8  there, but they asked me not to go there and I didn't.
9  Q    And what was the change over?
10 A    Oh, it was dramatic.  When I got in, I found out that
11 they had -- we had a customer service group that was
12 fantastic.  They had eliminated most of them.  We had one
13 customer service person for every salesperson, so you had
14 good service to our customers.  And they were an important
15 part of the way that the company was actually being operated.
16 We also had a company that was responsible for making sure
17 that the quality was good.  That was our quality assurance,
18 our Q&A, as we call it.  And they were all gone.  And they
19 not had let them go, now they had changed the entire process.
20 We were the first company to use a product called Taslan
21 (ph).  We had worked with a company developing that.  It was
22 a synthetic material.  And it was difficult to use and it was
23 very expensive.  But it made a great product.  And they had
24 decided in my absence and probably prior to my selling the
25 company, to substitute a material called T-1 or T-2, excuse

1  me. And T-2 was a material that they bought out of Korea and
2  it was a terrible material, but it was cheap. So, they the
3  change over to that material and that was significant.
4  Q   What happened as a consequence of these changes?
5  A   Well, almost immediately we started having serious
6  problems with the morale of the people. But more
7  importantly, we started having serious issues with the
8  quality of the products that was going out. They were going
9  out late because the ink, you know, obviously, we had to
10 print the cards, the ink wouldn't dry. There was problems
11 with the lamination adhering to it, if we ever got it to dry
12 and it wouldn't. So, I mean, that cards would come apart.
13 And it wouldn't, we had to put the variable data on there,
14 laser printing with that and it did what we call ghostings,
15 so that the numbers, instead of being a real sharp bar code
16 or a number, they were ghosted, which made them in some cases
17 illegible.
18 Q   Did you complain to anyone?
19 A   Oh, yeah, I did.
20 Q   Who did you complain to?
21 A   I complained to Tom Breen, who told me that they were all
22 over it. They realized they were having some problems. I
23 complained to Jeff Bainter (ph). I complained to everybody
24 that listened to me.
25 Q   This is Defendant's Exhibit 65, is this one of your

Goade - Direct                                                      37

1  complaints to Mr. Breen?
2  A    It is, yes, it certainly is.
3  Q    After January of 1989?
4  A    Yes.
5  Q    And what happened with respect to your complaints, did
6  anybody take any action?
7  A    They did not.
8  Q    And did the problems continue?
9  A    Yes, they did.
10 Q    Did you have other opportunities to complain to
11 DocuSystems management?
12 A    Every board meeting, that was my entire focus, was trying
13 to make them aware that this company that had been built on
14 quality and a great product, was now being produced with a
15 real inferior material.  The profits were there for a short
16 time because they were selling at the prices that we had sold
17 at a higher price.  And then, all of a sudden, you know, it's
18 like you order a new Cadillac and you get this old, beat-up
19 car that's got a shell that looks like a new car on it.  It
20 wasn't the case.  From appearances sake, it looked like it
21 was still a good product and they believed in the name of SSI
22 on that.
23 Q    Let me show you Defendant's Exhibits 64 and 68.  Are
24 these some more e-mails that you sent to DocuSystems
25 management in the summer of 1999?

1  A   I was forwarding things almost daily like this, yes.
2  Q   All right, now you mentioned something about being at
3  board meetings, let's talk about that for a minute.
4  A   Certainly.
5  Q   What is the board of directors of DocuSystems?  Not
6  talked about, but what is it?
7  A   Well, that's the key people at each one of the -- each
8  one of the companies that's within the family.  So, we all
9  met in Chicago.  The only ones that I was ever invited to was
10 always in Chicago at the same place, at DocuSystems corporate
11 offices there.  And we would come into this meeting and there
12 would be probably 10 to 12 people there.
13 Q   And were you entitled to be a member of that board as a
14 part of your deal to sell your company to DocuSystems?
15 A   Yes, I was.
16 Q   And for what period of time were you attending board
17 meetings?
18 A   Up until the time that they fired me, which was in
19 October of '99.
20 Q   All right.  And when you were fired in October of 1999,
21 did you attend any board meetings after that?
22 A   I did not.
23 Q   And how is it that you were fired in October of 1999,
24 what happened?
25 A   Well, I think that they felt like I was not someone that

