# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

|  |  |  |
|---|---|---|
| VANGUARD IDENTIFICATION SYSTEMS, INC. | : | CIVIL ACTION NO. 02-2943 |
|  | : |  |
| v. | : | Philadelphia, Pennsylvania |
|  | : | September 24, 2004 |
| RONNIE E. GOADE, SR., | : | 10:04 o'clock a.m. |
| Individually and as Trustee | : |  |
| for the Ronnie E. Goade, Sr. | : |  |
| Revocable Trust, et al | : |  |

. . . . . . . . . . . . . . . .

JURY TRIAL
BEFORE THE HONORABLE JOHN P. FULLAM
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:    GEORGE BOCHETTO, ESQUIRE
                       Bochetto & Lentz, PC
                       1524 Locust Street
                       Philadelphia, PA 19102

For the Defendants:    MARC L. ZAKEN, ESQUIRE
                       Edwards & Angell, LLP
                       Three Stanford Plaza, Suite 1310
                       Stanford, CT 06901

- - -

Audio Operator:        John Stasny

Transcribed by:        Paula Curran, CET
                       Tracey Williams, CET
                       Grace Williams, CET

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by AAERT-certified
transcribers.)



**Laws Transcription Service**
48 W. La Crosse Avenue
Lansdowne, PA 19050
(610) 623-4178

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_Geraldine C. Laws_                    _10/20/04_

Geraldine C. Laws, CET                         Date
Laws Transcription Service

1          (The following occurred in open court at 10:04

2     o'clock a.m.)

3          THE CLERK:  All rise.

4          THE COURT:  Good morning.

5          ALL:  Good morning.

6          THE COURT:  Be seated.  Proceed.

7          RONALD GOADE, Defendants' Witness, Previously Sworn.

8                    DIRECT EXAMINATION

9     BY MR. ZAKEN:

10    Q   Mr. Goade, I'd just like to put you in the time period

11    when you were working for DocuSystems.  In that time period,

12    did Docusystems manufacture any products under the SSI label

13    out of the plant that DocuSystems had in Nashville?

14    A   Yes, they did.

15    Q   Okay, could you explain to the jury what DocuSystems had

16    done with respect to manufacturing SSI product in the

17    Nashville plant?

18    A   They had rotary presses there, which means that they were

19    able to run them faster and better, unfortunately.  As I may

20    have explained earlier, running rotary presses doesn't truly

21    give you the same quality that you would get from the

22    Heilendberg (ph) press that we used.

23          THE COURT:  Please get close to the microphone.

24          THE WITNESS:  I'm sorry, your Honor.  I tried to

25    test this.  So, the Heilendberg press that we used was a

1  sheet bed operation and it gave us about a good a quality as

2  you could expect.  And that was one substantial difference.

3  Q    All right.  And in the Nashville plant, were products for

4  customers of SSI or Stick Strip being made out of the

5  Nashville plant?

6  A    Substantial amount, yes.

7  Q    Okay.  And what customers was DocuSystems selling product

8  to under the SSI label, out of the Nashville plant?

9  A    They were selling all types of cards, primarily phone

10 cards.  A lot of those.  What would be considered, I think,

11 low-end type plastic cards, transaction cards of some type. A

12 lot of cards for Las Vegas casinos, things of that nature.

13 Q    Okay.  And do you have a sense of the volume of business

14 that was being conducted by DocuSystems through -- on behalf

15 of the Stick Strip Laminating Company out of the Nashville

16 plant?

17 A    It was a substantial amount.  I can tell you that it was,

18 I don't know, eight to ten million dollars perhaps.

19 Q    All right.

20 A    It was a lot.

21 Q    Now, had these products, when you owned Stick Strip

22 Laminating Company, before you sold the company to

23 DocuSystems, were you making these products out of the plant

24 in Oklahoma?

25 A    Yes, we were.

Goade - Direct                                4

1   Q   And were you selling to these customers out of the plant

2   in Oklahoma?

3   A   Well, we were selling to similar customers.  I mean, the

4   customer base is not someone who just buys from you one time

5   and stays with you forever.  So, one customer may buy cards

6   in a certain year and they may not buy again for three or

7   four years.

8   Q   Okay, so did DocuSystems move the production of the cards

9   that you had made at Stick Strip, these types of cards that

10  you're describing, had DocuSystems moved the production of

11  those cards to it's plant in Nashville?