1  was really -- I was causing problems, I'll be honest about
2  it.  I was constantly complaining about how this fine company
3  had been taken and just ran down to a point where I didn't
4  see how it could possibly recover.  And interesting enough,
5  every time I'd go to the board meetings, Jeff Bainter would
6  also come.  He wasn't a board member.  He was the only person
7  that was ever there that was not a member of the board.  And
8  I would complain about these things and then Mr. Bainter
9  would stand up and tell everybody how, well, yeah, we had
10 these problems, but I think we've got them fixed now and
11 we're going forward and so on.  So, everything that I said
12 was pretty well just ignored.
13 Q  All right.  And in October of 1999, did you send a
14 communication to Mr. Formola (ph) of Code Hennesey regarding
15 your feelings about the way the company was being run?  I'm
16 going to show you this one, it's Defendant's Exhibit 72.
17 A  Yes, this was written in October 27, 1999.
18 Q  Now, first of all, let's just quickly go through the
19 cover sheet.  It's to Gary Pearson, who was he?
20 A  He was an attorney for McAfee and Taft.
21 Q  All right, so you were sending this to him on November
22 1st and it says, enclosed is the letter I sent to Formola and
23 the analysis that was given him on Wednesday, October 27th?
24 A  Yes.
25 Q  And the next page is an analysis?

Goade - Direct                                                44

1   MR. ZAKEN: I'm a little tired. Let me ask it
2   differently.
3   Q   When were you fired, do you remember the day?
4   A   In October, late October of --
5         THE COURT: Any particular year?
6         THE WITNESS: 1999, your Honor.
7   Q   And who fired you?
8   A   Tom Formola. He called me on my cellphone.
9   Q   All right. And you were where?
10  A   I was in Scottsdale.
11  Q   Is that where you live?
12  A   Yes.
13  Q   Scottsdale?
14  A   Arizona.
15  Q   Okay. So, as of the time that you were fired in October
16  of 1999, through to the time that you purchased the assets of
17  what used to be Stick Strip Laminating Company, did you have
18  any dealings with DocuSystems or Stick Strip?
19  A   No.
20  Q   Now, in May of 2000, did your lawyer file a lawsuit
21  against DocuSystems?
22  A   He did.
23  Q   Oh, before I get to that, let me ask you about this.
24  Were you aware that DocuSystems officially adopted a
25  resolution dismissing you from the board of directors in

Goade - Direct       45

1  February of 2000?  This is Defendant's Exhibit 14.
2  A    Well, I certainly knew it and I think I received this,
3  yes.
4  Q    You received it in the mail?
5  A    Yes.
6           THE COURT:  But you had previously been fired by Mr.
7  Formola?
8           THE WITNESS:  Yes, that's correct.
9  Q    All right, but I think, just clear up on this, between
10 October and February, had you attended any board meetings?
11 A    I had not.
12 Q    All right.  So, you got this thing in the mail in
13 February of 2000?
14 A    Yes.
15 Q    Now, in May of 2000, I just handed you -- I'm going to
16 hand you a copy of your lawsuit.
17           THE COURT:  I bet that might have an exhibit number.
18           MR. ZAKEN:  It's Defendant's Exhibit 16.
19           THE COURT:  Thank you.
20           THE WITNESS:  I think it's -- is it 27?  There's two
21 numbers here, I don't know.
22           MR. ZAKEN:  Yes.  I don't know which exhibit -- it's
23 Defendant's Exhibit 27, you're right, thank you.
24           THE COURT:  Well, 16, 27, it's one of those numbers.
25           MR. ZAKEN:  It's got Exhibit 16 at the top, but I

Goade - Direct                                46

1   think that came from Wilder's deposition. And it's got an
2   Exhibit 16 sticker on it, but it also says 27, which I think
3   is the right one.
4   Q   All right. And this, without going through it in any
5   great detail, this is your lawsuit, a copy of your lawsuit
6   filed on your behalf by your attorney?
7   A   It is, yes.
8   Q   With respect to your being fired from DocuSystems?
9   A   Yes.
10  Q   Now, this suit was pending at the time that you were
11  contacted to purchase the assets of Stick Strip?
12  A   That's correct.
13  Q   And when -- how were you contacted? Take us through
14  that, how were you contacted to purchase the assets of Stick
15  Strip?
16  A   Well, I had received numerous calls from people at SSI,
17  just needed a shoulder to cry on because there were so many
18  problems and so many people were gone. And just all of these
19  major problems were going on. And so, I knew that the
20  company was in disarray. And I knew that it had worsened
21  since I left, although, had I stayed there, I doubt that it
22  would have made any difference. And so, I received a call
23  one day from a gentleman and I don't know whether it was Joe
24  Casargas (ph) or I don't know who it was. I just know and
25  they said, we are, you know, trying to sell the assets of