12  A   The larger volumes, yes.

13  Q   Meaning the --

14  A   The large orders.

15  Q   Okay.

16  A   The substantial orders were all moved to DocuSystems in

17  their plant in Nashville.

18  Q   And was DocuSystems using equipment and I think you

19  answered this already, but DocuSystems was using equipment

20  different in Nashville than you used in Oklahoma?

21  A   Yes.

22          THE COURT:  While you're on that subject, did you

23  have anything to do with supervising the work that was going

24  on in Nashville or did you stay only in Oklahoma.

25          THE WITNESS:  I attempted to, they actually invited

Goade - Direct                                    5

1   me there one time, your Honor and asked if I would be able to

2   give some assistance in some problems they were having with a

3   specific job.

4              THE COURT:  Did you go there much?

5              THE WITNESS:  I went there maybe twice during that

6   period of time, that's all.

7   Q   All right.  And the Nashville plant, I think you said

8   yesterday was where the DocuSystems had decided to use the T2

9   product?

10  A   Well, they were using T2 in both facilities.  In the

11  Oklahoma facility, as well as in Nashville.

12  Q   All right.  And the T2, again, was?

13  A   It was an inexpensive substrate that was produced in

14  Korea, that they intended to use to replace Taslan.

15  Q   Now, had you used T2 when you owned Stick Strip

16  Laminating Company?

17  A   No.  Never heard of it.

18  Q   When you purchased -- withdrawn -- at the time you left

19  DocuSystems, what sub-strait was DocuSystems using on its

20  cards produced in the plant in Oklahoma?

21  A   Well, they are still attempting to use T2.  When they got

22  into problems, they would switch back over to Taslan.  So, it

23  was really a mixture at that time.  They were having complete

24  failure with the T2 materials.

25  Q   And I think you may have covered this already, but

Goade - Direct                                        6

1    briefly, with respect to your involvement in the manufacture

2    of product in Oklahoma, after you sold the company to

3    DocuSystems, what involvement did you have with that?

4    A    I had none.  In the actual manufacturing product after I

5    sold the company?

6    Q    Right.

7    A    No, I was not involved.

8    Q    Were you involved in that before you sold the company?

9    A    Yes, on a day to day basis almost.

10   Q    Okay.  So, what I'd like to do now is turn your attention

11   to the time period when you bought the assets of Stick Strip

12   Laminating Company in July of 2000.  Now, at that time, did

13   you buy any of the assets that were at the Nashville plant in

14   Tennessee that had been used as you just described to

15   manufacture SSI product in Nashville?

16   A    Yes, I did.  Some of the assets that had actually

17   belonged to SSI when I had bought the company, had been

18   transferred to Nashville.  And it was there in their facility

19   when I bought the company.

20   Q    Okay, was there equipment in Nashville that was used to

21   product Stick Strip product out of the Nashville plant that

22   you did not buy when you bought the assets of Stick Strip?

23   A    I'm sorry, I don't understand the question.

24   Q    I'll try it again.

25   A    Excuse me.

1          THE COURT:  Was there any equipment in Nashville

2     that was used to manufacture your product that you did not

3     buy when you bought the assets?

4     Q     These rotary presses --

5     A     I did not buy those.

6     Q     Well, that's what I'm asking.

7     A     Yeah, I'm sorry.

8     Q     Okay.  So, you -- just to be clear on this -- you

9     mentioned that in the Nashville plant, DocuSystems was using

10    rotary presses to manufacture these large volume card orders

11    that were being sold under the Stick Strip label, right?

12    A     That's correct.

13    Q     All right.  Did you buy any of those rotary presses?

14    A     I did not.

15    Q     Okay.  So, when you bought the assets of Stick Strip

16    Laminating Company, there were some things you said that were

17    in -- that had been in Oklahoma, that got transferred to

18    Nashville, that got transferred back to Oklahoma when you

19    bought the assets?

20    A     They didn't get transferred back.  They were sent to

21    Nashville and then when we tried to recover them, they were

22    not there.

23    Q     Okay, so you're going to have to explain that because you

24    lost me.

25    A     I'm sorry.  Well, when we bought the assets back, I had a

Goade - Direct                                    8

1    substantial amount of -- when I sold the company, we had a

2    substantial amount of equipment that was used for

3    manufacturing.  During the period of time that DocuSystems

4    owned Stick Strip, they transferred some manufacturing

5    material to Nashville.  When I bought the assets of the

6    company and came back in, I tried to recover that, but it was

7    not available.