1  Stick Strip Laminating Company and would you be interested in
2  buying it back. And I just -- I was stunned to hear that and
3  I said no. I appreciate your call, but I have no interest.
4  Q   Did he give you a number?
5  A   I don't believe I took it, if he did.
6  Q   No, no --
7  A   Oh, excuse me, a number for sale?
8  Q   -- did he give you a purchase price. I'm not talking
9  about a telephone number.
10 A   You know, I think -- I think it was four or five million
11 dollars.
12 Q   All right.
13 A   It was a lot.
14 Q   And what did you say?
15 A   I didn't have any interest.
16 Q   Okay. And did you receive any additional calls?
17 A   Quite a few.
18 Q   From?
19 A   From the same company that was trying to sell Stick
20 Strip.
21 Q   Is that this Dresner (ph) that we've heard about, Dresner
22 Investments?
23 A   I think so, yes, mm-hmm.
24 Q   All right. And you said that initially you said no to
25 offers about four or five million. But it happens that you

1  did buy back the assets?
2  A  I did, yes.
3  Q  And we know you bought it back for two million, so how
4  did that happen?
5  A  Well, there came a time when it started to be a concern
6  to us about a lot of different things. First of all, you
7  know, I can say that the employees were very important to me
8  and to my family. But frankly, we thought here's a -- we had
9  a chance to build the company back up to the company that it
10 used to be. And frankly, this was a company that made a lot
11 of money. It was very profitable. And ran correctly, it
12 didn't need a whole lot as far as changes. It just needed
13 someone to come back in and have the cash to bring it back up
14 to its prior condition.
15 Q  And so, you made a bid for two million dollars?
16 A  Eventually, I did, yes.
17 Q  Were you told that the doors of the company were going to
18 close?
19 A  That's correct.
20 Q  Were you told what was going to happen to the employees?
21 A  They would be gone, that is that -- they said that -- and
22 the exact words I can't remember, but it was very concerning
23 to me because it said, you know, we have no place to go.
24 This is a company that you are very familiar with.
25 Obviously, it has a lot of serious problems, but as of

Goade - Direct                                                53

1  Now, that's your current company?
2  A   It is.
3  Q   And when you bought the assets of Stick Strip, did you
4  have to do anything to get your company, SSI Technologies, up
5  and running to produce products?
6  A   Yes, it was -- the plant was in serious disarray.  The
7  plant, the small plant was virtually just a shell.  It was,
8  frankly, it was in an area not the better part of Oklahoma
9  City and it was virtually just in terrible shape.  And they
10 were just stacking all of these rejected jobs, they were
11 stacking them in there for some reason.  I don't know why.
12 Millions and millions of cards, of no value.  And then they
13 were stacking them inside this building.  The quality of the
14 printing equipment and the quality of the equipment for
15 manufacturing the cards, everything we had there had
16 virtually been stripped from one to another to try to get one
17 good working piece of equipment, because they didn't have the
18 money to maintain it.  So --
19         THE COURT:  Was there any time, at all, between the
20 time when you purchased the assets so that they could meet
21 the payroll on a Friday, did people continue to work the
22 following week or was there a time interval when nobody was
23 working, the plant was closed?
24         THE WITNESS:  No, they continued to work, your
25 Honor.

Goade - Direct                                                              54

1      THE COURT: Thank you. I'm sorry, but we're going
2 to have to recess at this point. I have another problem that
3 I have to leave early.
4      MR. ZAKEN: For the day, your Honor?
5      THE COURT: Yes.
6      MR. ZAKEN: Very well.
7      THE COURT: So, recess until tomorrow morning at
8 10:00 o'clock. We'll see you then. I hope we finish up
9 tomorrow.
10     (Court adjourned 3:53 o'clock p.m.)
11                              - - -