8    Q    Okay.

9    A    So, there was things missing there that I had owned

10   previously.

11   Q    Okay.  And what were the things that were missing?

12   A    There was magnetic striping coding equipment and there

13   was punch press equipment.  There was a lot of R&D things.

14   Just general things used for the manufacturing business.

15   Q    And R&D means?

16   A    Research and Development.

17   Q    All right.  Now, when you bought the assets of Stick

18   Strip and you came back to the plant in Oklahoma, on your

19   first day or days there, were there things there that you

20   expected to be there, that you had purchased, that weren't?

21   A    Yes.

22   Q    What?

23   A    Well, there was a substantial amount of computers and

24   software missing that had been there just days before,

25   according to all of the employees.  And that was all missing.

1   didn't really spell out the individual pieces and what they

2   did.  So, we were forced to go back in and rewrite some of

3   the software.

4   Q   Okay, so now, with respect to you mentioned there was

5   product that was being sold under the Stick Strip label out

6   of the Nashville plant?

7   A   Yes.

8   Q   With respect to the customers who had made orders for

9   those products, at the time that you bought the assets of

10  Stick Strip, what happened to those orders?

11  A   Well, I thought that they would stay with Stick Strip or

12  I thought they would stay with the new company.  But they

13  were not.  When they sold the DocuSystems plant, they sold it

14  to a company called Magnetic Tape and Label in Dallas.  And

15  he took all that business.

16  Q   Okay, just want to be clear on what the business is

17  you're talking about.

18  A   The business, he felt like any product that was produced

19  in Nashville, that he was entitled to retain that customer.

20  Q   Okay, so are you saying then that the customers that were

21  buying Stick Strip product out of Nashville, went with this

22  Texas company?

23  A   That's what I'm saying, yes.

24  Q   You thought they should go with you?

25  A   Yes, I did.

1   Q   And who did you have that discussion with?

2   A   I called Hugh Wilder and made this complaint.  I said,

3   you know, there's a lot of business that I thought we would

4   retain because we had owned that business previously.  And he

5   said, well, Magnetic Tape and Label has purchased

6   DocuSystems.  It was being ran there.  There was nothing I

7   could do, so I really didn't have any place to go to argue

8   the point.

9   Q   And is that the eight to ten million dollars worth of

10  business that you were talking about?

11  A   That was a substantial amount.  I can't tell you what the

12  amount was, but it was substantial.

13  Q   And Hugh Wilder, again, was who?

14  A   He was the, at that time, a vice president, executive

15  vice president -- if I'm correct -- with Heller.

16  Q   And Heller was the one, the bank that was selling you

17  back the assets?

18  A   That's correct.

19  Q   Hugh Wilder is the guy whose videotape we watched

20  yesterday?

21  A   That is correct.

22  Q   All right.  So, when you came back into the plant, I

23  think you started to describe it, at the close yesterday, you

24  started to describe the disrepair of the plant.  Can you tell

25  us about that again?

1    A    Well, they had not had the money or the desire, I don't

2    know which one.  So, to repair some of the equipment, they

3    would take identical pieces of equipment and they would rob

4    parts off of one and put it in the other.  So, in a sense,

5    they were taking two pieces of equipment and trying to make

6    on that was operational out of it.  Hardly any of the

7    equipment had been maintained.  And this type of equipment is

8    -- it's pretty scientific in some ways, such as magnetic

9    striping and coding, so if you don't keep it tuned perfectly,

10   it can go sideways, if you will, in a hurry.  Same thing on

11   applying labels and things of that nature.  The things that

12   we were doing a lot of at that time.  The equipment was in

13   disarray.  Had not been repaired.  Had not been maintained

14   and it was causing a lot of problems.

15   Q    So, now you mentioned about the computers and the

16   disrepair and these other problems, the work that had been

17   done out of Nashville that didn't go with your acquisition.

18   What did you do?  What steps did you take to get your new

19   company, SSI Technologies up and running?

20   A    Well, the first thing we did, obviously, is come in and

21   we looked at everything and tried to make an analysis of what

22   we saw and what is it going to take to get us back in

23   business.  Because it was obvious, at that point, it would

24   have been very difficult for us to build a quality product

25   based on what we had actually purchased in the asset

1   purchase.

2   Q    So, we started spending a lot of money in buying new

3   equipment and developing new types of equipment to get back

4   in there to be able to produce the same type of materials.

5   Q    Okay.  And what did you do, did you buy an T2 in this

6   acquisition?

7   A    No, no.

8   Q    So, what did you use for material when you started?

9   A    Well, we used Taslan.  We had a problem in getting the

10  Taslan, obviously, but there was some Taslan there.  But we

11  used what we had.

12  Q    All right.  Now, with respect to -- and what was the

13  volume of the business, the orders that you were able to

14  produce in the early days of your starting SSI Technologies?

15  A    Well, we actually started out, there was some ongoing

16  business that was in there and we actually started out fairly

17  well.  We were trying to produce the business, but the

18  numbers were dropping off in a hurry, of course, and frankly,

19  our competitors were really -- they were really -- I don't

20  know if you'd say slandering or not, but they were coming

21  after us pretty hard.  Telling them that we were a bankrupt

22  company and so on and so forth.  And they had had so many

23  problems in the past, so it was difficult to maintain the

24  business.  Plus, we didn't have any sales people left.

25  Q    And so you had to hire sales people?

Goade - Direct                                      8

1    substantial amount of -- when I sold the company, we had a

2    substantial amount of equipment that was used for

3    manufacturing.  During the period of time that DocuSystems

4    owned Stick Strip, they transferred some manufacturing

5    material to Nashville.  When I bought the assets of the

6    company and came back in, I tried to recover that, but it was

7    not available.

8    Q    Okay.

9    A    So, there was things missing there that I had owned

10   previously.

11   Q    Okay.  And what were the things that were missing?

12   A    There was magnetic striping coding equipment and there

13   was punch press equipment.  There was a lot of R&D things.

14   Just general things used for the manufacturing business.

15   Q    And R&D means?

16   A    Research and Development.

17   Q    All right.  Now, when you bought the assets of Stick

18   Strip and you came back to the plant in Oklahoma, on your

19   first day or days there, were there things there that you

20   expected to be there, that you had purchased, that weren't?

21   A    Yes.

22   Q    What?

23   A    Well, there was a substantial amount of computers and

24   software missing that had been there just days before,

25   according to all of the employees.  And that was all missing.

Goade - Direct                                    9

1  A lot of computers.  Maybe as many as 30.  A substantial

2  amount of software that had been taken.  There was also

3  equipment that was gone.  There was a lot of things during

4  this transaction period that ended up missing.

5  Q    Okay.  And did you have to replace those things?

6  A    Yes, we did.

7  Q    Did you replace them?

8  A    Yes, we did.

9  Q    What types of things did you buy?]

10 A    Well, we bought new computers and we bought the things

11 that we needed on a day to day basis of actually operating

12 the company.

13          THE COURT:  When you bought the assets back, was

14 there a list of exactly what assets you were buying or was it

15 just --

16          THE WITNESS:  No, there was a list, your Honor.

17          THE COURT:  You got everything that was on the list?

18          THE WITNESS:  I did not.

19          THE COURT:  You did not?

20          THE WITNESS:  No, sir.

21          THE COURT:  Thank you.

22 Q    What was on the list that you didn't get?

23 A    We didn't get a large Prico (ph) press that was valued at

24 over $100,000.  We didn't get the computers that I spoke to

25 before.  And the software was just listed as software, but it

Goade - Direct                                    10

1    didn't really spell out the individual pieces and what they

2    did.  So, we were forced to go back in and rewrite some of

3    the software.

4    Q    Okay, so now, with respect to you mentioned there was

5    product that was being sold under the Stick Strip label out

6    of the Nashville plant?

7    A    Yes.

8    Q    With respect to the customers who had made orders for

9    those products, at the time that you bought the assets of

10   Stick Strip, what happened to those orders?

11   A    Well, I thought that they would stay with Stick Strip or

12   I thought they would stay with the new company.  But they

13   were not.  When they sold the DocuSystems plant, they sold it

14   to a company called Magnetic Tape and Label in Dallas.  And

15   he took all that business.

16   Q    Okay, just want to be clear on what the business is

17   you're talking about.

18   A    The business, he felt like any product that was produced

19   in Nashville, that he was entitled to retain that customer.

20   Q    Okay, so are you saying then that the customers that were

21   buying Stick Strip product out of Nashville, went with this

22   Texas company?

23   A    That's what I'm saying, yes.

24   Q    You thought they should go with you?

25   A    Yes, I did.

1   Q   And who did you have that discussion with?

2   A   I called Hugh Wilder and made this complaint.  I said,

3   you know, there's a lot of business that I thought we would

4   retain because we had owned that business previously.  And he

5   said, well, Magnetic Tape and Label has purchased

6   DocuSystems.  It was being ran there.  There was nothing I

7   could do, so I really didn't have any place to go to argue

8   the point.

9   Q   And is that the eight to ten million dollars worth of

10  business that you were talking about?

11  A   That was a substantial amount.  I can't tell you what the

12  amount was, but it was substantial.

13  Q   And Hugh Wilder, again, was who?

14  A   He was the, at that time, a vice president, executive

15  vice president -- if I'm correct -- with Heller.

16  Q   And Heller was the one, the bank that was selling you

17  back the assets?

18  A   That's correct.

19  Q   Hugh Wilder is the guy whose videotape we watched

20  yesterday?

21  A   That is correct.

22  Q   All right.  So, when you came back into the plant, I

23  think you started to describe it, at the close yesterday, you

24  started to describe the disrepair of the plant.  Can you tell

25  us about that again?

1    A    Well, they had not had the money or the desire, I don't

2    know which one.  So, to repair some of the equipment, they

3    would take identical pieces of equipment and they would rob

4    parts off of one and put it in the other.  So, in a sense,

5    they were taking two pieces of equipment and trying to make

6    on that was operational out of it.  Hardly any of the

7    equipment had been maintained.  And this type of equipment is

8    -- it's pretty scientific in some ways, such as magnetic

9    striping and coding, so if you don't keep it tuned perfectly,

10   it can go sideways, if you will, in a hurry.  Same thing on

11   applying labels and things of that nature.  The things that

12   we were doing a lot of at that time.  The equipment was in

13   disarray.  Had not been repaired.  Had not been maintained

14   and it was causing a lot of problems.

15   Q    So, now you mentioned about the computers and the

16   disrepair and these other problems, the work that had been

17   done out of Nashville that didn't go with your acquisition.

18   What did you do?  What steps did you take to get your new

19   company, SSI Technologies up and running?

20   A    Well, the first thing we did, obviously, is come in and

21   we looked at everything and tried to make an analysis of what

22   we saw and what is it going to take to get us back in

23   business.  Because it was obvious, at that point, it would

24   have been very difficult for us to build a quality product

25   based on what we had actually purchased in the asset

1    purchase.

2    Q    So, we started spending a lot of money in buying new

3    equipment and developing new types of equipment to get back

4    in there to be able to produce the same type of materials.

5    Q    Okay.  And what did you do, did you buy an T2 in this

6    acquisition?

7    A    No, no.

8    Q    So, what did you use for material when you started?

9    A    Well, we used Taslan.  We had a problem in getting the

10   Taslan, obviously, but there was some Taslan there.  But we

11   used what we had.

12   Q    All right.  Now, with respect to -- and what was the

13   volume of the business, the orders that you were able to

14   produce in the early days of your starting SSI Technologies?

15   A    Well, we actually started out, there was some ongoing

16   business that was in there and we actually started out fairly

17   well.  We were trying to produce the business, but the

18   numbers were dropping off in a hurry, of course, and frankly,

19   our competitors were really -- they were really -- I don't

20   know if you'd say slandering or not, but they were coming

21   after us pretty hard.  Telling them that we were a bankrupt

22   company and so on and so forth.  And they had had so many

23   problems in the past, so it was difficult to maintain the

24   business.  Plus, we didn't have any sales people left.

25   Q    And so you had to hire sales people?

1   A    Well, they had not had the money or the desire, I don't

2   know which one.  So, to repair some of the equipment, they

3   would take identical pieces of equipment and they would rob

4   parts off of one and put it in the other.  So, in a sense,

5   they were taking two pieces of equipment and trying to make

6   on that was operational out of it.  Hardly any of the

7   equipment had been maintained.  And this type of equipment is

8   -- it's pretty scientific in some ways, such as magnetic

9   striping and coding, so if you don't keep it tuned perfectly,

10  it can go sideways, if you will, in a hurry.  Same thing on

11  applying labels and things of that nature.  The things that

12  we were doing a lot of at that time.  The equipment was in

13  disarray.  Had not been repaired.  Had not been maintained

14  and it was causing a lot of problems.

15  Q   So, now you mentioned about the computers and the

16  disrepair and these other problems, the work that had been

17  done out of Nashville that didn't go with your acquisition.

18  What did you do?  What steps did you take to get your new

19  company, SSI Technologies up and running?

20  A   Well, the first thing we did, obviously, is come in and

21  we looked at everything and tried to make an analysis of what

22  we saw and what is it going to take to get us back in

23  business.  Because it was obvious, at that point, it would

24  have been very difficult for us to build a quality product

25  based on what we had actually purchased in the asset

1  purchase.

2  Q   So, we started spending a lot of money in buying new

3  equipment and developing new types of equipment to get back

4  in there to be able to produce the same type of materials.

5  Q   Okay.  And what did you do, did you buy an T2 in this

6  acquisition?

7  A   No, no.

8  Q   So, what did you use for material when you started?

9  A   Well, we used Taslan.  We had a problem in getting the

10 Taslan, obviously, but there was some Taslan there.  But we

11 used what we had.

12 Q   All right.  Now, with respect to -- and what was the

13 volume of the business, the orders that you were able to

14 produce in the early days of your starting SSI Technologies?

15 A   Well, we actually started out, there was some ongoing

16 business that was in there and we actually started out fairly

17 well.  We were trying to produce the business, but the

18 numbers were dropping off in a hurry, of course, and frankly,

19 our competitors were really -- they were really -- I don't

20 know if you'd say slandering or not, but they were coming

21 after us pretty hard.  Telling them that we were a bankrupt

22 company and so on and so forth.  And they had had so many

23 problems in the past, so it was difficult to maintain the

24 business.  Plus, we didn't have any sales people left.

25 Q   And so you had to hire sales people?

1   A    We did, yes.

2   Q    They were not among -- you didn't have sales people when

3   you bought -- you kept the employees?  Well, let's start

4   there.  Did you keep the employees who were working for Stick

5   Strip when you bought the company?

6   A    Yes, we did.

7   Q    Bought the assets?

8   A    All but one person.

9   Q    And who was that?

10  A    That was Jeff Bainter.

11  Q    He was the guy who had been running the place for

12  DocuSystems?

13  A    That's correct.

14  Q    And you let him go?

15  A    Yes.

16  Q    And then, did you have to ramp up with some new employees

17  or different employees?

18  A    Well, we had some problems with people, who has a

19  different mindset, you know, the DocuSystem, their idea of

20  quality was to ship it and if the customer doesn't like it,

21  then that will be our QC department.  So, we had to bring

22  people back in.  I know we brought in about four people,

23  ex-employees, that had experience in actually quality

24  control, which was the important thing to us at that point.

25  Q    I think you had said that one of the first things

Goade - Direct                              15

1    DocuSystems did when the bought the company from you was to

2    let go of the quality control people?

3    A    That's correct.

4    Q    All right.  Did you put a lot of money -- did you put

5    money into the business, into SSI Technologies?

6    A    Every dime I had.

7    Q    All right, let me show you a chart.

8         MR. BOCHETTO:  Your Honor, at this point, I'm going

9    to object to the submission of these things.  We did discuss

10   it briefly in pre-trial.

11        THE COURT:  Objection overruled.

12   BY MR. ZAKEN:

13   Q    This is Defendant's Exhibit 66, your Honor.  Mr. Goade,

14   taking a look at Defendant's Exhibit 66, can you tell me what

15   it is?

16   A    It's a copy of all of the -- it says equity summary --

17   what it means to me is all the money that we had borrowed on

18   our homes and borrowed on the building and so on, to keep SSI

19   running.

20        THE COURT:  You mean, it's a list of what you claim

21   you spent, is that right?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  That's not the money.  You said this was

24   what you spent.  It's a list of what you spent?

25        THE WITNESS:  Yes.

1       MR. ZAKEN:  Yes, sir, it is, I'm sorry.

2    Q    So, when it says owner's equity summary, who is the owner

3    that it's referring to?

4    A    SSI Technologies.

5    Q    No, no, who --

6    A    Oh, I'm sorry.

7    Q    -- who put the money --

8    A    Okay, oh, I did, yeah.

9    Q    -- who put the 6.7 million dollars into the business --

10   A    Yes, yes.

11   Q    -- is my question.

12   A    I did.

13   Q    All right.  And it says at the top, July 14, $2,200,000,

14   is that what you put in to buy the assets back?

15   A    That's correct.

16   Q    And then there's these two entries here.  One for almost

17   $900,000 and one for $400,000.  Is that the 1.3 million you

18   said you put in shortly after purchasing the assets?

19   A    It is, yes.

20   Q    I want to take you down to this proceeds from loan from

21   Edmund Bank secured by mortgage on Arizona property?

22   A    Right.

23   Q    Can you tell me what that is?

24   A    That's the mortgage on our home in Scottsdale.

25   Q    You'd been asked previously about that, so let me ask you

Goade - Direct                                17

1  about that.  After you sold your company, Stick Strip, to

2  DocuSystems, did you have a house built in Arizona?

3  A    I did.

4  Q    And how did you pay for that?

5  A    I paid cash from the proceeds of the eight million

6  dollars that I received.

7  Q    All right.  And that, you now have a mortgage on that

8  house?

9  A    I do.

10 Q    What did you do, you borrowed from a bank on that house?

11 A    Yes.

12 Q    And what did you do with the proceeds of the bank loan

13 that you took?

14 A    We invested it back into the company.

15 Q    And is that that entry there, that November 2 -- looks

16 like it's November 5, 2002, is that when you did that?

17        THE COURT:  November, well, this says June.

18        THE WITNESS:  No, it's June 19, 2002.

19 Q    You're right, I'm sorry.

20 A    Right.

21 Q    I'm looking a different mortgage.

22 A    Okay.  There are some there unfortunately.

23 Q    Okay, well, let's talk about that one then.

24 A    Okay.

25 Q    The one on the house in Arizona is June 19, 2002?

1   A    That's correct.

2   Q    And skipping down to November 5, 2002, there's another

3   mortgage on a different house.   What is that?

4   A    That is a home that we had owned, a lake house in

5   Oklahoma, that we had owned for a long time.   It had been in

6   our family for many years.

7   Q    And had you owned that free and clear of debt?

8   A    Yes.

9   Q    And you mortgaged that?

10  A    We did, yes.

11  Q    And what did you do with the proceeds of the mortgage?

12  A    The money went into the company.

13  Q    Do you still have these mortgages on this house in

14  Arizona and this house in Oklahoma?

15  A    We have mortgages on the house in Arizona and two homes

16  in Oklahoma.

17  Q    Do you have any houses that aren't mortgaged?

18  A    I don't have anything that's not mortgaged.

19  Q    How has the Stick Strip -- I'm sorry, withdrawn -- how

20  has the SSI Technologies business done since you bought the

21  assets and started your new company?

22  A    It's not done well.   I think we finally have turned a

23  corner just in the last few months.   But we've lot a lot of

24  money.

25  Q    Before I get to that, I'm not going to present this to

1                (Court in recess; 12:14 to 1:19 o'clock p.m.)

2             THE COURT:  Good afternoon.

3             ALL COUNSEL:  Good afternoon, your Honor.

4             THE COURT:  Be seated, please.  I want to explore

5 with counsel what issues they think remain or could possibly

6 remain to be decided by the jury.

7             With respect to the Rule 50 motion, I am not going

8 to make any final ruling at this time, my theory being that

9 the jury, having sat here all week, should be allowed to do

10 something, and I propose to submit to them the following

11 issues:  Whether Mr. Goade made a misrepre -- or caused a

12 misrepresentation to be made back at the time he was buying

13 the -- or selling the company, and whether the plaintiffs

14 reasonably relied on that representation to their detriment.

15 And I'm going to get a finding as to when that cause of

16 action arose, in other words, then they first knew or, with

17 reasonable effort, should have known that they had been

18 wronged and were likely to suffer damage as a result.

19            And I suppose we should get some kind of a finding

20 with respect to the successorship issue, although my

21 inclination is to basically say that if they accept Mr.

22 Goade's testimony as correct there is no successorship, they

23 could find successorship only by rejecting his testimony.

24            What are the views of counsel on these or any other

25 subjects?

 1          MR. BOCHETTO:  Judge, the dispute on the foreclosure

 2   is whether it was conducted in good faith.

 3          THE COURT:  Right.

 4          MR. BOCHETTO:  The foreclosure line of cases --

 5          THE COURT:  What was the -- what's the evidence of

 6   lack of good faith?

 7          MR. BOCHETTO:  The evidence of lack of good faith,

 8   Judge, was that there were existing better offers at the

 9   exact same time, that the reason Mr. Goade's offer was

10   accepted --

11          THE COURT:  How would that have helped you, if this

12   fellow who was in here this morning, Mr. Whitaker of Lucas,

13   if he had been the purchaser, how would that improve your

14   chance of recovering?

15          MR. BOCHETTO:  Well, insofar as that source is

16   concerned, I believe that Mr. Whitaker and his company may

17   then have become the successor as against whom -- again,

18   because these assets were the subject on this line of cases

19   starting with the <u>Chrysler</u> case, your Honor, these assets

20   were the subject of the patent infringement, it was these

21   assets, these operations which caused the patent

22   infringement.  And the <u>Chrysler</u> line of cases say that when

23   another company comes along or another individual comes along

24   and buys all of those assets, as a matter of law, it buys it

25   subject to the patent infringement ruling.

1    THE COURT:  Of course, but that does not bind them

2  to pay the judgment for royalties that were realized years

3  earlier by somebody else.

4    MR. BOCHETTO:  Well, I believe that the line of

5  cases does say that they are bound by the judgment, Judge,

6  and I would --

7    THE COURT:  The cases that I have seen that you've

8  cited so far don't say anything about damages.

9    MR. BOCHETTO:  They specifically don't have that

10  language in there, Judge, but I believe that if you look at

11  the holdings, particularly the Continental Insurance Company

12  case, if you look at the holdings --

13    THE COURT:  What does it say?

14    MR. BOCHETTO:  -- there could be no other

15  conclusion.

16    THE COURT:  Continental Insurance Company, where was

17  that decided?

18    MR. BOCHETTO:  That is a --

19    THE COURT:  Superior Court?

20    MR. BOCHETTO:  -- Pennsylvania Superior Court

21  decision, your Honor.

22    THE COURT:  All right.

23    MR. BOCHETTO:  This is --

24    THE COURT:  That wasn't a patent case, was it?

25    MR. BOCHETTO:  Well, this is a diversity action,

1    Judge, Pennsylvania law applies.

2            THE COURT:  Pennsylvania law would apply with

3    respect to the effect of a transaction that occurred in

4    Illinois?

5            MR. BOCHETTO:  Yes, sir.

6            THE COURT:  The validity of a UCC foreclosure in

7    Illinois is governed by Pennsylvania law?

8            MR. BOCHETTO:  Well, again, I don't think the

9    validity, your Honor, is what's at issue here.  What's at

10   issue is that we have a Pennsylvania citizen, Vanguard, that

11   was harmed by a company doing business in Pennsylvania, SSI.

12   That company, Vanguard, sued here in Pennsylvania, in the

13   Eastern District of Pennsylvania --

14           THE COURT:  I am aware of that.

15           MR. BOCHETTO:  -- and is entitled to the protections

16   of Pennsylvania law.

17           THE COURT:  Oh, for heaven's sake.

18           MR. BOCHETTO:  And, your Honor, given -- if you

19   marry the Continental case and the Chrysler case with those

20   judicial admissions that your Honor now has in front of you,

21   I believe it is absolutely inescapable --

22           THE COURT:  Wow.

23           MR. BOCHETTO:  -- that --

24           THE COURT:  Then you're going to win on appeal if I

25   rule otherwise.

1   against --

2          THE COURT:  You're not going to get a directed

3   verdict, so okay?

4          MR. BOCHETTO:  Well, let me just at least articulate

5   who it would be against.  It would be against Ron Goade, REG

6   Acquisition Oklahoma and the Goade Trust, based upon this

7   successor interest line of cases.

8          THE COURT:  I understand your position.

9          MR. BOCHETTO:  All right.  Secondly, your Honor,

10  with respect to your proposal that you're going to ask the

11  jury for a finding as to when they should have likely

12  known --

13         THE COURT:  Yes, obviously -- it seems to me

14  reasonably obvious that your fraud claim is barred by the

15  statute of limitations.

16         MR. BOCHETTO:  Here's why we believe that it's clear

17  that it is not, your Honor, and the reason is is that the --

18  that cause of action for fraud did not ripen or mature until

19  July of 2000, your Honor --

20         THE COURT:  Oh, that's silly.

21         MR. BOCHETTO:  -- when judgment was entered, because

22  that -- and it's then and only then, your Honor, when we

23  would have had any damages.  Up until that point, as your

24  Honor has repeatedly pointed out, there was no -- there was

25  no way of knowing if in fact 100-percent we were going to